**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | | |
|---|---|---|
| JON KEENEY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | Civil Action No. AMD 01:CV-2670 |
| JOHN G. LARKIN and MICHAEL R. AZARELA | ) ) | |
| Defendants | ) | |

\*        \*        \*        \*        \*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**<u>OPPOSITION TO MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PROCEDURAL HISTORY ..................................................................................1

BACKGROUND ...............................................................................................2

PLAINTIFF'S ALLEGATIONS .........................................................................3

    I.    Parties ...................................................................................4

    II.    Defendants' representations that RailWorks' then-existing acquisitions had been integrated were false ......................................................................4

    III.    Additional False and Misleading Press Releases and Announcements ..............10

    IV.    Issuance of Bonds ...............................................................14

    V.    Misrepresentations Related to Other RailWorks Entities ....................................15

ARGUMENTS & AUTHORITIES ....................................................................16

    I.    Rule 10b-5 .........................................................................17

    II.    Defendants' Statements are not Protected by the Safe Harbor Provision of the PSLRA ..................................................................17

    III.    Plaintiff has Sufficiently Alleged That Defendants Made Material Misstatements ................................................................21

        A.  Plaintiff has Satisfied the Rule 9(b) and PSLRA Pleading Requirements....21

        B.  The Representations and Omissions Made by Defendants Were Material...23

            1.  Integration ..............................................................23

            2.  Additional False and Misleading Representations...................30

    IV.    Plaintiff has Established Scienter...................................................32

        A.  Concrete personal benefits ..................................................33

        B.  Knowledge of and Access to Contradicting Undisclosed Information .........34

C.  Failure to Verify Information ...................................................................34

V.    Accounting Violations are Indicative of the Fraudulent Scheme
      Perpetrated by Defendants .....................................................................35

VI.   Claims Against Defendant Azarela are not Barred by the Statute of

      Limitations    ........................................................................................35

VII.  Plaintiffs' Section 20(a) Claims Need not be Dismissed ....................................36

CONCLUSION            ...............................................................................................37

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| JON KEENEY, On Behalf of Himself and All Others Similarly Situated, | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| vs. | * | Civil Action No. AMD 01:CV-2670 |
| | * | |
| JOHN G. LARKIN and MICHAEL R. AZARELA | * | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S** |
| | | **OPPOSITION TO MOTION TO** |
| Defendants | * | **DISMISS** |

   *   *   *   *   *

This memorandum of law is submitted on behalf of Plaintiff Jon Keeney and all others similarly situated ("Plaintiff") in support of his opposition to Defendants' John G. Larkin ("Larkin") and Michael R. Azarela ("Azarela") (collectively "Defendants") Motion to Dismiss Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint"). As set forth below, the Amended Complaint meets the PSLRA pleading standards and therefore the Defendants' Motion to Dismiss should be denied.

The Amended Complaint alleges with particularity that Defendants have issued material false and misleading statements during the class period that are not protected by statutory safe harbor. These allegations meet all specifity requirements imposed by both Federal Rule of Civil Procedure 9(b) and the PSLRA. Additionally, Plaintiff has sufficiently alleged scienter. Finally, due to the Court-imposed stay on this matter, the statute of limitations was tolled, and the action against Defendant Azarela is not time-barred.

## PROCEDURAL HISTORY

1

Plaintiff filed this action on behalf of himself and all others similarly situated on September 6, 2001, alleging violations of federal securities laws. The original Class Action Complaint named as Defendants RailWorks Corporation and John G. Larkin, then the Chairman and Chief Executive Officer of RailWorks. On September 20, 2001, RailWorks filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Maryland. Because of the bankruptcy, a stay of this action was ordered on October 29, 2001. The Order stayed this action as to all defendants. RailWorks was discharged from bankruptcy, and on November 22, 2002, this case was reopened, and Plaintiff was granted leave to amend the original Complaint. On January 6, 2003, Plaintiff filed the Amended Complaint which is the subject of this Motion to Dismiss. In this Amended Complaint, Plaintiff removed RailWorks as a Defendant and added Michael R. Azarela, RailWorks' former Vice President and Chief Financial Officer as a Defendant. Plaintiff was prohibited from doing this earlier because of the stay.

## BACKGROUND

RailWorks was formed when 14 companies that supply and service rail companies merged to take advantage of economies of scale. (Baltimore Sun Aug. 21, 2001). Known in financial circles as a "roll up," the company grew rapidly, acquiring dozens of similar companies and went public in 1998. Id. The strategy of a roll-up is to acquire competitors quickly, drive up revenues and boost the stock price to help finance more acquisitions. Id. "The business is somewhat unique and the concept was actually pretty good, but the execution [by RailWorks] certainly lacked in the internal controls," stated Jack Levington, Associated Director of Corporate Finance at Standard and Poors. Id. After growing to 35 companies and piling up revenue of $468 million in 1999, the Company ran into cash-flow trouble in the fall of 2000 and has been unable to recover. Id. Analysts say RailWorks grew too quickly and lost credibility on

Wall Street when it failed to meet earnings forecasts. (National Post September 22, 2001). Many observers said the company's biggest problem was its failure to effectively integrate the 35 rail service companies it acquired following an initial public offering. (The Daily Deal October 20, 2001). "The company had trouble integrating more than 30 acquisitions since its initial public offering of shares in 1998," said Levingten, an analyst with Standard and Poor's. (National Post, September 22, 2001.)

Plaintiff instituted this class action on behalf of the Class of all persons who purchased or otherwise acquired the securities of RailWorks (NASDAQ: RWKS) between February 10, 1999 and August 20, 2001 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934. During the Class Period, Defendants falsely assured the securities market that RailWorks was successfully and profitably experiencing growth through acquisitions and successful integration of same. In truth, however, RailWorks was merely a collection of more than 25 disparate operating companies that had not been successfully integrated and were not making a profit. When RailWorks finally disclosed that the Company needed to be restructured and take a $48 million charge, largely in connection with writing down overvaluation of assets and integrating its various acquisitions, the value of its common stock immediately declined by more than 50 percent. Even after this announcement, Defendants continued to issue favorable financial results and projections which Defendants knew the Company could not, and would not, meet. Furthermore, Defendants made false assurances regarding the availability of working capital even though Defendants knew the Company actually was in dire financial straits, was not paying taxes as they accrued and would likely default on various financial obligations.

## PLAINTIFF'S ALLEGATIONS

## I.    Parties

RailWorks purported to be a leading nationwide provider of integrated rail system services and products and was active in new construction, rehabilitation, repair and maintenance of track, signaling, communications, electrical and other track-related systems, and rail products manufacturing and supply.  Amended Complaint at ¶4.  Defendant Larkin at all times relevant to this action, served in the capacity of Chairman of the Board and as Chief Executive Officer from the start of the class period through June 5, 2001.  Id. at ¶11.  By reason of his management position, membership on RailWorks' Board of Directors, and his ability to make public statements in the name of RailWorks, Defendant Larkin was a control person, and had the power and influence to cause (and did cause) RailWorks to engage in the unlawful conduct complained of herein.  Id. at ¶12.  Moreover, Defendant Larkin is liable to Plaintiff and the other members of the Class for the false and misleading statements he personally made during the class period and by virtue of his having signed various false and misleading Securities and Exchange Commission ("SEC") filings during the class period.  Id. Defendant Azarela at all times relevant to this action, served on the Board of Directors of RailWorks and was the Executive Vice President and Chief Financial Officer from the start of the class period through September, 2000. Id. at ¶13.  He also served as President and Chief Operating Officer of RailWorks from September 2000 through the end of the class period. Id.  Defendant Azarela reviewed and was aware of the financial information and projections issued by RailWorks and Defendant Larkin to the public.  Id.  Plaintiff is a purchaser of RailWorks common stock during the class period.

## II.    Defendants' representations that RailWorks' then-existing acquisitions had been integrated were false.

On April 27, 1999, RailWorks issued a press release reporting its financial results for its first quarter of 1999.  Commenting upon its financial results, **Defendant Larkin stated**:

> Relative to 1998 pro forma results, **actual earnings for the first quarter of 1999 demonstrate** the continuing success of our aggressive acquisition program combined with **the ability to achieve considerable operating efficiencies**.

Id. at ¶26.  (emphasis added).

On October 19, 1999, RailWorks issued a press release reporting its financial results for its third quarter of 1999.  Id. at ¶28.  Commenting upon RailWorks third quarter financial results, **Defendant Larkin stated**:

> We are especially pleased with our third quarter operating performance.  **Our dramatic year over year revenue growth is being driven by the successful integration of our founding and acquired companies** as well as by our proactive acquisition program.

Id. at ¶28 (emphasis added).

On November 30, 1999, RailWorks announced that it had been awarded contracts for a Panama Canal project and New York City Transit Authority's Canarsie Line project with an aggregate value in excess of $100 million.  Id. at ¶29.  Commenting upon the new business, **Defendant Larkin stated**:

> With the inclusion of these two projects, our backlog now exceeds $750 million.  Our backlog has more than tripled to record levels in the 16 months since the completion of our August 1998 IPO.  **This increase reflects** the strength of our bonding program and **the marketing synergies we are realizing** as we continue to successfully integrate the operations of the 27 companies we have acquired to date.

Id. at ¶29.  (emphasis added).

On December 8, 1999, RailWorks announced that it had acquired from Harsco Corporation the switch, crossing and transit grinding business, which Harsco acquired from

Pandrol Jackson in October of 1999.  Id. at ¶30.  Commenting upon the acquisition, **Defendant**

**Larkin stated**:

> **Our plan is to continue the development of additional niche services within the framework of our <u>existing integrated organization</u> and via our strategic acquisition program.**

Id. at ¶30.  (emphasis added).

On February 10, 2000, RailWorks issued a press release reporting its financial results for

its fourth quarter of 1999.  Id. at ¶31.  Commenting upon RailWorks fourth quarter financial

results, **Defendant Larkin stated**:

> As demonstrated by our strong fourth quarter operating performance, RailWorks continues to successfully generate significant revenue growth and margin expansion, as our operating team continues to penetrate our target markets while reaping the benefits of further integrating our business units.  Our top line growth continues to be driven by solid "same company" growth of approximately 16%, year over year for the fourth quarter.  **This internal growth is supplemented by our strategic acquisition program, which continues to develop high quality acquisition opportunities.  <u>Now that we have a full year of integrated operations under our belt</u>, we look forward to continuing to build our management team, our service and product offerings and our reputation in the rail marketplace as we move forward into the 2000.**

Id. at ¶31.  (emphasis added).

On June 8, 2000, RailWorks announced that it had completed the acquisitions of

Breaking Technology Corporation, Hovey Industries Ltd. and certain assets of Western Tar

Products Corporation, which would generate approximately $27 million in annualized revenues

for RailWorks.  Commenting upon the new acquisitions, **Defendant Larkin stated**:

> We are confident in our abilities to expeditiously integrate these companies into our existing operations **so that we will <u>continue</u> to find ourselves in a stronger strategic position <u>to offer fully integrated packages of products and services to our growing</u> customer base.**

Id. at ¶35 (emphasis added).

On July 19, 2000, RailWorks issued a press release reporting its second quarter of 2000 financial results.  Id. at ¶36.  Commenting upon RailWorks second quarter financial results, **Defendant Larkin stated**:

> During the first six months of 2000, we focused on integrating our operating units into our three cohesive business units (i.e. Transit Systems Group, Track Systems Group and Manufacturing and Supply Group).  **This integration effort has enabled us to execute against our high quality backlog and <u>realize integration savings</u>.**

Id. at ¶36.  (emphasis added).

Defendants' publicly issued statements set forth above were materially false and misleading when made and failed to accurately inform investors of RailWorks' true financial condition.  Specifically, Defendants' statements touting the Company's financial results and growth via acquisitions failed to disclose, among other things, that:

a.  RailWorks, in reality, was no more than a collection of over 25 disparate companies that had not been successfully integrated.  **In the December 5-6, 2000 Presidents' Meeting, attended by both Defendants, Larkin and Azarela, a key component of RailWorks business plan was the consolidation of thirteen companies into three business units[1];**

---

[1] Charles W. Moore, President of LK Comstock, one of the largest RailWorks entities, and President of RailWorks Transit Group, testified in his January 2003 deposition that sometime after June of 2000 Arthur Andersen was concerned about RailWorks failure to integrate:

> And that was spurred by Arthur Andersen's concerns that we were supposed to integrate these companies and make them go away and make them a homogenous unit.  We needed greater level of control of participation all the way down the chain.

Deposition of Charles W. Moore at 220-21.  Mr. Moore testified that the Board of Directors of the Transit Group is ostensibly the Board of Directors of RailWorks.  These facts were not alleged in the Amended Complaint but can be in the event the Court finds the Amended Complaint deficient and allows Plaintiff to amend same.

b.  Defendants knew but elected not to disclose that RailWorks would have to spend substantial sums of money in order to integrate its various acquisitions;

c.  **Defendants did not disclose the costs necessary to integrate RailWorks' acquisitions because doing so would negatively affect RailWorks' stock price and thereby make it more difficult for Defendants to continue using RailWorks stock as currency to buy other companies;**

d.  Since its various acquisitions had not been integrated, RailWorks was not and could not realize any marketing or cost synergies from its various acquired companies;

e.  While Defendants touted the revenue growth RailWorks would obtain through acquisitions, RailWorks did not have the ability to capitalize on these potential revenues prior to integrating these companies;

f.  RailWorks was not achieving any operating efficiencies through its collection of unintegrated, disparate operating companies;

g.  Defendants knew, as a result of past failures, that RailWorks could not expeditiously integrate acquisitions;

h.  Defendants knew that RailWorks would have to implement a sweeping restructuring plan in order to integrate its various acquisitions and take a charge amounting to tens of millions of dollars in connection with such restructuring; and

i.  Defendants knew RailWorks had not achieved any integration savings yet, and to the contrary, faced massive integration costs.

Id. at ¶38.

The rosy picture of a happily integrated company which RailWorks painted to the public over the preceding 18 months finally fell apart on September 28, 2000, when it issued a press

release stating that it had undertaken a "strategic review of its operations" and that it expected earnings to be adversely affected at least through the end of 2000.  Id. at ¶39.    This announcement shocked both investors and analysts, and the market reacted sternly and swiftly. Id. at ¶¶40-41.  On that news, RailWorks' shares lost 54 percent of their value (or $4.50) and closed at $3.88 per share on trading volume that was 72 times RailWorks' three-month daily average.  Id. at ¶¶ 40-41.  In pertinent part, the surprise September 28, 2000 press release entitled "RailWorks Corporation Announces Accelerated Integration/Restructuring Plan and A Revised Earnings Outlook" stated as follows:

> Following completion of the strategic review and as a result of current rail market and capital markets condition, management expects to focus on fully integrating RailWorks' existing acquired companies.  Management intends to implement a restructuring plan, which will include the completion of the company's systems integration program, the rationalization of the company's real estate, equipment fleets and inventories and the maximization of human resources and asset productivity.

* * * *

> **To reflect the costs associated with the restructuring of RailWorks' existing acquired companies into four operating units, settlement of legacy construction claims and certain other acquisition costs, RailWorks expects to record a largely non-cash charge ranging from $35 million to $45 million during the third quarter of 2000.**

Id. at ¶39 (emphasis added).

> Commenting upon the restructuring, **Defendant Larkin stated**:

> Since its initial public offering in August 1998, RailWorks has completed the acquisition of a substantial number of product and service providers. **It is now time to focus our primary efforts on the full realization of marketing and cost synergies available to us through the acceleration of our integration and efficiency programs.**

Id. at ¶39.  (emphasis added).

9

The statements in the September 28th press release seemingly contradicted the Company's previous public statements that "actual earnings for the first quarter of 1999 demonstrate the continuing success of our aggressive acquisition program combined with the ability to achieve considerable operating efficiencies," (4/27/99), "our dramatic year over year revenue growth is being driven by the successful integration of our founding and acquired companies," (10/19/99), the increase in backlog "reflects the strength of our bonding program and the marketing synergies we are realizing as we continue to successfully integrate the operations of the 27 companies we have acquired to date," (11/30/99), "our plan is to continue the development of additional niche services within the framework of our existing integrated organization," (12/8/99) the Company has had "a full year of integrated operations under our belt," (2/10/00) and "this integration effort has enabled us to execute against our high quality backlog and realize integration savings." (7/19/00).

### III.    Additional False and Misleading Press Releases and Announcements.

Even after the September 28, 2000 announcement debacle, RailWorks continued to issue false and misleading press releases. These releases included comments on the amended credit facility, credit availability, and various financial information. Id. at ¶¶ 42-48.

On March 1, 2001, RailWorks issued a press release boasting that it had been successful on a variety of project bids totaling over $100 million in future revenues and that RailWorks' backlog had grown to a record level of approximately $970 million. Id. at ¶45. Commenting upon the new business, Defendant Larkin stated:

> These important wins are additional examples of the work we are
> well positioned to perform profitably on behalf of a wide variety of
> customers. As 2001 unfolds we would expect the bidding
> environment to remain robust, especially, in the rail transit and
> regional railroad markets we have targeted. We also anticipate

> continued strength in our commercial building market as well as
> accelerating activity in our power generation business.

Id. at ¶45.

On June 26, 2001, RailWorks issued a press release announcing that the Company

expected its financial results for the second quarter of 2001 to fall below current estimates.

Specifically, RailWorks stated:

> EBITDA from operations is now expected to be within the $16-17 million
> range for the second quarter (rather than the previously estimated $20
> million), while EPS from operations is now expected to be within a range of
> ($0.10) - $0.10 per share (rather that the previously estimated $0.20). The
> $3-4 million reduction in EBITDA from prior estimates results from (i) **the
> previously announced sale of the civil construction assets formerly
> utilized by the RailWorks W. T. Byler, L.P. subsidiary, which was
> effective as of June 1, 2001, and which is expected to adversely affect
> EBITDA for the quarter by approximately $1 million**; (ii) continued
> softness in the rail-related treated wood markets, which is expected to
> contribute approximately $1 million to the reduction in quarterly EBITDA;
> and (iii) the lack of readily available working capital which caused second
> quarter slowdowns and delays at numerous project sites across the
> RailWorks network and which is expected to contribute approximately $1-2
> million to the reduction in EBITDA for the quarter. **We do not project any
> substantial incremental project slowdowns or delays in the second half
> of 2001 related to working capital availability based on previously
> announced bank amendment now in place** and the assumption that efforts
> currently underway for a more permanent arrangement will be successful.

Id. at ¶48. (Emphasis added.)

These statements were also materially false and misleading when made and failed to

accurately inform investors of RailWorks' true financial condition. Specifically, Defendants

failed to disclose, among other things, that RailWorks was encountering major cash-flow

problems (it had already violated its credit terms twice during the fall of 2000 and knew it would

violate the credit terms under its latest amendment and be in default again), the existence of

disputed change orders associated with projects undertaken by its Power & Industrial Group,

doubtful accounts receivable, the severe magnitude of losses ($14 million) associated with the

disposition of the assets of its W.T. Byler subsidiary and that it knew that RailWorks likely did not have sufficient cash on hand to fund operations going forward in the absence of major concessions from its lenders.  Id. at ¶49.

In fact, by the time that these misrepresentations and omissions were made, the Defendants recognized that RailWorks was a "troubled company."  Charles Moore, a RailWorks director and officer of a major RailWorks entity, testified that in January, 2001, RailWorks had learned that its subsidiary, HSQ was in breach of a contract with the Port Authority of Allegheny County, Pennsylvania.  Mr. Moore testified that in the spring of 2001, he discussed with Azarela and Larkin the possibility of HSQ defaulting on this contract.  Mr. Moore viewed the HSQ/Port Authority project as a "marquee project" having impact for follow-on work.  In a January, 2001 e-mail described briefly by Mr. Moore in his deposition, Mr. Moore wrote that a failure to perform under the contract "could be devastating to HSQ, Comstock and RailWorks in general."[2] In addition, Mr. Moore testified in his deposition, that in May or June, 2001, Jeff Lewis was appointed to the RailWorks Board of Directors as Chief Restructuring Officer.  Mr. Lewis was a "work-out advisor and his role was to deal with the securities and lias with the bankruptcy counsel and the creditors committee … **to make decisions relative to bankruptcy** and guide management in decisions it was making relevant to operations."    (emphasis added). Additionally, Mr. Moore testified that by April, 2002, he believed that RailWorks was a "troubled company."  The fact that RailWorks subsidiary HSQ was in jeopardy of defaulting on a major contract which was important to its future as well as the future of RailWorks and that RailWorks had hired a work-out specialist to advise it concerning RailWorks' potential bankruptcy was never disclosed to the investing public, thereby making RailWorks' statements concerning its financial condition false and misleading.

---

[2] These facts are not alleged in the Amended Complaint, but can be upon amendment of same.

Moreover, on July 30, 2001, Arthur Anderson presented a "Transit Services Segment Claims Review Report" analyzing Railworks' contract claims identified by Company management. Id. at ¶52. The report was actually prepared in May, 2001. Id. This Claims Review Report analyzed the "Comstock legacy claims" carried by RailWorks since 1999 and indicated that there had been an overstatement of approximately $23 million in previous RailWorks public disclosures and financial statements. Id. Defendants Larkin and Azarela were principals of Comstock and thereby would have had knowledge of the true value of these claims. Id. Comstock was acquired by RailWorks. Id. Defendants Larkin and Azarela leveraged their ownership and positions at Comstock to their advantage by gaining their management positions with RailWorks and ownership of RailWorks stock through such acquisition. Id. By overvaluing the assets of Comstock, Defendants Larkin and Azarela received RailWorks stock which they would not have otherwise been entitled to had the true value of Comstock been known. Id. The overstatement of Comstock's assets, which was not disclosed to investors, caused RailWorks' financial statements to be materially misleading all to the benefit of Defendants Larkin and Azarela. Id.

On August 20, 2001, RailWorks once again stunned investors when it issued a press release announcing that its second-quarter net loss did not satisfy requirements under its debt agreement, and the Company was likely to default without additional amendments to its credit agreement. Id. at ¶53. The Company also announced that Defendant Larkin and the Company's Chief Operating Officer had resigned, and that its bank group had issued RailWorks a notice of default on August 13, 2001. Id. at ¶¶ 53-55. The Company also announced that it had charged $12 million to a reserve account for the disputed change orders associated with its Power & Industrial Group, and **charged off** $7.1 million for doubtful accounts and **$14 million for a loss**

associated with disposition of assets of former RailWorks subsidiary, **W.T. Byler**. Id. at ¶55.  The price of the Company's common stock immediately declined by more than 75 percent upon the issuance of RailWorks' August 20, 2001 bombshell.  Id. at ¶55.

**IV.    Issuance of Bonds**

RailWorks, at the direction of Defendants Larkin and Azarela, issued bonds in order to fund various contracting projects.  Id at ¶56.  In order to show bondholders that RailWorks would be able to pay interest when it became due, in December of 2000, RailWorks projected $800 million in revenue for 2001.  Id. at ¶57.  However, in reality, RailWorks did not have a backlog in orders of $800 million and did not have a reasonable basis to project contracts for $800 million in revenue for 2001.  Id.  In April, 2001, Defendants Larkin and Azarela attended a meeting of the RailWorks Board of Directors.  Id. at ¶58.  Defendants Larkin and Azarela were chastised by the Board because of a monthly loss of $800,000.  Id.  Defendants Larkin and Azarela could not pinpoint the source of the losses and knew that the Company was losing money without the ability to control such losses.  Id.  The monthly loss was not reported to the Plaintiff or to the public, thereby causing RailWorks representations concerning its financial condition to be false and misleading.  Id.  The fact that the CEO, President and CFO of the Company could not account for such significant losses demonstrates a complete absence of financial and accounting controls and the Company's failure to achieve integration of the Company's many acquired companies.  These material facts were withheld from the investing public.

In a March 1, 2001 conference call with investors and analysts, RailWorks stated that cash flows were adequate to meet all of its obligations, and indeed the April 15, 2001 bond payment was paid.  Id. at ¶56.  According to Charles Moore, after the April bond payment,

RailWorks became cash-strapped and spiraled into a liquidity crisis.[3]  A second bond interest payment of $10 million was due on October 15, 2001.  Id.  Bondholders were told in May, 2001 that RailWorks would once again be able to fulfill their obligations.  Id.  However, on August 20, 2001, RailWorks announced that it would not be able to make the October bond interest payment or continue operations without major concessions from lenders.  Id.  RailWorks filed for bankruptcy approximately one month later.  Id. at ¶58.

## V.    Misrepresentations Related to Other RailWorks Entities

In June 2000, RailWorks acquired HSQ Technologies ("HSQ").  Id. at ¶59.  After the acquisition, RailWorks immediately changed the accounting methods for HSQ from the historical methods pursuant to directions from Defendant Azarela and with knowledge of Defendant Larkin.  Id.  These accounting changes artificially inflated HSQ's projected revenues and profit margin.  Id.  The artificially inflated profit margin allowed RailWorks to represent that it could meet its bond debt.  Id. at ¶¶59-62.  Also, according to a former HSQ officer, immediately after the HSQ acquisition, RailWorks established an approximately $4 million income reserve (expense) for HSQ.  RailWorks then used this reserve to state income for RailWorks for the second quarter of 2000, thereby overstating RailWorks financial statements.  Id. at ¶¶61-62.

On January 4, 2000, RailWorks acquired assets of the Dura-Wood Treating Company in Alexandria, Louisiana and formed Dura-Wood, LLC ("Dura-Wood").  Id  at ¶63.  According to a Dura-Wood front office worker, RailWorks installed an accounting program incapable of calculating state sales tax.  Id.  As a result, Dura-Wood failed to pay applicable Louisiana state sales tax from the time of its acquisition.  Id.  Defendant Larkin received direct notice of this

---

[3] This is not alleged in the Amended Complaint, but can be upon amendment of same.

failure, but he did nothing to change the accounting procedures.[4]  Id.  Additionally, former Dura-Wood employees have also related that during this time frame, RailWorks employees who reported directly to Larkin and Azarela directed Dura-Wood to overstate revenues and understate cost of goods sold thereby causing RailWorks' financials to be further overstated.  Id. at ¶¶ 63-65.

## ARGUMENTS & AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted."  When addressing a motion to dismiss under Rule 12(b)(6), a district court reviews the sufficiency of a complaint before it receives any evidence by affidavit or admission.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims.  Id.  Thus, the motion to dismiss for failure to state a claim is viewed with disfavor.  WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D §1357 at 321 (1990); Leleux v. United States, 178 F.3d 750, 754 (5th Cir. 1999).  Indeed, a motion to dismiss "will not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Hughes v. Rowe, 101 S.Ct. 173, 176 (1980), In re Visual Networks, Inc. Securities Litigation, 217 F.Supp.2d 662, 665 (D.Md. 2002).

In deciding whether dismissal is warranted, the Court accepts all well-pled allegations as true and construes the facts and inferences in the light most favorable to the plaintiff.  Id.  However, a court need not accept "unsupported legal conclusions, legal conclusions couched as factual allegations, or conclusory factual allegations **devoid of any reference to actual events.**  Visual Networks, 217 F.Supp.2d at 665 (emphasis added, internal citations omitted).  The

---

[4] This is further evidence of the Company's failure to maintain accounting controls and to achieve integration.

defendant bears the burden to prove that no relief can be granted under any set of facts that could

be proved consistent with the allegations in the complaint.  Hishon v. King & Spradling, 104

S.Ct. 2229, 2232 (1984).

## I.     Rule 10b-5

### Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any
means or instrumentality of interstate commerce, or of the mails or of any
facility of any national securities exchange,

(a)  To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person, in connection with the
purchase or sale of any security.

17 C.F.R. §  240.10b 5.

## II.     Defendants' Statements are not Protected by the Safe Harbor Provision of the PSLRA.

Defendants base a substantial portion of their Motion to Dismiss on the idea that their

statements and press releases were "forward-looking statements" and therefore protected by the

safe harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  15

U.S.C. §78u-5(c)(1).

The first problem with Defendants' argument is that many of their statements are not

forward-looking.  For example, the following statements clearly show an intent to describe the

current operating situation of RailWorks, and not forward-looking future goals or projections.

For example, the following allegations are contained in the Amended Complaint:

- "With our aggressive acquisition initiative **now producing** results . . . ." Amended Complaint at ¶25;

- "Actual earnings for the first quarter of 1999 demonstrate the continuing success of our aggressive acquisition program," Id. at ¶26;

- "Our dramatic year over year revenue growth is being driven by the **successful integration of our founding and acquired companies**," Id. at ¶28;

- "This increase [in backlogs] reflects the strength of our bonding program and **the marketing synergies we are realizing** as we continue to successfully integrate," Id. at ¶29;

- "Our plan is to continue the development of additional niche services within the framework of our **existing integrated organization**," Id. at ¶30; and

- "Now that we have a **full year of integrated operations under our belt**. Id. at ¶31.[5]

- Our integration effort has enabled us to execute against our high quality backlog and realize integration savings. Id. at ¶36.

These statements imply that RailWorks had successfully integrated previously acquired entities, that profitability and growth had already increased, and that RailWorks was already realizing marketing synergies. These are not statements of projected and planned integration and success, but statements that integration, etc. *had already occurred* and RailWorks was reaping the benefits of it. Such misrepresentations of then-existing facts are not protected. Accordingly, the "bespeaks caution" doctrine does not apply. See ABF Capital Management v. Askin Capital Management, LP, 957 F.Supp. 1308, 1324 (S.D.N.Y. 1997) ("bespeaks caution" doctrine does not apply to misrepresentations or omissions of present or historical facts) (citing authorities). Rather the "bespeaks caution" doctrine protects only future and forward-looking statements. Id.

---

[5] There are other examples of similar statements, but in the interest of brevity, they are not listed here and the Court is directed to view the Amended Complaint.

The case of <u>In re Aetna Securities Litigation</u> 34 F.Supp.2d 935 (E.D.Pa. 1999) is instructive in this case.  In <u>Aetna</u> the plaintiff alleged that the following statement made in a March 6, 1997 press release was false and misleading under Rule 10b-5 of the securities laws:

> Joe, [the Company's new president], has done a great job leading the rapid and *successful integration* of the health business and creating the winning strategy for the health business going forward.  Decisions have been made and implemented quickly, *the business is on track to meet all of the objectives that were set at the time of the merger.*

<u>Id.</u> at 944.  Plaintiff's alleged that by issuing this press release, defendant represented that, as of March 6, 1997 the Aetna-USC Health business had already been "successfully integrated" and that "a winning strategy for the health business going forward was in place."  <u>Id</u>.  Plaintiffs further alleged that defendants, by stating that "the business is on track to meet all of the objectives that were set at the time of the merger," adopted and reaffirmed statements made in a June 13, 1996 proxy issued in connection with the proposed merger.  <u>Id</u>.  The proxy projected operating income for an 18 month period following the merger and projected further reductions in expenses which were expected from successful integration.  <u>Id</u>.  Defendants argued that representations in the March 6th press release were immaterial because the press release contained certain warnings, including the warning that because of uncertainties and contingencies "there can be no assurance that the estimated synergies will be realized and actual synergies if any may vary materially from those shown."  <u>Id.</u> at 946.  The court disagreed:

> Although the cautionary language contained in the proxy materials dealt with projections and forecasts about the proposed merger of Aetna and USHC, at the time that the proxy statements were adopted in the March 6 press release, the merger had already occurred.  As such, the press release referred to matters of present fact - - that is, Aetna was "on track to meet all of the objectives" set forth in the earlier proxy materials.  The bespeaks caution doctrine does not apply to presently known facts.  <u>Voit v. Wonderware, Corp</u>. 977 F.Supp [263] at 371 [(E. D. Pa. 1997)].  Therefore, Defendants cannot rely on the "bespeaks caution" doctrine to neutralize the alleged misrepresentation set forth in the March 6 release.

19

Id. at ¶946.

The Defendants also argued that a statement in a May 6th press release that "Aetna US Healthcare significantly lowered operating expenses with the improved cost structure put in place last year" was forward looking and therefore protected under the safe harbor of the PSLRA.  Id. at 947.  The Court similarly disagreed:

> The Court finds that Defendants' argument is misplaced.  A forward looking statement may include:  (A) statements containing the projection of revenues, income (including income lost), earnings per share (including earnings lost), capital expenditures, dividends, capital structure, or other financial items; (B) statements of the plans and objectives of management for future operations; (C) statements of future economic performance; and (D) statements of the assumptions underlying or relating to the statements described in (A), (B), and (C).  15 U.S.C. §78u-5(i)(1)(A)-(D).  Defendant Compton's statement does not fit into any of the definitions set forth in the PSLRA for a forward looking statement.  Therefore, the safe harbor provisions of the PSLRA do not apply.

Id.

Similarly the representations made by Larkin in the present case were not forward looking statements protected by the bespeaks caution doctrine.  Such representations were statements of existing fact and do not fit into any of the definitions of forward looking statements prescribed by the PSLRA.  It should also be noted that many of the warnings which the Defendants attempt to rely upon pre-date many of the representations alleged to be false by the Plaintiff.  In this regard Defendants' reliance on the warnings concerning risks of not achieving integration which are enumerous in the March 10-K is particularly ludicrous in that such press release clearly preceded Defendants' misrepresentations.

In short, the statements relied upon by Plaintiff in support of his fraud claims, and in particular the representations concerning integration, are clearly not protected by the safe harbor provisions of the PSLRA.  Defendants cannot escape liability for false statements of existing fact

by accompanying such statements with language inaccurately labeling them "forward-looking statements."

Additionally, at the time these statements were made, Larkin, the CEO of the Company, and Azarela, the then CFO of the Company knew, among other things, that RailWorks had not been successfully integrated, that it would cost a great deal of money to achieve integration, and that RailWorks was not realizing any marketing synergies. Amended Complaint at ¶38.  Where the alleged fraud relates to the core business of the Company knowledge of the fraud may be imputed to the individual defendants.  In re Cell Pathways, Inc., 2000 WL 805221 at *7 (June 20, 2000) (citing In re Aetna, Inc., Sec. Litig. 34 F.Supp.2d 935, 953 (E.D.Pa. 1999) Exhibit A, attached).  Moreover, Defendant Larkin affirmatively stated that the Company had successfully integrated its then-existing acquisitions.  Whether he did so with actual knowledge that his statements were false or recklessly without investigating the bases for his statements he is equally liable for fraud.

### III.    Plaintiff has Sufficiently Pled That Defendants Made Material Misstatements

Defendants claim that Plaintiff has not adequately pled that the Defendants made "materially false and misleading" statements.  Defendants are simply wrong.  Plaintiff has satisfied the Fed. R. Civ. P. 9(b) and PSLRA pleading requirements, and Plaintiff has shown that Defendants' false and misleading statements were material.

#### A.    Plaintiff has Satisfied the Rule 9(b) and PSLRA Pleading Requirements

Rule 9(b), F.R.C.P., provides a heightened pleading requirement for allegations of fraud. To satisfy the burden imposed by Rule 9(b), the plaintiff must set forth with specificity the statements contended to be false or misleading, identify the speaker, state when and where the statements were made, and explain why the statements were false or misleading. In re Humphrey

Hospitality Trust, Inc., Sec. Litig., 219 F.Supp.2d 675, 682 (D.Md. 2002).  Additionally, in order to satisfy the PSLRA, the plaintiff must specify why the statement is misleading.  Id.  The purpose of the specificity requirement of Rule 9(b) is to give a defendant sufficient notice of the particular misconduct alleged to constitute fraud so that he can adequately prepare a defense. Andrews v. Fitzgerald, 823 F.Supp. 356, 373 (M.D.N.C. 1993).

Despite the heightened pleading standards of Rule 9(b) and the PSLRA, neither rule requires Plaintiffs to plead "detailed evidentiary matter" in order to survive a motion to dismiss. In re Health Management Inc. Sec. Litig., 970 F.Supp. 192, 208 (E.D.N.Y. 1997); See also In re Cephalon Sec. Litig., 1997 WL 570918, at *2 (E.D.Pa. Aug. 29, 1997) (PSLRA "does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim.") Moreover, neither Rule 9(b) nor the PSLRA require plaintiffs to set forth facts which, because of the lack of discovery, are in the exclusive possession of the defendants. See Sweeney Co. of Md. v. Engineers-Constructors, Inc., 109 F.R.D. 358, 360 (E.D.Va. 1986).

Plaintiff has satisfied Rule 9(b) and the PSLRA with regard to pleading the falsity of statements made by Defendants.  Throughout its Amended Complaint, Plaintiff quotes excerpts from press releases, and emphasizes certain phrases within these excerpts.  Some of these statements have been quoted in the preceding paragraphs.  It is made clear that these statements were issued by RailWorks, at the direction and/or with the approval of Defendants.  Many of the statements were made directly by the Defendant CEO Larkin.  The dates of these press releases are provided.  Finally, the Amended Complaint provides a detailed list of reasons why the highlighted statements were false and misleading.  See, e.g., Amended Complaint ¶38.  It is clear that Plaintiff has specified the fraudulent statements, identified the speaker, provided the dates of

the statements, and specified why the statements were false or misleading. Thus, Plaintiff has satisfied Rule 9(b) and the PSLRA.

**B.    The Representations and Omissions Made by Defendants Were Material**

Plaintiff has plead fraud-on-the-market based on numerous, specified material false and misleading statements made by Defendants. The fraud-on-the-market theory premises that the hypothetical reasonable investor is the market itself, instead of an individual. Phillips v. LCI International, Inc., 190 F.3d 609, 617 (4th Cir. 1999). When examining whether a statement was material to the market, all public information available to reasonable investors at the time allegedly false and misleading statements were made must be considered. Id.

**1.    Integration**

Defendants claim that the misstatements alleged in the Amended Complaint were not material because RailWorks had issued other public statements that integration efforts were *ongoing* and that there were risks associated with *future* integration efforts. However, at no point do the Defendants show that a statement was issued which told investors that the previously acquired companies had **not** been integrated. In fact, the press releases indicated just the opposite, i.e., that the Company's then-existing acquisitions had been successfully integrated and that the Company was reaping the benefits of same:

- That actual earnings for the first quarter of 1999 demonstrate the ability to achieve considerable operating efficiencies, Amended Complaint at ¶26;

- That revenue growth was being driven by successful integration, Id. at ¶28;

- That the increased backlogs reflected the market synergies being realized as acquired companies were continuing to be successfully integrated Id. at ¶29;

- That the Company was an existing integrated organization, Id. at ¶30;

- That the company had operated under a full year of integration, Id. at ¶31; and

- That the company was realizing integration savings, Id. at ¶36.

These statements are not vague or general, nor are they forward-looking. They make a clear statement that already-acquired companies were already integrated and that RailWorks was enjoying tangible benefits of this integration. Analysts and arbitrageurs would be extremely interested in knowing whether or not already acquired companies had been integrated.

Although vague and puffing statements are not actionable on their own, predictions supported by statements of fact are actionable if those statements are false or misleading. Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993). Additionally, "expressions of belief or opinion concerning *current* facts may be material. Id. (emphasis original). The statements listed in the paragraph above, and others included in the Amended Complaint, are false statements of existing fact that the acquired companies had been successfully integrated into the company. These statements were the foundation upon which statements concerning current revenue growth, savings and operating efficiencies as well as predictions of future revenue and service growth were supported. See Amended Complaint at ¶¶25, 28, 30, 31. Because these statements of future growth were supported by "facts" of integration, these statements are not "puffing" and are actionable.

Again the case of In re Aetna, Inc. Sec. Litig. 34 F.Supp 2d 935 (E.D.Pa. 1999) is instructive, if not despositive. The allegations in Aetna which survived a PSLRA based Motion to Dismiss are remarkably similar to the allegations in the present case. In Aetna plaintiffs argued that the defendants made false and misleading statements concerning the successful integration of Aetna and USHC following a merger of the two companies. The defendants, like those in the present case, argued that the defendants' representation concerning integration were puffing and therefore not material.

One statement which the plaintiffs alleged were false or misleading is as follows:

> Joe [the Company's new president] has done a great job leading the rapid and *successful integration* of the health business in creating a winning strategy for the health business going forward. Decisions have been made and implemented quickly, and *the business is on track to meet all the objectives that were set at the time of the merger.*

Id. at 944.  The Court rejected the defendants' argument that this representation was mere puffery.  First the Court outlined the test for materiality generally and as to how it relates to puffery.

> A statement or omission is material if there is a "substantial likelihood that, under all the circumstances, the [statement or omission] would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 45 L.Ed.2d 757, (1976).  As the Third Circuit has explained, "the issue is whether there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n. 11 (3rd Cir.1992) (citation and quotation omitted).  "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 450, 96 S.Ct. at 2133.  The district court, however, can rule that the allegations are inactionable as a matter of law "if the alleged mispresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." Id.

> "Puffing" statements—that is, vague expressions of corporate optimism and expectations about a company's prospects—are not actionable because reasonable investors do not rely on such statements in making investment decisions.  Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 57-58 (2d Cir. 1996).  However, "[i]f a statement is material, then it cannot be puffing." Voit v. Wonderware Corp., 977 F.Supp. 363, 370 (E.D.Pa.1977) (citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 200 (3d Cir.1990)).

Id. at 945.  The Court then analyzed the statement concerning integration in the press release that was alleged to be false and misleading:

Defendants argue that the statements contained in the press release constitute generalized statements of optimism, and as such are not material.

The March 6 release contains statements that clearly were meant to tout the accomplishments of Sebastianelli (e.g., "Joe has gone a great job"). Although such a statement, standing alone, would constitute a puffing statement, the statement about Sebastianelli was tied to the very issue about which Plaintiffs complain—the integration of Aetna and USHC. The release describes these efforts as "successful." Plaintiffs allege that this statement was materially misleading because the integration was rife with serious problems concerning computer system incompatibility, "black hole" claims, code conversion without notification, consolidation of claims service centers and reduction in workforce, and the negotiation of provider contracts. (Am.Compl. at ¶¶54-66). In addition, the release stated that Aetna was "on track to meet all objectives that were set at the time of the merger," a statement concerning the current status of the integration efforts. Plaintiffs also allege that this statement was false because Aetna was not on track to meet the objectives set forth in the proxy materials.

The general rule is that questions of materiality are fact-sensitive determinations to be made by the trier of fact. TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 450, 96 S.Ct. at 2133. Alleged misrepresentations are inactionable as a matter of law only when reasonable minds cannot differ on the questions of materiality. Id. The Court finds that the representations at issue here cannot be characterized as ones that would be so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality. Therefore, the Court rejects Defendants' argument that the statements in the March 6 release are immaterial as a matter of law.

Id. at 945.

The plaintiffs also argued that a May 16, 1997 press release announcing the first quarter results and stating that "[c]ommercial HMO medical costs were essentially flat" was false and misleading. Id. at 946-47. Plaintiffs explained that this was significant because the fact that costs had not increased from the immediately prior quarter implied that costs were coming under control and that the integration was successfully proceeding. Id. at 947. Plaintiffs contended that this statement was false because medical costs were not under control. Id. The Court, construing the pleadings in the light most favorable to the plaintiff, also found that these

allegations concerning flat medical costs contained in the May 6th release were sufficient to state a Rule 10b-5 claim.  Id.

The representations found to be false and misleading in Aetna are remarkably similar to the misrepresentations concerning integration at issue here.  Like Aetna, the representations not only state unequivocally that integration was successful as to the then-existing companies, but also that such integration had resulted in tangible benefits to the company.  Such representations are not mere puffing, but statements of fact that a reasonable investor would find important in making a decision to purchase stock in the Company.  Additionally, materiality is a question that generally should be presented to a jury.  "Only if no reasonable juror could determine that the [alleged statements] would have 'assumed actual significance in the deliberations of the reasonable [investor]' should materiality be determined as a matter of law."  In re MicroStrategy, Inc., Sec. Litig., 115 F.Supp.2d 620, 657 (E.D.Va. 2000) (citing Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999).

Defendants cite to a list of cases in which the courts have dismissed actions on the basis that the statements made were "soft," "puffing," or "generalized."  See, In re Manguistics Group, Inc. Sec. Litig., 1999 WL 1209509 at *1, 3 (D. Md. Aug, 6, 1999) (officer stated he was "comfortable" with an analyst opinion and was "optimistic"); In re Visual Networks, Inc., Sec. Litig., 217 F.Supp.2d 662, 664 (D.Md. 2000) (officer stated the company would experience 50% growth within the next two years); Graff v. Prime Retail, Inc., 172 F.Supp.2d 721, 726 (D.Md. 2001) (company stated that sale would provide substantial capital).  They then attempt to equate the comparatively general forward-looking statements made in those cases with the more specific statements of existing facts and past occurrences made by the Defendants.  It is difficult to see

how the statements described above relating to the implications of integration and success derived therefrom compare to vague statements of "optimism" for the future.

Defendants also attempt to analogize their situation with that in <u>In re CIENA Corp. Sec. Litig.</u>, 99 F.Supp.2d 650 (D.Md. 2000). CIENA Corp. had several misfortunes befall them, but despite the difficult position the company was in, the CEO tried to highlight some positives that remained despite the company's troubles. The difference between <u>CIENA Corp.</u> and the present situation is that CIENA Corp. investors were well aware of the company's misfortunes and the officers and directors had not attempted to use the CEO's statements as a cover-up to hide the company's recent problems. In the instant case, positive statements were continuously released despite the Defendants' knowledge of RailWorks' disastrous financial condition.

In contrast to these cases (which are clearly distinguishable) the <u>Aetna</u> case is directly in point. Moreover, other courts have found statements made to be material over Defendants' objections that they were mere puffery and even when such statements concern optimism about the future.

For example, in <u>In re WRT Energy Securities Litigation</u>, 1997 WL 576023 (S.D.N.Y. Sept. 15, 1997), the company issued statements about the use of proprietary technology, its success, and statements about its past success and future prospects. The Court found these statements were misleading in light of plaintiffs' claims that the company was experiencing financial difficulty at the time the statements were made. The defendant's cautionary language did not protect it because it "failed to reveal adverse information about current conditions." <u>Id</u>. at *9. Furthermore, the "vast discrepancy between the optimistic projections disseminated by the company and the bleak financial picture Plaintiffs claim[ed] was the reality would be regarded by the reasonable investor as material." <u>Id</u>. at *10.

28

In <u>Schaffer v. Timberland Co</u>., 924 F.Supp. 1298, 1313 (D.N.H. 1996), the Court found statements made by Timberland, such as that it expected to sell its oversupply in the normal course of business, and that the brand remained very strong, were "sufficiently concrete, and not mere puffery or vague optimism" when viewed in the context of other public statements. <u>Id</u>. at 1314. In <u>Warshaw v. Xoma Corp</u>., 74 F.3d 955 (9th Cir. 1996), Xoma issued press releases relating to pending FDA approval of a new pharmaceutical stating that "everything is fine," that approval was imminent, and other "optimistic" statements. However, the FDA did not approve the pharmaceutical, and plaintiffs survived a motion to dismiss by alleging that the defendants "knew that the facts contravened their 'optimistic' statements that [the pharmaceutical] was safe, effective, and would be approved by the FDA." <u>Id</u>. at 960.

Similarly, in <u>Marucci v. Overland Data, Inc.,</u> 1999 WL 1027053 (S.D. Cal Aug. 2, 1999), Exhibit B, attached,  a plaintiff survived a motion for summary judgment because of one sentence contained in a company's Prospectus issued in connection with an IPO. The issuer Defendant's, ODI's, Prospectus included the following statement:

> While the company believes that the [supply] problems relating to [DLT drive] components have been resolved, no assurance can be given that such problems will not re-occur or that the Company will not experience similar or more serious disruptions in supply in the future.

<u>Id</u>. at 4.

Plaintiffs alleged that this statement was false because at the time ODI was suffering continuing shortages of the DLT drive for its flagship product. <u>Id</u>. The prospectus highlighted the importance of this by stating that ODI's future success was dependent on this product. The court found that a reasonable trier of fact could conclude that the statement that supply problems "had been resolved" was false and misleading. Finally, the defendants were not protected by the cautionary language contained in the Prospectus because the "statement that supply problems

'had been resolved' did not speak to future or speculative events that might come to pass, but rather, to an item of historical fact regarding the supply of critical component." Id. at *9.

## 2.  Additional False and Misleading Representations

In addition to the Defendants' material misrepresentations concerning the successful integration of the company, Plaintiff has alleged additional material false and misleading statements by the Defendants as well.  For instance, Plaintiff alleged that Defendants failed to disclose the severe magnitude of losses  ($14 million) associated with the disposition of the assets of its W. T. Byler subsidiary thereby rendering its representations to the investing public concerning the financial condition of the company false and misleading.   See Amended Complaint at ¶¶49, 55.   Plaintiff also alleged that the Defendants failed to disclose an overstatement in the financials of approximately $23 million attributable to Comstock legacy claims carried by RailWorks since 1999.  Id. at ¶52.  Plaintiffs further alleged that because Defendants Larkin and Azarela were principals of Comstock prior to Comstock's acquisition by RailWorks, they would have known of the true value of these claims.  Id.  In fact, Defendants failed to disclose these claims so that they could receive additional RailWorks' shares in connection with the transfer of their interests in Comstock to RailWorks.  Id.  This $23 million overstatement of the Company's financials was clearly material to the financial condition of RailWorks and the failure to disclose same caused RailWorks' financials to be materially false and misleading.  Id.

In addition, Plaintiff alleged that in April, 2001, Defendants Larkin and Azarela attended a meeting of the RailWorks' Board of Directors at which they were chastised for the failure to account for a monthly loss of $800,000.  Id at ¶57-58.  This $800,000 loss was not disclosed to the investing public.  Id.  Moreover, the fact that the CFO, CEO and President of the Company

could not account for a loss of this magnitude demonstrates that the company had a complete absence of financial and accounting controls over its more than 25 disparate subsidiaries and had failed to achieve integration contrary to their representations to the investing public.

Moreover, the Plaintiffs allege that in May 2001, RailWorks represented that it would be able to fulfill its obligation concerning interest payments on bonds which it had issued.  Id. at ¶56.  At such time, RailWorks had just recently made a $10 million interest payment on the bonds and partially as a result was in the process of spiraling into a liquidity crisis.  Plaintiff also alleged that subsequent to the HSQ acquisition the Defendants manipulated the accounting procedures of HSQ causing the artificial inflation of HSQ's revenues and profit margin.  Id. at 59-62.  The Defendants also directed the improper recognition of $4 million of revenue, properly attributable to HSQ, as revenue for RailWorks.  Id. at 59-62.  Furthermore, Plaintiff alleged that former Dura-Wood employees have related that after RailWorks' acquisition of Dura-Wood, RailWorks installed an accounting program which was incapable of calculating state sales tax and that the Defendant Larkin was informed of same but nevertheless did nothing to correct the situation.  Id. at ¶63.  This further demonstrates the lack of financial and accounting controls RailWorks had over its many subsidiaries.  Id.

In addition to the facts alleged in the Amended Complaint, Plaintiff alleged in this response, additional facts which it learned through subsequent investigation--and its investigation is continuing.  For instance, RailWorks director, Charles Moore testified in his deposition that the Company was aware in early January, 2001 that HSQ was in danger of defaulting on a major contract which could impact the future of HSQ as well as RailWorks and it other subsidiaries.  Mr. Moore further testified that this matter was discussed with Defendants Larkin and Azarela.  Nevertheless, this information was not disclosed to the investing public,

thereby causing RailWorks statements concerning the condition of the company to be false and misleading.  In addition, Mr. Moore testified that in the spring of 2001, RailWorks had appointed a Chief Restructuring Officer whose duties, among other things, were to advise RailWorks as to the potential of RailWorks filing bankruptcy.  This was never disclosed to the investing public. This undisclosed information is clearly material and caused RailWorks' statements concerning the condition of the company to be false and misleading.

In this regard, <u>Arnlund v. Smith</u>, 210 F. Supp.2d 755 (E.D.Vir. 2002) is instructive.  In <u>Arnlund</u>, the plaintiff brought suit against individual officers and directors of Heilig-Meyers, pursuant to Rule 10b-5, in part, for a failure to disclose material information about the company's financial situation.  Specifically, defendants failed to disclose that the Board had received bankruptcy consultation, that the company needed special counsel and debt restructuring advisors, and that the company had liquidity problems.  <u>Id</u>. at 762.  The Court, in denying defendants' PSLRA-grounded motion to dismiss on this issue, held that it "[could] not find that the possibility of bankruptcy and a liquidity crisis would be of no import to a reasonable investor."  <u>Id</u>. at 765.

While these facts were not alleged in the Amended Complaint, they can be alleged upon amendment of same.6

## IV.    Plaintiff has Established Scienter

The Fourth Circuit has yet to decide what constitutes scienter under the PSLRA, and so it refers to the standard set by the Second Circuit.  <u>Phillips</u>, 190 F.3d at 621.  Scienter, under the Second Circuit standard, applied by district Courts within the Fourth Circuit may be established by "alleging specific facts that either (1) constitute circumstantial evidence of conscious or

---

6 For a full recitation of the material misrepresentations and omissions made by the Defendants, see Plaintiff's Allegations, <u>supra</u>.

reckless behavior or (2) establish a motive to commit fraud and an opportunity to do so." Id. at

620. This standard was further clarified in Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000).

Novak described the following four situations in which scienter had been sufficiently pled:

- When the defendant realized concrete benefits because of the false statement or nondisclosure;

- When the defendant engages in intentional misconduct or illegal behavior;

- When the defendant has knowledge of or access to information contradicting public statements; and

- When defendant fails to review or check information that he has a duty to monitor or ignores obvious signs of fraud. Id. at 307-08.

### A.    Concrete personal benefits

Desires to consummate corporate transactions may be sufficient motive for securities

fraud. Rothman v. Gregor, 220 F.3d 81, 93-94 (2d Cir. 2000) (holding that there was a strong

inference of fraudulent intent to artificially inflate stock prices for use in an acquisition of

another company). RailWorks was a "roll up" company whose business strategy involved using

its stock as currency for purchasing other companies. See Amended Complaint at ¶38.

RailWorks, through Defendant Larkin, made false and misleading statements in order to keep its

stock price high. Id. A decrease in its stock price would make it more difficult to complete

acquisitions. RailWorks would not have been able to purchase target companies but for

Defendants' artificial inflation of RailWorks' stock value. This scheme to inflate the RailWorks

stock value in order to allow the acquisition of target companies provided concrete personal

benefits to the Defendants. See Rothman 220 F3d at 93-94.

"In some circumstances, the artificial inflation of stock price in the acquisition context

may be sufficient for securities fraud scienter." Rothman, 220 F.3d at 93. In Rothman, the

plaintiffs' alleged that the defendants, including the individual defendants, had concretely

benefited from an artificially inflated stock price because the artificially high price meant that less stock was necessary to acquire four companies.  Id.   There was a strong inference that the company and its officers artificially inflated the company's stock price in order to acquire target companies.  This allegation, in addition to the other allegations of the complaint, "reinforce[d] the adequacy of the complaint's allegation of scienter."  Id. at 94.  See also In re Time Warner Inc. Sec. Litig. 9 F.3d 259, 270 (2d Cir.1993) (allegation that defendants issued misstatements in order to maintain high stock price to lessen dilutive effects of a new rights offering announcement was sufficient allegation of scienter).

### B.    Knowledge of and Access to Contradicting Undisclosed Information

The Amended Complaint alleges that defendants "knew facts or had access to information suggesting that their public statements were not accurate," and therefore, this gives rise to a strong inference of scienter.  Novak, 216 F.3d at 311.  The Amended Complaint, as specified above, alleges that Defendants made statements regarding the integration of acquired companies, capital, credit, change orders, and the Byler transaction even though they knew those statements were false.  Such knowingly false statements allow for an independent inference of scienter.

### C.    Failure to Verify Information

Finally, the Amended Complaint alleges that false and misleading statements were publicized through press releases issued from the company.  As high ranking officers in the Company, Defendants either reviewed these press releases before issuance, or had a duty to review these releases.  Indeed, Defendants are listed as Contacts at the end of these press releases.  Since they are listed as Contacts in regard to the information presented in the press releases, they had the duty to review these releases prior to their issuance, even if that duty did

not already exist because of their status within the company. A review of these statements would have revealed that they contained false or misleading statements regarding the condition of RailWorks. If Defendants reviewed said press releases, then they knowingly allowed false and misleading information to be released to the public; however, if Defendants did not review the releases, then they "failed to review or check information that they had a duty to monitor." Novak, 216 F.3d at 309. In either situation, Defendants acted in a reckless manner and the requirements of scienter have been satisfied.

## V.    Accounting Violations are Indicative of the Fraudulent Scheme Perpetrated by Defendants

Although allegations of Generally Accepted Accounting Principles ("GAAP"), standing alone, do not satisfy the PSLRA, Svezzese v. Duratek, Inc., 2002 WL 1012967 at *4 (D.Md. April 30, 2002), this action has not been brought solely on the basis of an accounting irregularity. Allegations of GAAP violations must also be coupled with allegations of fraudulent intent. Id. Plaintiff has shown fraudulent intent by showing how the accounting violations were implemented in order to artificially inflate the value of RailWorks stock. Plaintiff has also shown that Defendants had knowledge of these accounting violations. Furthermore, the Amended Complaint alleges not only serious violations of GAAP principles, but also the publicizing of false and misleading information, non-disclosures of material information, and other violations. The accounting violations are a piece of the fraudulent scheme developed by Defendants for their benefit.

## VI.    Claims Against Defendant Azarela are not Barred by the Statute of Limitations

On September 20, 2001, RailWorks voluntarily filed a petition under Chapter 11 in the United States Bankruptcy Court for the District of Maryland. As a result of the bankruptcy

filing, on October 29, 2001, this Court issued an Order staying this action "as to all defendants pending the action of the United States Bankruptcy Court for the District of Maryland or until further order of this court." From that point, this action was administratively closed until the automatic stay was lifted. Because of the stay issued in this proceeding, Plaintiff was unable to amend its Complaint to add Azarela as a Defendant or to add any additional claims. Any plenary action against Azarela would have involved the same facts and allegations as this instant case, and would have impacted RailWorks property. Because of this, any plenary action would have been subject to the same automatic stay. In fact, should a plenary action have been brought, Azarela and RailWorks would have objected on the grounds that the filing of the plenary action was a violation of the automatic stay.

Moreover, the statute of limitations for Rule 10b-5 claims is one year from when the Plaintiff discovered the facts constituting the violation, but no longer than three years after the violation. Lampf v. Gilbertson, 501 U.S. 350 (1991). Whether Plaintiff knew of the facts giving rise to Azarela's fraud outside of the one year period is a question of fact that cannot be resolved at the motion to dismiss stage. Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000); Vasilatos v. Ceram Tech Int=l Ltd., No. 92 Civ 4574, 1993 WL 177780, at *1 (S.D.N.Y. May 19, 1993).

## VII.    Plaintiffs' Section 20(a) Claims Need not be Dismissed

Plaintiff has shown that its Amended Complaint states a claim for primary securities fraud violations; therefore, Defendants' argument that control-person liability is impossible is invalid. Defendants do not dispute the validity of the "control person" claims on any other basis. Clearly the individual defendants because of their positions had the ability to control and direct the Company. Moreover, many of the false and misleading statements were actually made by the Defendant Larkin.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, Plaintiff requests leave from the Court to amend its Complaint so that Plaintiff may continue his investigation and to add newly-acquired information.

**NEUBERGER, QUINN, GIELEN
RUBIN & GIBBER, P.A.**

**/s/**

_____
PRICE O. GIELEN
Trial Bar No. 00577
One South Street
27th Floor
Baltimore, MD 21202
Tel: (410) 332-8584
Fax: (410) 332-8561
**Local Attorneys for Plaintiffs**

**-and-**

**FEDERMAN & SHERWOOD**
William B. Federman
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Tel: (405) 235-1560
Fax: (405) 239-2112
**Lead Attorneys for Plaintiffs**