1999 WL 1027053                                                                                                          Page 1
Fed. Sec. L. Rep. P 90,644
**(Cite as: 1999 WL 1027053 (S.D.Cal.))**

United States District Court, S.D. California.

MARUCCI, et al.
v.
OVERLAND DATA INC., et al.

**No. 97CV0833-TW (JFS).**

Aug. 2, 1999.

William S. Lerach, Patrick J. Coughlin, Helen J. Hodges and Karen L. Thomas of Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, California, Arthur N. Abbey, Jill S. Abrams and James J. Seirmarco of Abbey, Gardy & Squitieri LLP, New York, New York, and Curtis V. Trinko and Lori E. Colangelo of Law Offices of Curtis V. Trinko LLP, New York, New York, for the plaintiffs.

Charles H. Dick Jr., Michael P. McCloskey and Robert M. Harkins Jr. of Baker & McKenzie, San Diego, California, for the defendants.

Opinion

WHELAN, J.

**\*1** Exchange Act-Antifraud-Misrepresentations.-Material questions of fact existed concerning whether statements made by a computer component manufacturer addressing parts shortages were misleading. Evidence indicated that the statements that the company believed the parts supply problem had been solved may have been false when made.

See ¶ 22,776, "Exchange Act-Manipulations; National Market System" division, Volume 3.

Exchange Act-Antifraud-Scienter.-Material questions of fact existed concerning whether company officials acted with scienter when making statements that the company believed that a parts supply problem had been solved. Scienter is a fact-based question best left to the trier of fact and sufficient evidence indicated that the officers may have known the statements were false when made.

See ¶ 22,775, "Exchange Act-Manipulations; National Market System" division, Volume 3.

Exchange Act-Antifraud-Materiality.-Materiality questions are fact-based and are best left to the trier of fact, Factors such as the rapid and significant drop in the issuer's stock price after its parts shortages were disclosed indicated that the statements could be material.

See ¶ 22,774, "Exchange Act-Manipulations; National Market System" division, Volume 3.

I. *Introduction*

Defendants Overland Data, Inc. et. al. move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This court has jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331. For the reasons expressed herein, the court DENIES, in its entirety, Defendants' motion for summary judgment.

II. *Background*

Overland Data, Inc. ("ODI") is a San Diego company that manufactures and sells three families of magnetic tape data storage devices for computers. ODI's primary product, Library Xpress, can be used to increase the amount of electronic data storage by installing digital linear tape ("DLT") drives into a proprietary chassis.

ODI launched its Library Xpress productline in March 1996, utilizing two alternative, early-stage drives manufactured by Quantum Corporation ("Quantum"), the DLT2000XT and the DLT4000 drives. Later that year, Quantum announced that it was commencing implementation of a new generation of a higher capacity DLT drive to be labeled the DLT7000 series. The DLT7000 drives were faster and able to write more data to each tape cartridge than the earlier DLT4000 drives. In an effort to maintain its competitive position in the tape storage market, at year-end 1996 ODI began planning for integration of the DLT7000 into a new version of its Library Xpress product line.

As early as 1995, ODI's Board of Directors considered capitalizing the company's expansion with an initial stock offering to the public. By the fall of 1996, the stock market had improved for technology companies like ODI, and the company began soliciting proposals from potential underwriters. The Board elected to proceed with an Initial Public Offering ("IPO") of its stock to the public and filed its Form S-1 Registration Statement with the SEC on December 23, 1996. After filing amendments in January, the company filed its final Prospectus and conducted its IPO to the public markets on February 21, 1997. Defendants sold approximately 3 million

1999 WL 1027053 Page 2
Fed. Sec. L. Rep. P 90,644
**(Cite as: 1999 WL 1027053 (S.D.Cal.))**

shares and raised $30 million in proceeds.

### 1. *The Prospectus*

*2 The Prospectus contained an extensive and detailed section entitled "Risk Factors," identifying investment risks peculiar to ODI's line of business. One of the more significant risks identified was:

> [T]he DLT tape drives used by the Company in its Library Xpress products are obtained from a sole supplier, Quantum Corporation ("Quantum"), which from time to time has placed customers such as the Company (and its competitors) on allocation due to shortages of its component.

Prospectus at 6. The Prospectus went on to describe specific risks associated with one-source suppliers such as Quantum:

> Currently, there are no alternative sources for the DLT tape drives supplied by Quantum. The Company does not have a long-term contract with Quantum, which could cease supplying DLT tape drives directly to the Company. From time to time in the past, the Company has not been able to obtain as many drives as it has needed from Quantum due to drive shortages or quality issues.... During the past 12 months, the Company has experienced problems with the quality and timeliness of the supply of DLT drives and read-write heads, each of which is a sole source component. Such problems have adversely affected the Company's sales during this period. *While the company believes that the problems relating to these components have been resolved,* no assurance can be given that such problems will not re-occur or that the Company will not experience similar or more serious disruptions in supply in the future.

Prospectus at 7 (emphasis supplied). To further illustrate potential supply problems, ODI's Prospectus identified two prior instances where the company suffered due to inability to obtain major components from their sole suppliers. First, the Prospectus disclosed an incident in mid-1996 when ODI could not obtain a sufficient supply of read-write reads for one of its products because the heads were available from only one source. Second, the Prospectus disclosed that in spring 1996 during quality assurance testing at ODI, the failure rate of Quantum DLT4000 tape drives rose to an unacceptable level, delaying shipment of several of its products for several months.

### 2. *Supply Problems with the DLT7000*

Shortly after the February 21, 1997 public offering, supply problems erupted with respect to the DLT7000 drives. Just three weeks after the public offering, ODI announced to the public that it was "on allocation" for the DLT7000 drive, meaning that it could not ship enough Library Xpress products to meet revenue and sales projections for the year. The stock market reacted immediately, decisively, and negatively. ODI's stock price immediately plummeted from $10 3/8 to $6 per share on a single day of extreme trading volume.

### 3. *The Instant Action*

Plaintiffs commenced this class action securities case on May 2, 1997, asserting claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"). By order dated September 22, 1997, the Honorable Jeffrey T. Miller selected a lead plaintiff. One month later, Plaintiffs filed the operative first amended complaint, adding claims arising under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

*3 Plaintiffs' first amended complaint primarily attacks the February 21, 1997 Prospectus for failing to disclose that ODI was suffering from acute shortages of the Quantum DLT7000 drive. Plaintiffs contend that statements in the Prospectus implied that the DLT7000 supply problems were "resolved," when in fact they were becoming more severe as the February 1997 public offering approached. Finally, Plaintiffs contend that ODI knew, at the time of its public offering, that it could not secure sufficient DLT7000 drives to meet the revenue and sales projections disclosed in the Prospectus.

On March 2, 1999 Defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs filed their opposition memorandum on April 5, 1999 and Defendants filed their reply on April 19, 1999. The court took the motion under submission and issues this order without oral argument pursuant to Civil Local Rule 7.1.d.1.

### III. *Legal Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v.. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is "material" when, under the

1999 WL 1027053  Page 3
Fed. Sec. L. Rep. P 90,644
**(Cite as: 1999 WL 1027053 (S.D.Cal.))**

governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non- moving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322- 23, 106 S.Ct. at 2552-53. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159- 60, 90 S.Ct. 1598, 1609-10, 26 L.Ed.2d 142 (1970).

However, once the moving party meets this initial burden, the non-moving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." ' *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).

**\*4** When making this determination, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

IV. *Discussion*
A. *Interpretation of federal securities law claims*

To prevail on a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, plaintiff must prove that there has been (1) a misstatement or omission (2) of material fact, (3) made with scienter, (4) on which plaintiff relied, which (5) proximately caused his or her injury. *McCormick Fund v. American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994). In turn, Section 20(a) imposes secondary liability for violations of the Exchange Act on persons who, directly or indirectly, control any person liable under the Section 10(b) of the Exchange Act. 15 U.S.C. § 78t(a); *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1355 (S.D.Cal.1998)(Miller, J.).

Defendants contend that Plaintiffs cannot establish that a genuine issue exists as to three essential elements of a Section 10(b) claim: a false statement, materiality, and scienter. The court will address each of these elements in turn.

1. *False or misleading statements*
The primary element of any Rule 10b-5 claim is the existence of a false or misleading statement. To satisfy this requirement, "the statement or omission must be shown to have been false or misleading *when made."* In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1404 (9th Cir.1996) (emphasis in original). Plaintiffs' case rests on a single sentence in the February 1997 Prospectus:
> *While the company believes that the problems relating to these components have been resolved,* no assurance can be given that such problems will not re- occur or that the Company will not experience similar or more serious disruptions in supply in the future.

Prospectus at 7 (emphasis added). According to Plaintiffs, the prepositional phrase quoted above was false because, at the time, ODI was suffering from continuing shortages of the DLT drive for its flagship Library Xpress product line.

The Prospectus released to the public further highlighted the importance of ODI's newest product line, stating that ODI's "future success is dependent on its Library Xpress product line," and the Defendants expected "this product and follow-on Library Xpress products to generate a significant portions of [ODI's] revenues in fiscal year 1997." Ex.

547, at P000528, 541. As noted above, ODI's Library Xpress products incorporated DLT drives which were obtained solely from Quantum, a competitor of ODI.

**\*5** In each version of the Prospectus filed between December 23, 1996 and February 21, 1997, Defendants included the prepositional phrase ending in "had been resolved," suggesting to the public that the company's DLT drive supply problems had been alleviated by the time of the public offering. Plaintiffs contend these statements were false and misleading when made because, at the time they were made, ODI's supply of Quantum DLT drives (e.g. the DLT7000) was limited, unreliable and on continual allocation [FN1] from Quantum. Consequently, Plaintiffs contend that supply problems had *not* "been resolved" and were a continuing and significant threat to ODI's profitability.

> FN1. The phrase 'on allocation' refers to Quantum's strict method of distributing its limited quantity of DLT drives to its customer base as it deems appropriate. For example, although a customer may 'order' several hundred DLT drives, Quantum only assures customer delivery of a minimum number of drives it elects to 'allocate' to that particular customer for a certain time period.

In moving for summary judgment, Defendants insist that at the time of the February 1997 public offering, sales of Library Xpress with DLT7000 drives were in their infancy and that no supply problems had yet been experienced with the DLT drives. According to Defendants, Quantum had already committed to deliver 100 units of the DLT7000 tape drives in the first three months of 1997, and shortly before the public offering, Quantum increased its expected delivery to 120 units. On March 3, 1997 ODI sent Quantum a new order for 750 DLT7000 drives for delivery during the April-May-June 1997 quarter. ODI contends that it did not discover that Quantum could not accommodate ODI's order for 750 DLT7000 drives until March 7, 1997, two weeks after the public offering. On March 16, 1997, just three weeks after the IPO, ODI announced to the public that Quantum had placed DLT7000 drives on allocation and that as a result ODI would receive "significantly less" DLT7000 drives from Quantum than was previously represented. ODI told the public that this shortfall in DLT7000 drives would negatively impact sales for ODI's fiscal 1997 third and fourth quarters ending March 31, 1997 and June 30, 1997 respectively. Upon disclosure of this news to the public, ODI shares dropped significantly in value and ultimately caused initiation of this litigation.

Plaintiffs insist the publicly disclosed shortfall of DLT7000 drives was materially different than the disclosures contained in the February 21, 1997 Prospectus wherein ODI had represented that it "believe[d] that the problems relating to these components ha[d] been resolved". Plaintiffs contend that considerable evidence exists to show this statement was false and misleading when made because, at the time of the public offering, Defendants knew that ODI's supply of Quantum DLT drives was consistently unreliable, erratic and on allocation.

The court agrees.

A reasonable trier of fact could certainly find that Defendants' prior disclosures regarding the supply of Quantum DLT drives were false or misleading when made. There is considerable evidence that ODI had been "on allocation" before, during and after the IPO and that supply problems of DLT drives would continue to pose risks to ODI's profitability before the public offering. First, it was well known to Defendants that most, if not all, Quantum DLT7000 and DLT2000XT customers were on allocation at least from December 1996 through March 1997. (*See* Nelson Depo. at 215; Allen Depo. at 65-66; Earnhart Depo. at 221-22 ("[Quantum] works on an allocation model that basically says you fulfill your strategic and your key accounts and then if bonus product becomes available, you distribute that."); Sweetman Depo. at 77-78 ("[m]y understanding [was] ... that not just ODI was on allocation from Quantum, everyone was.")). Second, Quantum warned ODI as early as January 1997 that DLT7000 "production quantities had been committed to other customers" for the quarter ended June 30, 1997. (*See* Sweetman Depo. at 114-118). In fact, it was well known that Quantum only guaranteed delivery of ODI's quarterly allocation, *and nothing more*. (*See* Earnhart Depo. at 221-22; Zammit Depo. at 99-101 ("At least they guaranteed your allocation.")).

**\*6** On January 31, 1997, four weeks before the public offering, ODI's commodities specialist, Mr. Robert Fesinmeyer, alerted senior staff at the company that its orders for DLT2000XT drives exceeded its allocation for the quarter ended March 31, 1997 and that Quantum refused to commit additional drives to ODI. (*See* Fesinmeyer Depo. at

125-126; Ex. 339). With respect to the critical DLT7000 drives, Fesinmeyer informed fellow employees at ODI that prospects for timely delivery of the Quantum drives, as before, continued to present a problem for ODI. (*See* Ex. 339 (stating that recent supply problems with Quantum "remain[ ] consistent with previous similar situations we have pursued."); Ex. 340 ("Quantum reported to me today that prospects for more DLT7000's has declined ... While I will continue to expedite ODI's requirements ... be advised this is more of an uphill battle.")). Two days before the public offering, Fesinmeyer sent an electronic mail message to ODI's senior management, stating: "The [DLT]7000 schedule delay is disturbing, but frankly not unexpected as yields have been known to be bad recently."

This was not the first time prior to the public offering that ODI senior management had been warned about DLT drive supply problems. (*See e.g.* October 1996 Board Report "DLT7000 is undergoing many design changes as Quantum Engineering attempts to stabilize the product."; Ex. 378 at F001158, 1164 ("The [DLT]2000XT is now on allocation and probably will be for a significant part of 3Q97."); Zammit Depo. at 51-52 (the DLT7000 had not been approved by ODI engineering, and ODI was experiencing "a large [DLT7000 drive] fallout through testing.")). The January 1997 Board Report included in the pre-IPO February 17, 1997 board package stated "DLT7000/Library Xpress is the only area of uncertainty at this time due to stop ship in Quantum ... no progress this month on the DLT7000." (Ex. 407 at P002283, 2315, 2322). Indeed, according to some, receiving official news of the DLT7000 shortfall "was no surprise to anyone [at ODI]." (Sweetman Depo. at 114; Kirchoff Depo. at 69 (DLT drive availability was a "continuing problem.")).

The court easily finds that genuine issues of material fact exist as to whether ODI's Prospectus contained false and misleading statements. A reasonable trier of fact could rely on the evidence recited above to conclude that Defendants' prior disclosures that past supply problems "had been resolved" were false and misleading when made. Since Defendants' argument is based on their contention that ODI's public filings and disclosures were free from material omissions during the class period, genuine issues of material fact remain, precluding summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### 2. *Scienter*

Defendants next contend that Plaintiffs cannot establish that Defendants made any false or misleading statements with scienter. "To establish section 10(b) liability, the plaintiffs must show that defendants acted with scienter, 'a mental state embracing intent to deceive, manipulate or defraud." ' *In re World of Wonder Securities Litig.,* 35 F.3d 1407, 1424 (9th Cir.1994) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12 (1976)). Scienter can be established by deliberate or knowing conduct. *Id.; SEC v. First Pac. Bancorp.,* 142 F.3d 1186, 1191 (9th Cir.1998).

**\*7** Scienter can also be established by a showing that the defendant acted recklessly. Recklessness in private securities fraud actions is not carelessness or even gross negligence; "it instead embraces a conscious state of mind that is inherently deceptive." *In re Basea Sec. Litig.,* 969 F.Supp. 238, 241 (S.D.N.Y.1997). It is conduct presenting such an "extreme departure from the standards of ordinary care ... that it was either known to the defendant or so obvious that [he or she] must have been aware of it." *Hollinger v.. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)); *see also In re Software Toolworks, Inc.,* 50 F.3d 615, 626 (9th Cir.1994) (scienter is shown by conduct which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it); *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989) (summary judgment appropriate absent showing of scienter).

Here, Plaintiffs have presented sufficient evidence of Defendants' knowing, intentional or deliberate recklessness regarding the availability of DLT drives at the time of the February 1997 public offering. Defendants knew of the DLT supply problems since they issued the very orders which entitled ODI to delivery of Quantum DLT drives. Between late 1996 and early 1997, Messrs. Earnhart and Fesinmeyer contacted Quantum several times each day, pleading for the delivery of more DLT drives-without success. (*See* Sweetman Depo. at 23-24). Mr. Allen, a Quantum representative, apparently reminded ODI prior to the IPO "you folks already know what's [not] coming." (*Id.*). Finally, numerous ODI Board Reports prepared prior to the public offering reveal that ODI senior management had notice of continuing and serious supply problems regarding the Quantum DLT drives. (*See* October 1996 through January 1997 Board Reports, Ex. 378; Ex. 398 at P002397 ("Delivery of QUANTUM 7000 units now out to end

of February is going to create revenue holes."); *Id.* at P2390 (DLT 7000 allocation for Q397 may be lower than expected); Ex. 407 at P2322 (yields on DLT7000 drives continue to be lower than expected)).

A reasonable trier of fact could find that Defendants acted with at least deliberate recklessness by failing to fully disclose the deteriorating supply of DLT drives in the early part of 1997 when such supply problems would, in all likelihood, have imposed a significant and negative impact on ODI's profitability.

Next, Defendants argue that they are shielded from liability by the fact that the Prospectus was "replete with warnings about the *potential* for Quantum to stop or limit the supply of DLT drives at any time." (*See* Def. Mem. at 9 (emphasis in original)). This argument is without merit. *Heliotrope General, Inc. v. Ford Motor Company, Inc.,* No. 96-CV-0872 BTM (LSP) (S.D.Cal. Feb. 27, 1997) (Moskowitz, J.), at 8-9 (disclosure that a merger could occur "at any time" did not relieve defendants of obligation to disclose more specific risks known by them). "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & McLean,* 640 F.2d 534, 544 (5th Cir.1981).

**\*8** Finally, ODI's subsequent efforts to disclose the DLT drive supply problems in March 1997 [FN2] do not remedy the false statements Defendants previously disseminated at the time of the public offering. Genuine issues remain as to whether Defendants acted with at least deliberate recklessness in failing to properly disclose that adequate and timely delivery of Quantum DLT drives presented an ongoing problem at ODI during the class period. *See e.g. Hannon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992) (summary judgment properly denied where company employees knew about problems associated with company's products while the company was issuing allegedly misleading statements about the production to the public). Accordingly, Defendants' request for summary judgment on the element of scienter is denied. [FN3]

> FN2. Defendants may remain liable for these and other press releases insofar that each Defendant appears to have committed a manipulative or deceptive act as part of an overall *scheme* to defraud the public. *Cooper v. Pickett,* 122 F.3d 1186, 1194 (9th Cir.1997) (securities fraud liability may be based on allegations that group of defendants acted together to violate securities laws). Every person who engages in a scheme to defraud is considered a primary violator of the securities laws. *United States v. O'Hagan,* 521 U.S. 642, -, 117 S.Ct. 2199, 2213 (1997).

> FN3. To the extent Defendants argue that their scienter is negated by the fact that Defendants sold only a 'portion' of their holdings at the public offering takes nothing away from the evidence suggesting that Defendants may have disseminated false and misleading statements to the public in an effort to protect the public offering and to preserve the future value of Defendants' holdings.

### 3. *Materiality*

Like scienter, materiality is another fact-specific element of a Rule 10b-5 claim which should normally be left for the trier of fact. *See Basic v. Levinson,* 485 U.S. 224, 232-234 (1988); *Fecht v. Price Company,* 70 F.3d 1078, 1080 (9th Cir.1995); *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994) (Section 11 claims). A false statement or omission will be considered 'material' under Section 10(b) if its disclosure would alter the 'total mix' of facts available to an investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to his or her investment decision. *Basic,* 485 U.S. at 232-234. However, when no rational trier of fact can find that an alleged misrepresentation or omission was material, "summary judgment may nevertheless be justified 'in appropriate cases." ' *McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994).

In this case, the court cannot say as a matter of law that the alleged misrepresentations and/or omissions were not 'material.' A reasonable trier of fact could conclude that a reasonable investor would have found ODI's continuing supply problems with the DLT drives important in whether to purchase or sell Overland shares.

The materiality of these facts is supported by three factors. First, the public was specifically told that ODI believed its past supply problems "had been

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

resolved" when in fact the evidence suggests that ODI senior management knew or believed otherwise. (*See e.g.,* Exs. 378, 398, 407). [FN4] ODI enhanced the materiality of this statement by emphasizing a majority of its projected revenue would be based on the sale of DLT-based products. (*See* Ex. 547, at P000528, 541 (the sale of DLT7000 based "Library Xpress products [is likely] to generate a significant portions of [ODI's] revenues in fiscal year 1997."). If anything, the materiality and importance of the DLT drive supply to the future of ODI's stock was *enhanced* by the Prospectus' harrowing risk disclosures, which may have caused investors to rely on the company's admonition that its supply problems were "resolved."

> FN4. See Part IV.A.1, *supra.*

**\*9** Second, this was not the first time that supply problems had been encountered with respect to Quantum DLT products. (*See* Ex. 339 (recent supply problems with Quantum "remains consistent with previous similar situations we have pursued."); Ex. 340 ("Quantum reported to me today that prospects for more DLT7000's has declined ... While I will continue to expedite ODI's requirements ... be advised this is more of an uphill battle.")).

Third, when ODI announced in March 1997 that it was "on allocation" for DLT7000 drives and would not meets its revenue projections for the third and fourth quarters, its stock price plummeted from $10 3/8 to $6 per share in a single trading day. While not dispositive, this swift and severe drop in the share price supports the materiality of Defendants' false representation in the Prospectus. [FN5] In sum, genuine issues remain and a reasonable trier of fact could conclude that Defendants' false and misleading statements were material.

> FN5. On March 24, 1997, Vincent Turzo, a stock analyst for Jeffries & Company, one of the underwriters for ODI's IPO, wrote: "[t]he stock is down sharply from its February 20th offering price due to Overland Data's announcement that it expects to receive significantly less Quantum DLT7000 drives than the quantities it ordered to meet its currently projected sales." Ex. 509.

B. *The cautionary language in the Prospectus does not absolve Defendants from liability for false and misleading factual statements*

Defendants next argue that the "bespeaks caution" doctrine shields them from liability because the Prospectus warned of specific risks inherent with retaining Quantum as a sole source supplier. Because the Prospectus "bespoke caution" with meaningful cautionary language, Defendants contend, the false misrepresentation that supply problems "had been resolved" was immaterial.

More specifically, Defendants rely on the surrounding cautionary language in the Prospectus which states, "While the company believes that the problems relating to these components have been resolved, *no assurance can be given* that such problems will not re-occur or that the Company will not experience similar or more serious disruptions in supply in the future." Prospectus at 7 (emphasis supplied).

Reliance on this cautionary language does not necessarily immunize Defendants from liability. Defendants' statement that supply problems "had been resolved" did not speak to *future* or speculative events that might come to pass, but rather, to an item of historical fact regarding the supply of critical components. It is well established that the "bespeaks caution" doctrine cannot make non-material a false statement of historical fact. *See Gray v.. First Winthrop Corp.,* 82 F.3d 877, 883 (9th Cir.1996) (holding "bespeaks caution" doctrine inapplicable to misrepresentations of historical fact but noting that the doctrine is "relevant" where the historical fact is part of a forward- looking statement shrouded in cautionary language); *In re Grand Casinos, Inc. Sec. Litig.,* 988 F.Supp. 1273, 1280 (D.Minn.1997) ("By omitting any reference to that which allegedly had occurred already, defendants' disclosures could be materially misleading even though these disclosures contained specific, forward-looking warnings regarding certain risks.") The bespeaks caution doctrine provides no basis for summary judgment since the statements at issue were not forward looking, but rather, related to current and ongoing problems affecting the supply of DLT drives. [FN6]

> FN6. The court also rejects Defendants' suggestion that they had a 'reasonable basis' to state that supply problems 'had been resolved' as of February 1997. The evidence recited and examined throughout this order,

including the 1996 and 1997 Board Reports (Exs.378, 398, 407) relied upon by ODI senior management (including ODI's outside directors Otterson, Shane & Rizzi), overwhelmingly suggest, if not establish, that continuing Quantum DLT supply problems were "either known to the defendant or so obvious that [he or she] must have been aware of it." *Hollinger,* 914 F.2d at 1569. Thus, any effort to establish a due diligence defense by the outside directors is rejected at this time insofar as Defendants have failed to carry their burden on that issue.

 **\*10** Even assuming, *arguendo,* that the statements were forward looking, the warnings were insufficient given the negative DLT drive supply information possessed by ODI at the time of the February 1997 IPO. *See Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1097 (1991) ("a misleading statement will not always lose its deceptive edge simply by joinder with others that are true"); *Gray,* 82 F.3d at 884 ("most of the risks disclosed in the prospectus were so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading."). Accordingly, Defendants' reliance on the "bespeaks caution" doctrine does not demonstrate the absence of a genuine issue of material fact.

### C. *Plaintiffs' remaining claims*

 In reviewing Defendants' moving papers with respect to Plaintiffs' claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act, the court cannot discern any independent argument or ground for summary judgment that does not directly depend on Defendants' Section 10(b) arguments. Accordingly, summary judgment is not warranted as to the remaining claims.

### V. *Conclusion*

 In light of the foregoing, the court DENIES, in its entirety, Defendants' motion for summary judgment [Doc. No. 74]. In light of this determination, the court DENIES AS MOOT Plaintiffs' motion to strike the Grundfest article [Doc. No. 92], Plaintiffs' motion to strike Defendants' declarations and timeline exhibit [Doc. No. 94], and Defendants' motion to strike exhibit 248. [FN7]

> FN7. The Grundfest article, proposed timeline and exhibit 248 were neither considered nor relied upon in reaching the court's decision herein. All other objections raised with respect to either parties' evidence are denied without prejudice.

 IT IS SO ORDERED.

1999 WL 1027053, 1999 WL 1027053 (S.D.Cal.), Fed. Sec. L. Rep. P 90,644

END OF DOCUMENT