UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| JON KEENEY, On Behalf of Himself and All Others Similarly Situated, | * | |
| | * | Civil Action No. AMD-0I-CV-2670 |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| JOHN G. LARKIN and MICHAEL R. AZARELA, | * | |
| Defendants. | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *

DEFENDANTS' REPLY MEMORANDUM
IN FURTHER SUPPORT OF MOTION TO DISMISS

01681/0/00074280.WPDv1

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    PLAINTIFF FAILS TO STATE A CLAIM WITH RESPECT TO INTEGRATION
      ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Cited Press Releases Do Not Contain False Statements . . . . . . . . . . . . . . . 4

      B.    RailWorks Provided Meaningful Disclosures Regarding Integration . . . . . . . . 5

      C.    Plaintiff Did Not, and Cannot, Distinguish the Cases Cited in Defendants'
            Opening Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.   PLAINTIFF FAILS TO STATE A CLAIM WITH RESPECT TO NON
      INTEGRATION ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  RAILWORKS' (PRESS RELEASE STATEMENTS ARE PROTECTED BY
      STATUTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD SCIENTER . . . . . . . . . . . 14

V.    PLAINTIFF'S CLAIM AGAINST AZARELA IS TIME-BARRED . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## PRELIMINARY STATEMENT

This reply memorandum is submitted on behalf of Defendants, John G. Larkin ("Larkin") and Michael R. Azarela ("Azarela") (collectively, the "Defendants"), in further support of their motion, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Amended Complaint") of Plaintiff, Jon Keeney ("Plaintiff").

Plaintiff devotes much of his Memorandum of Law in Support of Plaintiffs Opposition to Motion to Dismiss ("Plaintiff's Mem.") - a total of 15 pages *[see* pages 4-10, 23-30] - to the issue of whether or not RailWorks Corporation ("RailWorks" or the "Company") made adequate disclosures concerning the integration of companies it acquired before and during the purported class period. In this discussion, Plaintiff offers selective quotations from RailWorks' press releases [Plaintiff's Mem. at 5-7], just as he did in his initial Complaint and in the Amended Complaint that is the subject of the instant motion. However, Plaintiff deliberately chooses not to quote or address cautionary language in those very press releases, including warnings about integration. Plaintiff also ignores entirely many explicit warnings contained in publicly filed documents which clearly disclosed that RailWorks had not fully integrated its acquired companies and that RailWorks might fail in its efforts to do so. Even a cursory review of these documents, which were discussed at length in the Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Mem."), reveals the lack of merit of Plaintiff's theory and, indeed, of his entire Amended Complaint.

The essence of Plaintiff's claim seems to be that RailWorks did not adequately disclose risks relating to the integration of acquired companies, specifically by failing to report that "previously acquired companies had not been integrated." [Plaintiff's Mem. at 23 (emphasis in original)]. As a factual matter, Plaintiff is simply wrong. In March1999, a month after the putative class period began, RailWorks filed a Form 10-K that stated:

> **The Operating Companies Do Not Have a Combined Operating History; The Company May be Unsuccessful Integrating Their Decentralized Operations . . . The operating companies were separate independent entities before RailWorks acquired them and to a certain extent they continue to operate as independent entities... ,, The integration of the operating companies . . . is important to the Company's operating and growth strategies ... . Management may not be able to integrate the operations or the necessary systems and procedures . . . to manage effectively the combined enterprise.**

[Graham Aff., Ex. B, Form 10-K, p. 24, 3/29/99 (cited in Defendants' Mem. at 5) (emphasis added)].[1]

Later, in a November 1999 public filing, RailWorks wrote, "[o]ur operating companies do not have a combined operating history and, we may be unsuccessful integrating their decentralized operations." [Graham Aff., Ex. R, Form 10-Q, p. 20, 11/15/99]. In public documents that were issued or filed in February, May and August 2000, RailWorks stated that "the absence of a combined operating history of our operating companies and difficulties in integrating their operations" were risks that could change projected results. [Graham Aff., Ex. S, 1999 Annual Report; Graham Aff., Ex. T, Form 10-Q, p. 17, 5/12/00; Graham Aff., Ex. U, Form 10-Q, p. 29, 8/11/00 (cited in Defendants' Mem. at 5-6)]. It is particularly notable that the August

---

[1] The Graham Affidavit was submitted with Defendants' opening memoarndum.

2000 public filing came just a month before plaintiff alleges he was "stunned" by a press release

that reported RailWorks' plan to "focus on fully integrating [the] existing acquired companies."

*[See* Amended Complaint ~ 39].

These repeated warnings made it clear to any reasonable investor that significant risks

existed with respect to the integration of all acquired companies. These warnings also show that

RailWorks never represented that it had fully integrated all of its acquired companies, contrary to

Plaintiff's theory. When viewed in their totality and in context, RailWorks' statements were full

and fair in describing the progress that had been made with respect to integration, but also in

emphasizing the possibility of ultimate failure. In light of the "total mix" of information that

RailWorks provided to the market, Plaintiffs' Amended Complaint is devoid of merit and should

be dismissed in its entirety. *See Phillips v. LCI Int., Inc., 190* F.3d 609, 615 (4th Cir. 1999)

("allegedly fraudulent corporate statements must be examined in context and in light of the `total

mix' of information made available to investors.") (citing *Basic Inc. v. Levinson,* 485 U.S. 224

(1988)).

## **ARGUMENT**

### I.    **Plaintiff Fails to State a Claim with Respect to Integration Issues**

Most of Plaintiff's Memorandum concerning integration issues is devoted to regurgitating

the Amended Complaint, the allegations of which were already addressed in Defendants' opening

memorandum on this motion. Nonetheless, Plaintiff does raise certain additional points which, as discussed below, fail to salvage the Amended Complaint.[2]

### A.    The Cited. Press Releases Do Not Contain False Statements

Plaintiff selectively quotes from a series of press releases [Plaintiff's Mem. at 5-7, 18], and paraphrases the same press releases [Plaintiff's Mem. at 23-24]), to argue that these documents "imply that RailWorks had successfully integrated previously acquired companies." [Plaintiff's Mem. at 18].  Based upon the plain text of the releases, no such implication can be said to exist. While the press releases do indicate that some degree of integration had occurred, and that some benefits were being enjoyed as a result, the releases do not suggest that integration efforts were final, complete and successful. Indeed, even in Plaintiff's paraphrasing, it is clear that certain press releases, refer to *continuing* efforts to integrate. [Plaintiff's Mem. at 23 ("... as acquired companies were continuing to be successfully integrated.")]. Thus, as an initial matter, the press releases do not make the very assertions that Plaintiff claims are false.[3]

---

[2]      One additional point that Plaintiff makes is of an improper factual nature. Specifically, Plaintiff refers to the deposition of Charles Moore for the notion that Arthur Andersen was concerned about RailWorks' efforts to integrate acquired companies. [Plaintiff's Mem. at 7 n. I]. This reference is of no value to Plaintiff for two reasons. First, as Plaintiff himself recognizes, the cited "evidence" is not properly before the Court. Indeed, it is quite telling that Plaintiff feels compelled to "supplement" the Amended Complaint by citing matters outside the pleadings. Second, allegations regarding mismanagement do not state a claim for securities fraud. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 3. Ct. 1292 (1977); *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir. 2000) (poor business judgment is not actionable securities fraud). Thus, plaintiffs reference to RailWorks' management of the integration process - rather than disclosures regarding that process - would not state a claim, even if it were true that RailWorks management was not up to the job.

[3]      Plaintiff also fails to explain adequately why the press releases are false. *In re Humphrey Hospitality Trust, Inc. Sec. Litig.,* 219 F. Supp. 2d 675, 682 (D. Md. 2002) (to satisfy the Private Securities Litigation Reform Act of 1995, plaintiff must "`specify the reason or reasons why the statement is misleading."') (quoting 15 U.S.C. § 78u-4(b)(1)).

**B.      RailWorks Provided Meaningful Disclosures Regarding Integration**

Plaintiff argues that while RailWorks may have issued warnings regarding future integration, it failed to disclose that integration was not complete with respect to previously acquired companies. [Plaintiff's Mem. at 23]. Plaintiff states that "at no point do the Defendants show that a statement was issued which told investors that the previously acquired companies had not been integrated." [Plaintiff's Mem. at 23 (emphasis in original)].

This assertion is plainly false. Perhaps had Plaintiff read RailWorks' publicly issued statements before filing his initial Complaint and the Amended Complaint, or had he read Defendants' opening memorandum on this motion with greater care, he would have seen that RailWorks issued numerous warnings that integration was not complete with respect to previously acquired companies. Indeed, these warnings were issued throughout the putative class period and put to rest Plaintiff's baseless argument.

As described in the Defendants' opening memorandum, RailWorks filed a Form 10-K in March 1999, just after the beginning of the putative class period. This document stated:

> The Operating Companies Do Not Have a Combined Operating History; The Company May be Unsuccessful Integrating Their Decentralized Operations. . . The Company . . . has acquired six additional operating companies, since [August 1998] . . . **The operating companies were separate independent entities before RailWorks acquired them and to a certain extent the continue to operate as independent entities ... .** The integration of the operating companies . . . is important to the Company's operating and growth strategies ... . **Management may not be able to integrate the operations or the necessary systems and procedures . . . to manage effectively the combined enterprise . . .** [T]here can be no assurance that the management group will be able to implement the Company's acquisition and operating strategies . . . Any failure by management to . . . integrate the operating companies . . . could have a material adverse effect

on the Company's business, financial condition and results of
operations.

[Graham Aff., Ex. B, Form 10-K, p. 24, 3/29/99 (cited in Defendants' Mem. at 5) (emphasis

added)]. This series of statements provides a clear warning that RailWorks might be unable to

integrate successfully entities that it had already acquired. Thus, Plaintiff's assertion that "at no

point do the Defendants show that a statement was issued which told investors that the

previously acquired companies had not been integrated" [Plaintiff's Mem. at 23 (emphasis in

original)], is just flat wrong.[4]

Plaintiff seeks to draw a distinction between RailWorks' disclosures concerning

companies that had already been acquired and its disclosures concerning future acquisitions. *[See*

Plaintiff's Mem. at 23]. However, that distinction is not meaningful in the context of RailWorks,

which Plaintiff acknowledges is a "roll up" company that acquired a total of 35 entities.

[Plaintiff's Mem. at 2]. The distinction that Plaintiff proposes suggests that there was a point in

time at which RailWorks could have accurately stated that all acquired companies had been

successfully integrated and that no additional companies were being acquired. Considering the

level of acquisition activity in which RailWorks engaged during the putative class period, it is

not feasible to pick such a point. Plaintiff's artificial construct simply cannot be reconciled with

the reality of RailWorks' business, and it cannot be said that the market did not know RailWorks

---

[4]     Throughout the class period. RailWorks issued other warnings with respect to integrating
companies that had already been acquired. For example, RailWorks filed a Form 10-Q in November 1999 that
stated, "[o]ur operating companies do not have a combined operating history and, we may be unsuccessful
integrating their decentralized operations." [Graham Aff., Ex. R, Form 10-Q, p. 20, 11/15/99]. In February 2000,
RailWorks issued its 1999 Annual Report that enumerated risk factors, including "the absence of a combined
operating history of our operating companies and difficulties in integrating their operations ... ." [Graham Aff., Ex.
S, 1999 Annual Report]. Identical warnings also appeared in Forms 10-Q filed by RailWorks in May and August
2000. [Graham Aff., Ex. T, Form 10Q, p. 17, 5/12/00; Graham Aff., Ex. U, Form 10-Q, p. 29, 8/11/00].

would need to expend time and money on a consistent basis to integrate the companies it acquired. Indeed, repeated disclosures were made on this subject.

### C.    Plaintiff Did Not, and Cannot, Distinguish the Cases Cited in Defendants' Opening Memorandum

Plaintiff's discussion of case law with respect to disclosure issues is unconvincing. Plaintiff attempts to disn-uss the long line of Maryland District Court and Fourth Circuit Court of Appeals cases cited in the Defendants' opening memorandum by arguing that these cases all involved future-oriented statements. [Plaintiff's Mem. at 27-28]. In making this argument, Plaintiff ignores the fact that *In re Humphrey Hospitality Trust, Inc. Sec. Litig.,* 219 F. Supp. 2d 675, 679-80 (D. Md. 2002), involved corporate statements regarding current economic performance.

Plaintiff also unsuccessfully attempts to distinguish *In re CIENA Corp. Sec. Litig.,* 99 F. Supp. 2d 650 (D. Md. 2000), by arguing that investors in that case were aware of the company's distress, whereas the Defendants in this case purportedly "continuously released" a stream of "positive statements." [Plaintiff's Mem. at 28]. Again, anyone who actually read RailWorks' public filings would be unable to say that the Company kept investors in the dark, but would know that RailWorks consistently issued warnings and cautionary statements. Thus, *CIENA is* on point and supports dismissal of the Amended Complaint.

In addition to seeking to distinguish the case law cited by Defendants, Plaintiff cites a variety of court decisions in his memorandum, almost none of which were issued by a court in this District or by the Fourth Circuit Court of Appeals. Plaintiff asserts that *In re Aetna, Inc. Sec. Litig., 34* F. Supp. 2d *935* (E.D. Pa. *1999),* is "directly in [sic] point." [Plaintiff's Mem. at 28].

Evidently, Plaintiff reaches this conclusion simply because *Aetna* concerned an acquisition - the acquisition of U.S. Healthcare by Aetna, Inc - and integration issues that arose following that acquisition.

In *Aetna,* plaintiff alleged that the defendants had misrepresented that the operations of U.S. Healthcare and Aetna had been integrated successfully by stating "[Aetna's President] has done a great job leading the rapid and successful integration of the health business ... ." Id. at *944.* It was alleged that this statement was false because "the integration was rife with serious problems concerning computer systems incompatibility, `black hole' claims, code conversion without notification, consolidation of claims service centers and reduction in workforce, and the negotiation of provider contracts." Id. at *945.* As a threshold matter, the court dismissed plaintiff's complaint for failing to comply with the pleading requirements of the Private Securities Litigation Reform Act of *1995* ("PSLRA"). Id. at *943.* Nonetheless, the court found that the cited representations could not be characterized as immaterial as a matter of law. Id. at *945.*

The facts in *Aetna* bear little resemblance to those here. First, in *Aetna,* there was a single merger, followed by a specific representation that the integration of the merged companies had been completed successfully. In contrast, RailWorks began to operate only upon the acquisition of 14 disparate companies, and RailWorks acquired a total of 35 companies from the Company's founding through 2001, all of which had to be integrated. *[See* Defendants' Mem. at 3]. Thus, RailWorks engaged in continuous integration activity, and there was no point at which a representation could have been made that all integration efforts had been completed successfully. Of course, RailWorks never made such a representation.

Second, the defendants in *Aetna* appear not to have issued any warnings regarding integration problems, but: instead simply warranted that integration had been completed successfully. Thus, based on the *Aetna* defendants' statements, the market had no reason to suspect integration difficulties. In contrast, RailWorks issued numerous warnings regarding the integration of its acquired operating companies and future acquisitions.

Third, it is significant that, prior to an announcement of disappointing quarterly earnings, one *Aetna* defendant sold Aetna stock worth $129,000,000 and another defendant sold stock worth $8,500,000. Id. at 941. Here, Larkin and Azarela did not engage in any RailWorks stock transactions during the class period other than Larkin's purchase of 25,000 shares in March 2001, by which point Ra1.1WOrkS' difficulties were well known. [Defendants' Mem. at 14-15]. Thus, the inferences that could be drawn from the *Aetna* defendants' improper trading simply do not exist here. For each of these reasons, *Aetna* cannot be described as on point.[5]

Plaintiff also cites cases from New York, New Hampshire and California in support of his argument that the Dei:endants' statements were material. However, the defendants in the cited cases did not issue explicit, specifically-worded warnings about existing risks or existing adverse conditions. Rather, the defendants simply made positive statements. *Schaffer v. Timberland* Co., 924 F. Supp. 1298, 1314 (D.N.H. 1996) (company asserted that demand was strong and inventory would be sold in normal course, while not disclosing that 126,000 obsolete

---

[5]    Part of the court's decision in *Aetna* actually supports Defendants' position that many of the statements contained in RailWorks' public filings viere mere puffery. *[See* Defendants' Mem. at 21-23]. In *Aetna,* plaintiffs had complained about a press release that described an executive (other than Aetna's president) as having been an "integral force in `the merger and the highly successful integration at Aetna U.S. Healthcare.'" *Aetna,* 34 F. Supp. 2d at 947. The court described the phrase "highly successful" as a "generalized statement that is inactionable as a matter of law because it constitutes `puffery' and would be understood by reasonable investors as such." Id.

and defective units would be sold at 20% to 60% below cost); *Warshaw v. Xoma Corp.,* 74 F.3d

955, 959-60 (9`h Cir. 1996) (company made positive statements regarding prospects for FDA

approval of drug despite internal studies indicating approval was unlikely); *In re WRT Energy*

*Sec. Litig.,* 1997 WL 576023, at *9 (S.D.N.Y. 1997) (defendants did not reveal adverse

information regarding current gas and oil operations); *Mariucci v. Overland Data, Inc.,* 1999 WL

1027053, at *4-5, 8 (S.D, Cal. 1999) (company suffering from supply problem made

contemporaneous statemi:nt that it believed the problem had been solved and issued no other

warnings on the issue). In contrast to the conduct of the defendants in these cases, RailWorks

issued numerous warnings and made accurate disclosures about integration, its credit facility and

other issues. Thus, these cases are irrelevant.

## II.    Plaintiff Fails to State a Claim with Respect to Non-Integration Issues

As a threshold matter, Defendants note that the alleged fraud on the market addressed

below (i.e., concerning non-integration issues) occurred after RailWorks issued the September

2000 press release which, in Plaintiff's words, caused "[t]he rosy picture of a happily integrated

company" to "fall apart," "stunned" investors and "surprised" analysts. [Plaintiff's Mem. at 8;

Amended Complaint TT 39-40]. The Court should view with great skepticism Plaintiff's attempt

to expand the class period by alleging a wholly new and different fraud that began

simultaneously with the disclosure regarding alleged integration fraud.

Plaintiff devotes fewer than three pages of the Argument and Authorities section of his

opposition memorandum to all of RailWorks' allegedly fraudulent statements that concern issues

other than integration. [Plaintiff's Mem. at 30-32]. Notably, these pages are taken up almost

entirely with a summary of the allegations that appear in the Amended Complaint and are largely

devoid of legal analysis. Indeed, Plaintiff raises few new issues in this section and does so only through improper references to the deposition of Charles Moore ("Moore"). As if to explain why the Court is presented with these allegations for the first time in April 2003 when the class period ended in August 2001, Plaintiff writes that it discovered these facts in a "subsequent investigation." [Plaintiff's Mem. at 31].[6]

While allegations based on the Moore deposition must be disregarded as a threshold matter because they are not part of the record on this motion, these allegations would not remedy the deficiencies of the Amended Complaint, even if considered in full, because they are false. According to Plaintiff, Moore testified that in the spring of 2001, RailWorks hired a "Chief Restructuring Officer whose duties, among other things, were to advise RailWorks as to the potential of RailWorks [sic] filing bankruptcy." [Plaintiff's Mem. at 32]. Plaintiff, for reasons that only he understands, asserts repeatedly that RailWorks never disclosed this fact to the public. [Plaintiff's Mem. at 12, 32]. Yet again, Plaintiff is dead wrong. Indeed, RailWorks disclosed that it had hired a Chief Restructuring Officer in a press release that Plaintiff himself quoted in the Amended Complaint and that Defendants submitted with their opening memorandum.

Specifically, RailWorks issued a press release on August 20, 2001 which disclosed that the Company had appointed Shaun K. Donnellan as Chief Restructuring Officer "to assist in the development of the Company's recovery plan." Further, the press release reported that Mr.

---

[6]      In citing the Moore deposition, Plaintiff makes clear that he understands the deficient nature of the Amended Complaint and that his references to this deposition are not properly before the Court. Plaintiff writes, "[these facts were not alleged in the Amended Complaint, but can be in the event the Court finds the Amended Complaint deficient and allows Plaintiff to amend same." [E.g., Plaintiff's Mem. at 7 n. 1]. Because Plaintiff filed his original complaint in September 2001, and has already submitted an Amended Complaint, the offer to plead additional facts does not merit consideration.

Donnellan's duties would include "improving cash management procedures, renegotiating credit facilities," and assisting the Chief Executive Officer. [Graham Aff, Ex. jj, 8/20/01; cited in the Amended Complaint ~T 53-55]. Perhaps Plaintiff was simply negligent in writing that the Company kept quiet about Donnellan's hire. Nonetheless, Plaintiff's repeated false factual allegations make clear that none of his allegations may be taken at face value.

Plaintiff also alleges that Moore testified about RailWorks' failure to disclose the fact that a subsidiary might default on a contract. [Plaintiff's Mem. at 31]. Plaintiff makes no attempt to explain the materiality of this alleged omission. Nonetheless, an allegation that no disclosure was made regarding the possibility of problems with a single contract of an unspecified amount at one of the 35 entities that RailWorks had acquired is, on its face, utterly immaterial. Plaintiff cannot state a claim on such a basis.

Plaintiff's citation to *Arlund v.* Smith, 210 F. Supp. 2d 755 (E.D. Va. 2002), is inapposite. In *Arlund,* company management had concluded that should amendments to the company's credit facility not be made by May 25, 2000, the company would be in default and should be "positioned to file for bankruptcy." Id. at 758. By May 25, no agreement to amend the credit facility had been reached. Nonetheless, the company issued an annual report representing that it was solvent and growing, and that "there were no significant factors affecting the business of the Company." Id. Two and one-half months later the company went bankrupt. Id. at 759. In this context, the court held that information relating to the company's liquidity crisis and the possibility of bankruptcy was material and should have been disclosed. Id. at 765. *Arlund* arguably might be instructive if RailWorks had failed to disclose its difficulties with respect to credit. However, RailWorks issued warnings on credit issues as a regular matter,

12

as discussed in pages 8-11 of the Defendants' opening memorandum. Indeed, RailWorks first

warned of issues with its credit facility in November 2000 [Graham Aff., Ex. ff, Form 10-Q, p.

30, 11/14/00 (Defendants' Mem. at 8-9)], almost a full year before it declared bankruptcy, and

well before the Company allegedly hired someone to evaluate "the potential of RailWorks [sic]

filing bankruptcy." [Plaintiff's Mem. at 32]. In December 2000, RailWorks issued a press release,

reporting that the Company had executed an amendment to its credit agreement. [Graham Aff.,

Ex. bb, 12/14/00]. Subsequent public filings in March, May, June and August 2001 also

addressed pressing credit problems in detail. [Graham Aff., Ex. gg, Form 10-K, pp. 21-22,

3/27/01; Graham Aff., Ex. hh, Form 10-Q, p. 20, 5/15/01; Graham Aff. Ex. ii, Form 8-K, p. 1,

6/22/01; Graham Aff., Ex. C, Form 10-Q, p. 31, 8/20/O1(Defendants' Mem. at 9-11)]. Thus,

RailWorks' conduct bears no relation to the conduct of the company in *Arlund,* where

management issued no warnings about liquidity despite knowing that bankruptcy was

impending. Further, considering the relevant filings, it is remarkable that Plaintiff, rather than

making specific allegations regarding nondisclosures or misrepresentations, continues to insist

that he was "stunned" when RailWorks revealed that it "did not satisfy requirements under its

debt agreement" in August 2001. [Amended Complaint ~ 53; Plaintiff's Mem. at 13].

It is noted that Plaintiff persists in asserting the bizarre allegation that the Defendants

committed fraud by failing to make bond interest payments and announcing that fact in August

2001. [Plaintiff's Mem. at 14-15]. Obviously, the question is raised as to how Plaintiff, who does

not plead that he was a bondholder, was affected by this alleged fraud. Further, although Plaintiff

implies that the August 2001 announcement should have been made earlier, he does not allege

any facts to support the implication that this announcement was dilatory. As such,

Plaintiff's allegations regarding bond payments are perfect examples of "fraud by hindsight" and cannot defeat Defendants' Motion to Dismiss the Amended Complaint.

## III.    RailWorks' Press Release Statements Are Protected by Statute

According to Plaintiff, certain press releases issued by RailWorks were not forward-looking and thus do not qualify for protection under the PSLRA.[7]  The Amended Complaint did not specify, in any manner, those portions of the cited press releases that were false. For this reason, Defendants were forced to address the press releases in their entirety and argue that the press releases were within the PSLRA's safe harbor as a general matter. Indeed, the majority of statements in the cited press releases are forward-looking and protected. To the extent that any press releases contain statements that are not forward-looking, those statements are neither false nor material, as discussed above and in the Defendants' opening memorandum.

## IV.    Plaintiff Has Failed to Adequately Plead Scienter

Plaintiff cites *Rothman v. Gregor,* 220 F.3d 81 (2d Cir. 2000), to argue that he has pled scienter simply by alleging that Larkin made false statements to keep RailWorks' stock price high, which allowed the Company to complete acquisitions more easily. [Plaintiff's Mem. at 33]. In *Rothman,* the plaintiffs alleged that the defendants had failed to expense royalty advances in order to artificially inflate the company's stock price and facilitate the acquisition of several

---

[7]    Plaintiff has modified his original argument that the press releases were not protected by the PSLRA because they were not accompanied by cautionary statements [Amended Complaint, ~ 74], apparently because Plaintiff read the press releases in their entirety and saw that each contained a cautionary statement. Now, Plaintiff argues that reliance on many of the warnings RailWorks issued is "particularly ludicrous" because many of those warnings "pre-date many of the representations alleged to be false." [Plaintiff's Mem. at 20]. While leaving it to the Court to determine which arguments are ludicrous, it is noted that each press release contains a warning and that warnings regarding integration appear in other publicly filed documents throughout the entire class period.

companies. Id. at 90-93. The court found that plaintiffs had alleged sufficient facts to support a

strong inference of recklessness with respect to the royalty advances, and that an acquisition in

which the majority of the acquisition price was paid in stock "could support a motive to commit

fraud and thereby *contribute* to a finding of scienter." Id. at 92, 93-94 (emphasis added).

However, the court was explicit in stating that its opinion did not stand for the

proposition that simple allegations concerning an acquisition would suffice to plead scienter.

Specifically, the Second Circuit wrote:

> Whether sufficient motive could be shown solely by an allegation
> of a high stock price artificially maintained in the context one [sic]
> impending acquisition might well depend on the particular
> circumstances of the case, and, in any event, is not the issue before
> us.

Id. at 94. Thus, most liberally construed, *Rothman* holds that a finding of scienter may be based

on a stock-heavy acquisition when facts are alleged that create a strong inference of recklessness.

Here, unlike *Rothman,* Plaintiff has not adequately pled recklessness. Indeed, Plaintiff makes no

attempt to respond to the arguments advanced in the Defendants' opening memorandum on this

issue. *[See* Defendants' Mem. at 33-34]. Thus, *Rothman* is inapposite.

In addition, Plaintiff does not plead that RailWorks acquired any specific company in a

majority-stock deal where the stock value had been inflated artificially. Rather, he simply alleges

in a conclusory manner that "RailWorks would not have been able to purchase target companies

but for Defendants' artificial inflation of RailWorks' stock value." [Plaintiff's Mem. at 33].

Plaintiff alleges no facts to support his statement that RailWorks would not have been able to make its acquisitions "but for" the supposed "artificial inflation" of RailWorks' stock price. Although outside the record on this motion to dismiss,[8] the vast majority of the acquisitions made by RailWorks during the putative class period were made for cash and other consideration, and did not involve the payment of RailWorks stock. This fact shows Plaintiff's assertion that RailWorks could not have acquired companies absent securities fraud to be utterly false. One of the acquisitions that is part of the record on this motion, and which did have a stock component, was the acquisition of W.T. Byler, Inc. *[See* Defendants' Mem. at 12]. However, the purchase price in that transaction consisted of over $23,000,000 in cash and only approximately $3,000,000 in stock *(i.e.,* 300,000 shares). [Graham Aff. Ex. Y, Form 8-K, p. 2, 11/5/99].[9] By contrast, in *Rothman,* the single subject acquisition was made in circumstances where the stock component of the acquisition exceeded the cash component, *i.e.,* the stock used was valued at *$7,200,000* and only $5,400,000 in cash was paid. *Rothman, 220* F.3d at 94.

Considering the nature of RailWorks' acquisition activity, it simply defies logic to argue that a strong inference of scienter can be raised through reference to this activity. Furthermore, it is important to remember that the defendants in this case are two individuals, Larkin and Azarela,

---

[8]     If requested by the Court, Defendants could supplement the record on this motion to provide information concerning the purchase terms of RailWorks' acquisitions during the putative class period.

[9]     Further, Plaintiff can point to no acquisitions following the September 2000 press release to support an inference of scienter, as indicated by the lack of acquisition disclosures in RailWorks' public filings.

not RailWorks. In his opposition memorandum, Plaintiff points to no facts that relate specifically to Larkin or Azarela to suggest that they engaged in conscious or reckless misbehavior or that they had motive and opportunity. [See Defendants' Mem. at 31-36].[10]

## V.    Plaintiffs Claim Against Azarela is Time-Barred

Plaintiff offers little in response to Defendants' argument that the claim against Azarela is time-barred. Specifically, Plaintiff makes the conclusory statement that "any plenary action [against Azarela] would have been subject to the same automatic stay." [Plaintiff's Mem. at 36]. Plaintiff cites nary an authority for this proposition. Certainly, the plain language of the Order provides no support for Plaintiff's argument considering that the Order stayed Plaintiff's original complaint "as to all defendants" [Plaintiff's Mem. at 36], i.e., RailWorks and Larkin. Thus, Plaintiff's argument fails.

Indeed, even if an action against Azarela would have been subject to the stay, Plaintiff took no action - such as seeking leave of the Court to file a complaint - to put Azarela on notice of an impending suit. Plaintiff asserts that Azarela would have objected to any such action. However, it is irrelevant whether or not Azarela would have objected. Plaintiff simply took no action against Azarela and is now time-barred from doing so.

Finally, Plaintiff argues that "[w]hether Plaintiff knew of the facts giving rise to Azarela's fraud outside of the one year period is a question of fact ... ." [Plaintiff's Mem. at 36]. Actually, it

---

10    Plaintiff also offers a couple paragraphs regarding other bases for finding scienter. [Plaintiff's Mem. at 34-35]. The nature of these points as afterthoughts is plain in light of the very cursory treatment given them by Plaintiff. Nonetheless, it is noted that these arguments rest on the notion that RailWorks issued false statements. As discussed, Plaintiff has not pled adequately that RailWorks issued false statements, or that the two individual defendants before the Court had the requisite scienter.

can be determined as a matter of law when Plaintiff learned of Azarela's alleged fraud by simple examination of the Amended Complaint. According to the Amended Complaint, Plaintiff became aware of the alleged relevant omissions and misrepresentations when RailWorks partially disclosed its true financial condition in September 2000 [Amended Complaint ~ 39], and when Railworks disclosed "the entire truth" in August 2001. [Amended Complaint T~ 50-55]. Thus, based on Plaintiff's own Amended Complaint, it can be determined, as a matter of law, that plaintiff learned of the facts that allegedly underpin his claims no later than August 2001. As such, Plaintiff's January 2003 claim against Azarela is time-barred.

## CONCLUSION

For the reasons stated herein and in the Defendants' opening memorandum, Defendants respectfully request that this Court dismiss Plaintiff's claims in their entirety. Further, Defendants ask that any request made by Plaintiff to amend be denied. There would be no justification for such a request, considering that Plaintiff's Amended Complaint is already before the Court and - as set forth above - the additional amendments proposed by Plaintiff would be futile. *See* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990).


Dated: April 29, 2003

_____
Andrew Jay Graham (Bar No. 00080)
One South Street, Suite 2600
Baltimore, MD 21202
(410) 752-6030
Attorneys for Defendants
John G. Larkin and Michael R. Azarela

Of Counsel:
DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY 10177
Stewart D. Aaron
Joshua Colangelo-Bryan (admitted in Washington State; New York bar admission pending)