**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | | |
|---|---|---|
| JON KEENEY, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | Civil Action No. AMD 01:CV-2670 |
| JOHN G. LARKIN and MICHAEL R. AZARELA | ) ) ) | |
| Defendants | ) ) | |

**PLAINTIFF'S SURREPLY MEMORANDUM IN RESPONSE
TO DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT
OF MOTION TO DISMISS**

Plaintiff Jon Keeney, and all others similarly situated, ("Plaintiff") submits this Surreply Memorandum in response to Defendants' Reply Memorandum in Further Support of Motion to Dismiss. This Surreply Memorandum is necessary to address new issues raised in Defendants John G. Larkin's ("Larkin") and Michael R. Azarela's ("Azarela"), Reply Memorandum in Further Support of Motion to Dismiss. The new issues include Defendants' contention that RailWorks Corporation ("RailWorks" or the "Company") adequately disclosed to investors that RailWorks had hired a restructuring officer whose duties would include assisting in a potential bankruptcy of the Company.

**I.      Defendants Failed to Disclose that the Role of the Restructuring Officer
Retained by RailWorks Included Preparing for and Assisting in the Bankruptcy**

Defendants argue that RailWorks adequately disclosed its retention of a Restructuring Officer in May or June 2001. Defendants' Reply Memorandum in further Support of Motion to Dismiss ("Defendants' Reply") at 11-12. Defendants are correct that in an August 2001, Press Release the Company related that it had appointed a "Chief Restructuring Officer" and that his role was to "assist in the development of the Company's recovery plan." Id.

EXHIBIT 1

However, this disclosure was not made for at least two months **after** the Restructuring Officer was retained.  More importantly, the Company did not disclose in this press release, or any other public disclosure, that the Chief Restructuring Advisor's "role was to deal with the securities and **lias with the bankruptcy counsel and the creditors' committee…to make decisions relative to bankruptcy….**" (emphasis added).  There was simply no mention in the August 2001, Press Release, nor in any other public disclosure by RailWorks, that the Company was contemplating or planning for bankruptcy or that it had hired a specialist in connection with same.  In fact, the Company despite issuing positive statements, declared bankruptcy just four (4) months later.  Certainly the fact that the Company was contemplating the potential for bankruptcy and had hired a specialist to deal with issues in the event of bankruptcy was material.[1]

## II.    Defendants Affirmatively Misrepresented that RailWorks Integration Efforts were Successful and the Company was Reaping the Tangible Benefits of Integration

Defendants suggest that "[t]he essence of Plaintiff's claim seems to be that RailWorks did not adequately disclose risks relating to the integration of acquired companies, specifically by failing to report that previously acquired companies had not been integrated." "Defendants' Reply at 2.  This assertion is also only partially accurate.  The true essence of Plaintiff's Complaint (at least in so far as it relates to integration) is that Defendants' affirmatively misrepresented that RailWorks' then-existing disparate acquired companies had been, or were in the process of being, successfully integrated and that RailWorks was reaping the tangible benefits of same.  In fact, contrary to Defendants' representations, including the specific direct representations of Defendant Larkin, integration efforts (if there in fact were any underway) were not successful and integration was not being achieved.  Indeed this

---

[1] While the allegations concerning the Company's Restructuring specialist and his contemplated role in the prospective RailWorks' bankruptcy were not included in the Amended Compliant, they can be included if necessary upon further amendment.

EXHIBIT 1                                        2

failure to integrate with its concomitant anticipated savings and cross-marketing between subsidiaries, led to the eventual bankruptcy of the Company.

### III.    Disclosures During RailWorks Bankruptcy

RailWorks emerged from bankruptcy in November of 2002. (Kansas City Star, Randolph Heaser, RailWorks CEO knows Challenges of Turning Around a Troubled Company, November 19, 2002). As part of its reorganization, RailWorks has become a privately held company after being publicly traded since 1998. In the bankruptcy, RailWorks was able to shed about 200 million dollars in debt from Bank of America, stockholders and other creditors. Id.

RailWorks was formed in 1998 when fourteen (14) rail services companies were rolled into one as part of an initial public offering of stock. (The Journal News, Julie Moran Alterio, RailWorks Getting Back on Track, October 20, 2002). The plan was to create a company with nationwide scope to provide construction, maintenance, materials and services for the rail and transit industry. Id. RailWorks became an amalgamation of thirty-five (35) companies involved in providing rail services and products. (Kansas City Star, November 19, 2002). The idea was to build economies of scale and brand recognition, but financial problems arose as management kept buying more companies as cash flow dwindled. Id. RailWorks present CEO and Chairman, Ab Rees, told the Kansas City Star that RailWorks began to lose its way when it kept expanding through acquisition. Id. "More significantly, they didn't integrate the thirty-five companies which were individual businesses run by entrepreneurs," Rees told the Star. Id. "So that's what we've been doing since Aug. 1 [2002]—making it one company instead of thirty-five," said Rees. Id. "The company was moving very fast and trying to acquire this niche very quickly and perhaps in some areas got ahead of themselves. Sometimes you have to step back and integrate the companies," Rees

EXHIBIT 1                    3

told The Journal News.  (The Journal News, October 20, 2002).  "**We used to be 35 separate companies and now we are one brand.**  We are RailWorks.  We have many products, but we are one company," Rees said.  Id.  (emphasis added).

Defendants seem to suggest that their misrepresentations concerning integration are not actionable for the reason that RailWorks' acquisition program was still in progress. Defendants' Reply at 6, 8.  Defendants contend that RailWorks "engaged in continuous integration activity, and there was no point at which representations could have been made that all integration efforts had been completed successfully."  Defendants' Reply at 8. "Considering the level of acquisition activity in which RailWorks engaged during the putative class period, it is not feasible to pick such a point."  Id. at 6.  According to the Defendants, "Plaintiff's artificial construct cannot be reconciled with the reality of RailWorks' business, and it cannot be said that the market did not know RailWorks would need to expend time and money on a consistent basis to integrate the companies it acquired." Id. at 6-7.  However, the point Defendants miss in their Reply is that the represented actions were that all presently acquired companies had actually been integrated.  When, in fact, this is exactly what had not happened.  See, e.g., Plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws at ¶¶30-31.  Furthermore, the Defendants reported successful progress and benefits of the misrepresented integration that had never actually been realized.  This is the gravaman of Plaintiff's integration theory.

### IV.    False Representations of Successful Integration and Benefits of Integration

RailWorks acquired 2 companies in 1998.  See, 10-K for the year ending December 31, 1998.  RailWorks acquired 14 companies in 1999.  See, 10-K for the year ending December 31, 1999, at 6-7.  In the year 2000 the Company acquired 5 companies or groups of companies.  See, 10-K for the year ending December 31, 2000 at 6-7.  2000 acquisitions

EXHIBIT 1                                    4

were made in April of 2000, May of 2000, again in May of 2000, June of 2000, and July of 2000.  Id.  The Company suspended its acquisition program as of September 30, 2000.  See, 10-Q for the period ending September 30, 2000.  The last acquisition by the Company prior to the suspension of the program was the July 2000 acquisition.  Id.  The companies acquired in 1998 had 1998 revenues totaling $5.2 million. See, 1998 10-K.  The companies acquired by Railworks in 1999 had 1999 revenues totaling $323.5 million.  See, 1999 10-K.  The companies acquired by Railworks in the year 2000 had total 2000 revenues in the amount of $52 million.  See, 2000 10-K.  The Company's last acquisition in July 2000, had revenues totaling $2 million for the year ending 2000.  Thus, by October 1999, in terms of revenue, 73% of RailWork's acquisitions had been completed.   In terms of revenues 85% of Railwork's acquisitions had been completed by the end of 1999.   Thus, RailWorks' acquisitions had largely been completed at the time RailWorks, and particularly Defendant Larkin, misrepresented that the Company, (a) had been successfully integrated; and (b) was enjoying the tangible benefits of integration.

As set forth in Plaintiff's Memorandum of Law in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss ("Plaintiff's Response"), with 27 of the 35 acquisitions completed, Defendant Larkin commented in a November 30, 1999, Press Release:

> With the inclusion of these two projects, our backlog now exceeds $750 million.  Our backlog has more than tripled to record levels in the sixteen (16) months since the completion of our August 1998 IPO.  **This increase reflects the strength of our bonding program and the marketing synergies we are realizing as we continue to successfully integrate the operations of the 27 companies we have acquired to date.**

Amended Complaint at ¶29  (emphasis added).  In a subsequent Press Release issued on December 8, 1999, Larkin commented:

> Our plan is to continue the development of additional niche services within the framework of our **existing integrated organization** and via our strategic acquisition program.

EXHIBIT 1                                    5

Id. at ¶30  (emphasis added).  And in a February 10, 2000, Press Release, with 85% of RailWorks acquisition program completed in terms of revenues, Larkin stated:

> Now that we have a full year of **integrated operations under our belt**, we look forward to continuing to build our management team, our service and product offerings and our reputation in the rail marketplace as we move forward into 2000.

Id. at ¶31 (emphasis added).  Finally, on July 19, 2000, with at least 99% of RailWorks acquisitions complete in terms of revenue, Larkin commented in a press release that the Company's "integration effort has enabled us to execute against our high quality backlog and realize integration savings."  Id. at ¶36.

Thus, the vast majority of Railwork's acquisitions had been completed prior to the misrepresentations by the Defendants concerning the successful integration of the Company. Most importantly, at the time of Larkin's comments in the July 19, 2000, Press Release, RailWorks was finished acquiring companies.  In the same time frame, as Charles W. Moore, a key RailWorks' executive testified in his deposition, Arthur Anderson was expressing concerns to RailWork's management about the Company's failure to integrate.[2]  Plaintiff's Response at 7, n.1.  Of course as Ab Rees, RailWorks' current Chairman and CEO acknowledged, the Company's failure to integrate resulted in its bankruptcy.

### V.    Defendants' General Warnings of Future Risks Do Not Immunize Defendants' Misrepresentations of Present Facts

Defendants' contention that the general warnings contained in its SEC filings and press releases immunize its misrepresentations of present fact concerning the Company's integration is simply wrong.  First, the PSLRA safe harbor provision and the bespeaks

---

[2]  Defendants suggest that the excerpt from the Moore deposition was included to demonstrate mismanagement on the part of the Company.  Defendants' Reply at 4, n.2.  This is simply not the case.  The deposition testimony of Mr. Moore which could be included in the allegations of a Second Amended Complaint was included to demonstrate the fact that integration was not being achieved, contrary to the representations of Mr. Larkin, and that the Defendants were aware of it.

EXHIBIT 1                    6

caution doctrine only protect forward-looking statements. As discussed in Plaintiff's Response Brief, the statements made by the Defendants concerning integration were not forward looking but, instead, statements of existing fact.

Second, the warnings contained in the SEC filings do not directly contradict the Defendants' statements in the Press Releases, i.e., they do not state that acquired companies are not being successfully integrated. Rather such boilerplate warnings are general in nature, the type of general warnings concerning the risks of future contingencies that would be contained in any document of this type. Moreover, even if the language in the SEC filings could be construed to adequately inform investors that integration was not being achieved, as Defendants assert, they can provide no protection to Defendants because they are not contained in the press releases, the very documents in which the misrepresentations were made. Misleading oral statements are not protected by cautionary language "spread out among various documents." In re HI/FN Inc Securities Litigation, 2000 W.L. 33775286 at *5 (N.D. Cal. August 9, 2000) (quoting Copperstone v. TSCI Corp., No. C 97-3495 SBA, Slip op. at 20 (N.D. Cal. January 19, 1999) ("Courts are generally reluctant to hold that a forward-looking statement is protected by cautionary language contained in documents other than that which contains the forward-looking statement.")); see also Powers v. Eichen, 977 F.Supp. 1031, 1043-44 (S.D. CA 1977.) Indeed oral or written affirmatively false statements are simply not protected by the inclusion of cautionary language in a separate document. In re: Musicmaker.com Securities Litigation, 2001, W.L. 34062431 at *20 n.15 (C.D. Cal. June 4, 2001).

In In re: Musicmaker.com, the court stated:

Defendants contend that the cautionary language in the registration statement and prospectus accompanies all subsequent forward-looking statements for the purpose of the PSLRA safe harbor and the bespeaks caution doctrine, regardless of where, when or by whom the subsequent statements were made.

EXHIBIT 1                    7

In support of this proposition Defendants cite <u>Stac</u> <u>supra</u>, 89 F.3d at 1402, 1406. Although the cited pages contain nothing directly supporting plaintiff's [sic][defendants']view, the plaintiffs in <u>Stac</u> relied in part on omissions from statements to the news media, and the court in holding that the safe harbor shielded all defendants' statements relied on cautionary statements in the prospectus. Thus it is arguable that <u>Stac</u> stands for the proposition that a cautionary statement in a prospectus could accompany a subsequent statement to the news media for the purposes of safe harbor with the respect to the curing of an omission. But in the instant case, the news media statements at issue are adequately alleged to directly contradict statements in the registration statement and prospectus, and this is not a situation analogous to the facts in <u>Stac</u>. **Here Bernardi allegedly committed not omissions but affirmatively false statements of present fact.**

<u>Id.</u> (emphasis added) Moreover, the press releases at issue in this case simply do not refer to any of the SEC filings relied upon by Defendants and consequently any warnings in such filings cannot possibly provide the Defendants with protection. <u>See</u>, <u>In re Musicmaker.com Securities Litigation</u>, 2001 W.L. 34062431 at *20.

Of course Defendants argued in their Motion to Dismiss that it was of "no import that said warnings appeared in the SEC filings rather than the Press Releases…." Defendants' Memorandum at 29. In support of this proposition, Defendants attempt to rely upon <u>Raab v. General Physics Corp.</u>, 4 F.3d 286, 289 (4th Cir. 1993) and <u>Graff v. Prime Retail, Inc.</u>, 72 F.Supp., 721, 728-79 (D.Md. 2001). <u>Id.</u> However, in this case, unlike in <u>Raab</u>, and <u>Graff</u>, it is affirmative misrepresentations that are at issue not merely omissions. Thus it is the proposition set forth in <u>Raab</u>, and <u>Graff</u>, that is of no import. Rather the rule set forth in <u>In re Musicmaker.com</u> and <u>In re: HI/FN</u> applies. In fact, in <u>In re Musicmaker.com</u> the court found that statements made in press releases were false and misleading and actionable despite the fact that the statements had been contradicted by defendant in a contemporaneously filed registration statement. The court found that contradictory statements in the registration statements were sufficiently detailed factual pleadings of the "circumstances surrounding

EXHIBIT 1                    8

fraud" and "facts giving rise to a strong inference that the Defendant acted with the required state of mind…" in making the misrepresentations in the press releases.  Id. at *19.

Third, the warnings contained in the various press releases in which the misrepresentations concerning integration are contained are clearly insufficient to provide Defendants with protection.  Id.  Defendants concede that the cautionary language contained in these press releases only warned of the risk of the "timing and integration of **future** acquisitions."  Defendants' Reply at 4-5 (emphasis added.)  The press releases simply do not warn that, contrary to the Defendants' representations and specifically the representations of Larkin, integration of the then-existing companies was not being achieved.

### VI.    Plaintiff Has Adequately Alleged Scienter and Has Stated Claims Against Defendants Based on Control Person Liability

Defendants state that "it is important to remember the Defendants in this case are two individuals, Larkin and Azarela, not RailWorks.  In its opposition memorandum, Plaintiff points to no facts that relate specifically to Larkin or Azarela to suggest that they engaged in conscious or reckless misbehavior or that they had motive and opportunity."  Defendants' Reply at 16-17.  Certainly, Plaintiff had alleged facts that demonstrate reckless misbehavior on the part of the Defendants.[3]    In fact, Defendant Larkin actually made the false representations in the press releases concerning the Company's successful integration.  Moreover, for purposes of proving scienter it is permissible to infer that top executives of a company will have knowledge of matters which are critical to its business.  See, In re Musicmaker.com, 2001 W.L. 340062431 at *22.  Clearly the Defendants who were the top ranking officers and directors of the Company would have knowledge of matters critical to RailWorks' business, including whether integration was being achieved and whether the

---

[3]    As set forth in Plaintiff's Response Brief Plaintiff has also sufficiently alleged motive and opportunity.

EXHIBIT 1                                    9

Company was contemplating bankruptcy. Indeed, as finally acknowledged in the Bankruptcy proceeding, it was the Company's inability to achieve integration, or perhaps even attempt it, that led to its bankruptcy.

Moreover, Plaintiffs have alleged claims against the Defendants for control person liability. Section 20(a) of the Securities Exchange Act of 1934 provides for derivative liability of person(s) who "control" those who are primarily liable under the Exchange Act.[4] Dellastatious v. Williams, 242 F.3rd 191, 194 (4th Cir. 2001). Control persons may escape liability only by demonstrating that they acted in good faith with regard to the securities violation. Id. To demonstrate that the good-faith affirmative defense has been satisfied under Section 20(a), Defendants must show that they did not act recklessly. Id.

> Thus, Section 20(a) clearly assigns secondary liability upon demonstration of a primary violation by the controlled person and of direct or indirect control by the controlling person, subject only to a "proviso" in the nature of an affirmative defense that the controlling person acted in good faith. It does not prescribe culpability as a prima facie element of secondary liability; rather, it provides for an exception to liability where there is *no culpability* on the part of the Defendant. This clear language compels the construction that Section 20(a) does not require a plaintiff to demonstrate culpable participation and instead provides an affirmative defense of good faith.

In re Microstrategy Securities Litigation, 115 F.Supp. 2d 620, 659 (E.D. Va. 2000).

Allegations that the Individual Defendants held the highest offices in the corporation, spoke frequently on its behalf and made key decisions concerning how to present its financial results are sufficient to survive a Defendants' contention that the complaint lacks specificity for control person liability. In re Adaptive Broadbands Securities Litigation, 2002 W.L.

---

[4]  Section 20(a) provides in pertinent part:

> Every person, who directly or indirectly, controls any person liable under any provision of this chapter or rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. §78 t(a)

EXHIBIT 1                                    10

989478 at *19 (N.D. Cal. April 2, 2002).  In any event, Plaintiff has alleged culpable participation by the Defendants, especially Larkin.  In the Amended Complaint, Plaintiff states control person liability claims against the Defendants by demonstrating primary violations on the part of RailWorks and the individuals' status as control persons of RailWorks.  See, Id.  Control person liability can be established by sufficiently alleging that a Defendant has control over a company that has been sufficiently alleged to have committed securities fraud.  See, In re Musicmaker.com Securities litigation, 2001 W.L. 340062431 at *26.

Moreover, the fact that the Defendant Railworks was in bankruptcy is immaterial. The Plaintiff need not proceed against the primary violator as a Defendant.  In re J. W. P. Inc. Securities Litigation, 928 F.Supp. 1239, 1267 (S.D. N.Y. 1996); see, In re City Sources Inc. Securities Litigation, 694 F.Supp. 1069, 1072 and 1077 (S.D. N.Y. 1988) (holding that Plaintiff need not name alleged primary violators as Defendants but describing detailed allegations as to their wrongdoing contained in complaint.)  The liability of the primary violators are simply an element of proof for a Section 20(a) claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong.  In re City Sources Inc. Securities Litigation, 694 F.Supp. 1069, 1077 (S.D. N.Y. 1988).

## VII.    CONCLUSION

For the reasons set forth above and in Plaintiff's Response Brief, Defendants' Motion to Dismiss should be denied.  Although this action was filed in September 2001, the action was stayed from October 29, 2001, until November 22, 2002.  The Defendants' suggestion that the Plaintiffs have somehow been dilatory in raising the additional facts in Plaintiff's Response, Plaintiff's Memorandum at 11 n.6, is without merit.  Accordingly, if the Court

EXHIBIT 1                          11

grants Defendants' Motion the Court should permit Plaintiff leave to amend to allege the additional facts included in Plaintiff's Response Brief as well as any additional facts which may be uncovered through additional investigation.

**NEUBERGER, QUINN, GIELEN**
**RUBIN & GIBBER, P.A.**


_____/s/_____
PRICE O. GIELEN
Trial Bar No. 00577
One South Street 27th Floor
Baltimore, MD 21202
Tel:  (410) 332-8584
Fax: (410) 332-8561
**Local Attorneys for Plaintiffs**

**-and-**

**FEDERMAN & SHERWOOD**
William B. Federman
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Tel: (405) 235-1560
Fax: (405) 239-2112
**Lead Attorneys for Plaintiffs**

EXHIBIT 1                    12