IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
JON KEENEY, On Behalf of      )
Himself and All Others        )
Similarly Situated            )
                              )
        Plaintiff             )
                              )
    v.                        )   Civil Docket No. AMD 01-2670
                              )
JOHN G. LARKIN                )
and                           )
MICHAEL R. AZARELA            )
                              )
        Defendants            )
                              )
```

Baltimore, Maryland
June 18, 2003
3:00 p.m.

The above-entitled matter came on for a hearing before
The Honorable Andre M. Davis

A P P E A R A N C E S

On Behalf of the Plaintiff:
William B. Federman, Esquire
Price O. Gielen, Esquire

On Behalf of the Defendants:
Stewart D. Aaron, Esquire
Joshua Colangelo-Bryan, Esquire
Andrew Jay Graham, Esquire

---

1        PROCEEDING OF JUNE 18, 2003
2        THE COURT:  Good afternoon.
3        COUNSEL:  Good afternoon, Your Honor.
4        THE COURT:  We are here in Keeney v. Larkin, Case
5   Number AMD 01-2670.
6        You may state your appearances, counsel.
7        MR. GIELEN:  Good afternoon, Your Honor.  Price Gielen
8   for the plaintiff.  If I may introduce Mr. Federman, he will be
9   arguing the motion today.  I have put in a motion for admission
10  pro hac vice today.  The court clerk has a copy, and this is
11  the original for the court.
12       THE COURT:  You can give the original to the clerk,
13  Mr. Gielen.  Thank you.
14       Good afternoon, Mr. Federman.
15       MR. FEDERMAN:  Good afternoon, Your Honor.
16       THE COURT:  Welcome.
17       MR. GRAHAM:  Good afternoon, Your Honor.  Andrew
18  Graham.  I would like to introduce Stewart Aaron and Joshua
19  Colangelo.  Mr. Aaron will be handling the argument.  They have
20  been admitted pro hac vice.
21       THE COURT:  Thank you, Mr. Graham.
22       Good afternoon, Mr. Aaron and Mr. Colangelo-Bryan.
23       MR. AARON:  Good afternoon, Your Honor.
24       MR. COLANGELO-BRYAN:  Good afternoon, Your Honor.
25       THE COURT:  The motion is important, but so is the

---

1   check.
2        MR. GIELEN:  We have the check.
3        THE COURT:  Okay.  I won't sign it.  I will let the
4   clerk process it in the ordinary course.
5        I thought it might be useful, counsel, just to have
6   some brief argument on the case.  Of course, the case has been
7   dormant for some period while the bankruptcy was proceeding.
8        I will hear from defendant, although I must say I
9   think, frankly, the plaintiff really has the laboring oar here.
10  But I will give the defendant a chance to summarize your
11  position, and then I will hear from Mr. Federman.
12       MR. AARON:  Thank you, Your Honor.
13       THE COURT:  You are free to use the lectern or the
14  table, or you can remain at counsel table, whatever is most
15  comfortable.
16       MR. AARON:  If it is acceptable to Your Honor, I will
17  stay right here.
18       THE COURT:  That's fine.
19       MR. AARON:  As Your Honor is aware, this case is
20  brought under Section 10b of the Securities Exchange Act of
21  1934 and Rule 10b-5 promulgated thereunder, which is a
22  disclosure statute.  Because it is a disclosure statute, its
23  purpose is to, you know, make sure that investors get all
24  material information about a company and its business in order
25  to make investing decisions.  And, thus, the Fourth Circuit has

---

1   taught, as have other courts in the country, that mismanagement
2   in and of itself is not actionable nor is incompetence
3   actionable.  What matters is whether full and fair disclosure
4   has been made.  And it is our position, Your Honor, on behalf
5   of defendants Azarela and Larkin, that that has occurred in
6   this case.
7        I just want to focus briefly on -- I think one of the
8   allegations in the complaint that is kind of at the center of
9   things, at least as best I can tell from the opposition
10  memorandum, is on page 5 of the opposition memorandum,
11  referring to an October 1999 RailWorks press release.  In that
12  press release, Your Honor, the -- to refer you specifically to
13  where it is, it is Exhibit G to the Graham affidavit.
14  Defendant Larkin is commenting on what had been third quarter
15  1999 performance of the company, and that happened to have been
16  a very good quarter for the company.
17       Earlier in the press release, the company reports that
18  total revenue was up 117.3 percent from the third quarter of
19  the prior year, and that net income was up 108.3 percent from
20  the prior year.  Mr. Larkin comments:
21            We are especially pleased with our third quarter
22            operating performance.
23       Honing in on the sentence that plaintiff takes issue
24  with:
25            Our dramatic year over year revenue growth is

1              being driven by the successful integration of
2              our founding and acquired companies as well as
3              by our proactive acquisition program.
4       Mr. Larkin is merely commenting, as a good CEO would,
5  about the performance of his company. What plaintiff does not
6  do about the statement, and I believe that what the plaintiff
7  says as well, successful integration, the company really was
8  not successfully integrated.
9       But under Rule 9b and the Private Securities
10 Litigation Reform Act, it obviously is not enough merely to
11 identify a statement, but one of the critical things that one
12 must do is to explain why it is that the statement is
13 fraudulent. And that's where we believe the plaintiff falls
14 down on two counts. One, looking at the total mix of
15 information, both in this press release and in earlier public
16 filings, the market is aware that RailWorks is a roll-up
17 company. It was started by 14 companies being joined together,
18 and then there were 20 more companies over the course of this
19 Class Period, actually maybe 21, for a total of 35 that were
20 acquired. The company was in a constant acquisition mode.
21      So, even assuming arguendo -- I don't believe that the
22 statement I just read for the record says this, but even
23 assuming arguendo it were to say, we believe that we are now
24 successfully integrated, in context it is a perpetual thing.
25 So, even assuming they had integrated up to that point, they

1  are not saying about the future what is going to happen. In
2  fact, a risk factor in that very press release says:
3              These statements are subject to involve ...
4  I'm not sure how good the grammar is.
5              These statements are subject to involving a
6              number of risks and uncertainties that could
7              cause actual results to differ materially.
8       THE COURT: One hopes that it actually left the
9  computer worded slightly differently than that.
10      MR. AARON: Yes. I'm reading from the Westlaw
11 printout.
12      THE COURT: Yes. That's what I am looking at as well.
13      MR. AARON: And the sentence states:
14             Factors which could affect the Company's actual
15             results include general economic conditions,
16             competitive factors, seasonality of our
17             business, timing and integration of future
18             acquisitions, ...
19      So, what RailWorks is telling the market is, look, we
20 are a roll-up company, we are in constant acquisition mode, and
21 we can't tell you, and these statements are repeated again and
22 again and again, that we are going to be able to successfully
23 integrate these companies.
24      Going back and looking at the actual words that were
25 used by Mr. Larkin, "Our dramatic year-over-year revenue

1  growth", there is nothing false about that, there is no
2  allegation that there was no revenue growth, "is being driven
3  by". You know, to put it in other words, we believe it is due
4  to successful integration.
5       It doesn't say, we guarantee we are done, it is
6  complete, and everything is hunky-dory as well as our proactive
7  acquisition program.
8       At this point in time, RailWorks was, quite frankly,
9  very successful. When the wheels came off down the road, in
10 September of 2000, what is interesting about this case from the
11 securities litigation perspective, or from other cases I have
12 seen, what one would expect to see in September of 2000 when,
13 as I said, the wheels came off, arguably, because there was a
14 large drop in the stock price and they didn't file for
15 bankruptcy until some time later, but one would expect to see a
16 press release saying, you know, integration never happened, and
17 all of that, and then you have, you know, the investors coming
18 in saying, hey, you should have told us about that.
19      THE COURT: There would be 19 cases instead of one.
20      MR. AARON: Yes, Your Honor. That's a fair point.
21      What the press release does say on September 28, 2000
22 is:
23             RailWorks also indicated that it expects
24             earnings to be adversely affected at least
25             through the end of 2000 due to a number of

1              factors. Current conditions adversely affecting
2              the demand for the company's products and
3              services include:
4  And then it lists three things.
5       THE COURT: I'm sorry. Which exhibit are you on now?
6       MR. AARON: I apologize, Your Honor. I am jumping
7  around and leaving you and my colleague aside. It's Exhibit Q
8  to the Graham affidavit. This is the document that is referred
9  to in the amended complaint as the partial truth coming out and
10 that it is what stunned the investors.
11      THE COURT: This is the close of the Class Period?
12      MR. AARON: Curiously, it is not, Your Honor, because
13 what happens is that in September of 2000, the plaintiff
14 contends that the partial truth comes out, and they are
15 stunned. And then they are stunned again in August of 2001.
16 So, this is the first stunning news that comes out.
17      THE COURT: Yes.
18      MR. AARON: What I am focusing on is what I view to be
19 the crux of this press release, and that is in the second
20 paragraph.
21      I want to tell you, marketplace, that our earnings are
22 going to be adversely affected by three things.
23             1) slower-than-expected approval of funding
24             grants from TEA 21 (the federal program designed
25             to fund the construction, extension and/or

```
 1                rehabilitation of the nation's rail transit
 2                infrastructure),
 3            2) a slowdown in spending by the New York
 4                Transit Authority ...
 5            3) a temporary reduction in the scale of
 6                maintenance and capital programs ...
 7       And then it goes on and talks about:
 8            Additionally, increased financial leverage and
 9            rising interest rates have caused the company to
10            experience significantly higher borrowing costs.
11       That is what I will refer to as the bad information,
12  the adverse information that causes the stock price to plummet.
13       Then what happens is it goes on and talks about that
14  they have completed a strategic review and intend to implement
15  a restructuring plan and:
16            ... management expects to focus on fully
17            integrating with RailWorks' existing acquired
18            companies.
19       Now, a fair reading of this press release does not
20  say, hey, we have not been integrated all along.  What it says
21  is, and we are now in September of 2000, I guess 11 months
22  after the prior statement that I read, and remember companies
23  keep on getting acquired, and what we are doing now is, because
24  we are having --
25            THE COURT:  Excuse me, Mr. Aaron.
```

```
 1       Do you recall off the top of your head how many
 2  companies were acquired between the two?
 3            MR. AARON:  The numbers that I have, Your Honor, is
 4  that RailWorks was formed through --
 5            THE COURT:  I mean between the two press releases in
 6  particular.
 7            MR. AARON:  Oh.  We probably can answer that.  We are
 8  starting --
 9            THE COURT:  It was more than just a couple; right?
10            MR. AARON:  It looks like --
11       (Pause in the proceeding.)
12            MR. FEDERMAN:  I have the numbers if you want them.
13            THE COURT:  How many?
14            MR. FEDERMAN:  In 1998, there were --
15            THE COURT:  No, no.  Just between two press releases.
16            MR. FEDERMAN:  I didn't cut it off.  I have 1999 and
17  2000.
18            MR. AARON:  My colleague, Mr. Colangelo-Bryan, is
19  advising me the number is nine.
20            THE COURT:  Nine.  Okay.  Go ahead.
21            MR. AARON:  So, what occurred here or what this press
22  release fairly says is, we are being affected on our earnings
23  by a number of factors, and here they are, and now we really
24  need to, because we are having such pressure on our earnings,
25  we need to go back and redouble our efforts, add integration
```

```
 1  and all of that.  What is the word integration?  I was thinking
 2  about this on the train ride down.  I took the Acela, and it
 3  was very nice.  I hadn't taken the Acela before.  What does
 4  integration mean?  All it means is bringing pieces together.
 5            THE COURT:  It seems to me it certainly is a process.
 6  I mean, integration is not pregnancy.  You know, it seems to me
 7  a reasonable investor has to understand that integration in
 8  this context is a process and not a point in time.
 9            MR. AARON:  Yes.  I certainly agree with that, Your
10  Honor, and you said it far better than I did.
11            I will just move on to a couple of other brief points.
12            THE COURT:  Do you think the plaintiff seriously
13  advances a claim here apart from the integration claim?
14            MR. AARON:  I don't, Your Honor.
15            THE COURT:  I am going to ask Mr. Federman, of course.
16  He is the best person to answer that question.
17            MR. AARON:  Yes.  And I am prepared to address any one
18  of the items.  Quite frankly, what might be the better order is
19  maybe Mr. Federman could address that, and then I could address
20  it in the nature of rebuttal.  But I am prepared to address
21  each one of the points.
22            THE COURT:  Okay.
23            MR. AARON:  I think scienter is really, if I were to
24  highlight the number one issue that I think is a problem for
25  the plaintiff, that would be it.  As Your Honor is aware, the
```

```
 1  PSLRA imposes more stringent requirements for scienter, and
 2  there is some current debate as to whether or not the Fourth
 3  Circuit is going to follow the Second Circuit or say something
 4  different, but I think, regardless of how it comes out,
 5  assuming that the Second Circuit is the test, I think the
 6  plaintiff fails on both counts.
 7       The first, of course, would be that they would need to
 8  show consciousness or recklessness.  In the context of this
 9  record, there is nothing that is pled with respect to
10  consciousness of Larkin or Azarela.  Sure, it is pled that they
11  filed bankruptcy, and, therefore, they must have known or they
12  should have known, and they were running the company and all
13  that, but the case law is clear that that is not enough.
14       The Phillips case talks about that there has to be
15  highly unreasonable conduct and extreme departure from the
16  standard of ordinary care.  There is nothing pled.  Those facts
17  need to be pled with specificity, and certainly there is
18  nothing pled.
19       As to motive and opportunity, quite frankly, that is
20  good for us because I was reading the Aetna case, which is a
21  case out of the Eastern District of Pennsylvania, and I was
22  speaking with my colleague down in the attorney lounge, and the
23  number that was thrown out was $129 million as what one of the
24  insiders, one of the defendants made because they sold their
25  stock before the price dropped.
```

## Page 13

1    Mr. Larkin and Mr. Azarela were not so fortunate. In
2 fact, neither one sold. One purchased, and his wife purchased,
3 which is just an incidental point.
4    There is a statement in the Humphrey case, which I
5 believe to be a correct statement of the law, that the purchase
6 shows an absence of scienter. So, the scienter point we really
7 think is, if we were to choose kind of the biggest point, -- as
8 you know, because it is the plaintiff's burden and all of that,
9 if we can defeat any single element of the 10b-5 claim, then
10 the defendant should prevail.
11    The final point I make is just on statute of
12 limitations. It is kind of an interesting point and all of
13 that, but it is my belief, and I believe that the case law
14 supports me, that Your Honor's stay order did not affect filing
15 a case against Mr. Azarela. Such a case could have been filed.
16 It would have been in the nature of a plenary action or
17 plaintiff could have made some application, and Mr. Azarela --
18 statutes and limitations are intended so people know when the
19 cloud has cleared over their head, and there was nothing to put
20 Mr. Azarela on notice within the statute of limitations that he
21 was at risk of being named in the suit. If plaintiff intended
22 to pursue claims against Mr. Azarela, it is defendants'
23 position that they should have taken some action before the
24 statute of limitations lapsed.
25    THE COURT: Okay. Thank you, Mr. Aaron.

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 14

1    Can we start there, Mr. Federman, on the limitations
2 issue as to the joined defendant.
3    MR. FEDERMAN: Yes. If I might, Your Honor, it is
4 curious that I am now being faulted for having not filed a
5 second action.
6    THE COURT: Well, you could have done a couple of
7 things. If you really thought that the stay had the effect of
8 prohibiting an amended complaint leaving out the bankrupt
9 estate, you could have -- I get phone calls from lawyers all
10 the time, as my law clerks will tell you. Why do these lawyers
11 call chambers all the time?
12    This is an example, it seems to me, where a phone call
13 would have been entirely appropriate. Judge, we have this
14 limitations problem, and you have issued this stay, and we are
15 not sure exactly what you mean by the stay.
16    So, you could have filed a separate action or you
17 could have sought leave of court to --
18    MR. FEDERMAN: We fought out with the defendants in
19 the bankruptcy court modifying the stay to pursue this case.
20 We spent a considerable amount of time with Mr. Gielen's firm
21 in --
22    THE COURT: But you never contacted the Court.
23    MR. FEDERMAN: Frankly, I didn't know the Court gave
24 advisory opinions.
25    THE COURT: It would not have been an advisory

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 15

1 opinion. It would have been, Judge, we are going to file an
2 amended complaint because we don't think, one, it violates your
3 stay order, and, two, because we don't want to roll the dice on
4 this limitations issue.
5    MR. FEDERMAN: In that case, Your Honor, I guess we
6 rolled the dice, and, from your comments, perhaps we lost on
7 it. I could just imagine the reaction had I filed a separate
8 complaint. I would have then heard the argument that I was
9 attempting to circumvent your order.
10    THE COURT: I don't think so. Look, I don't fault
11 anybody for this, but the truth of the matter is I never had to
12 stay the action against Mr. Larkin. That was literally just a
13 convenience as much as, frankly, to counsel as to the court.
14    I can tell you that I have had cases where I have
15 actually rejected requests by defendants not covered by the
16 automatic stay to issue a plenary stay. I have said on a
17 couple of occasions, no, let's go forward with the remaining
18 defendants.
19    Again, I don't blame anybody, but I don't think the
20 compelling case has been made that somehow plaintiff was
21 lulled, let alone prohibited, from pursuing plaintiff's rights
22 simply by virtue of a stay for convenience, because that is
23 really what it was.
24    MR. FEDERMAN: That's not what it said, Your Honor,
25 and we spent a considerable amount of time in the bankruptcy

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 16

1 court attempting to lift the stay and had continuous
2 objections.
3    THE COURT: But not against Larkin. You couldn't have
4 spent time in the bankruptcy court seeking to lift a stay
5 against Larkin.
6    MR. FEDERMAN: No. We did as to the company to
7 pursue, frankly, Larkin and the D and O policy, and that is
8 what was denied.
9    THE COURT: Okay. But the stay as to Larkin -- and,
10 again, I don't particularly fault you for this, I really don't.
11 It says that this -- well, you know what the order says.
12    MR. FEDERMAN: I read it continuously.
13    THE COURT: It says:
14        This Order is deemed appropriate under the
15        circumstances.
16    And it says:
17        ... thus staying this action as to that
18        defendant.
19    Meaning, of course, RailWorks.
20    And then I went on to say, as I most often do:
21        (1) That this action is STAYED AS TO ALL
22        DEFENDANTS pending the action of the United
23        States Bankruptcy Court for the District of
24        Maryland or further order of this court;
25    That is generally how my orders read in these

Sharon Cook, Official Court Reporter, U.S. District Court

1 instances.
2          I can assure you that if you had come to me by phone
3 or by letter or by formal motion, Judge, we think we need to
4 join the board, or outside counsel, or the outside accountants,
5 or whomever, I would have said, okay, well, let's get them in
6 here.
7          MR. FEDERMAN: Well, it is refreshing, Your Honor,
8 that apparently I am being accused of not being aggressive
9 enough or broad enough with my net of defendants, as opposed to
10 the converse where I am being accused of being overly broad in
11 inclusion.
12         But, Your Honor, we did what we did. We pursued
13 aggressively in bankruptcy court, we lost there, and as soon as
14 the bankruptcy was over, we came almost immediately back to
15 this court.
16         We also filed a motion recently, Your Honor, I am not
17 sure if you are aware of it, for an order permitting the filing
18 of a surreply brief.
19         THE COURT: Yes. Of course, I am aware of it. My
20 normal practice is -- you attached it, which was the
21 appropriate thing to do, so I read it, and I will decide
22 whether I will let you file it after I hear your argument.
23         MR. FEDERMAN: Okay.
24         THE COURT: There is no opposition, by the way.
25         MR. AARON: We have not seen it, Your Honor.

1          THE COURT: You have not seen it?
2          MR. AARON: I am looking over to Mr. Graham, and he --
3          MR. GRAHAM: I don't have it in my pleadings file,
4 Your Honor, and I don't recall seeing it. I don't know what
5 happened.
6          THE COURT: It was filed electronically; correct?
7          MR. GIELEN: Correct.
8          MR. FEDERMAN: Yes.
9          THE COURT: It came in through e-filing.
10         MR. GRAHAM: I don't know what happened, but I'll
11 check.
12         THE COURT: Okay.
13         MR. FEDERMAN: We had the same problem. They filed
14 their brief electronically, and neither of us got a copy.
15         MR. GIELEN: That's true. We did not get their brief.
16 I was just checking the docket and saw it.
17         THE COURT: You didn't get their reply brief?
18         MR. GIELEN: Correct. I saw it on the docket, so I
19 sent someone over to pick it up.
20         THE COURT: Well, apologies all around. We have had a
21 few glitches, but --
22         MR. FEDERMAN: We have been working well with this set
23 of counsel. The bankruptcy counsel, obviously, we had a huge
24 battle with and had absolutly no cooperation. If Your Honor
25 wants, we can submit those briefs. We tried to get the stay

1 lifted, I assure you, and we were unsuccessful. But, in this
2 case, Your Honor, the --
3          THE COURT: Look, I don't want to drag this out, but,
4 again, you didn't have to get the permission of any bankruptcy
5 judge to proceed against Mr. Larkin.
6          MR. FEDERMAN: I guess what I needed was a
7 clarification. Perhaps I should have filed a motion for the
8 Court to clarify when it said, "stayed as to all defendants",
9 that the Judge did not mean all defendants. He only meant the
10 defendant who filed bankruptcy.
11         THE COURT: No. I did stay it. I did stay it, and I
12 administratively closed the case because I assumed you wouldn't
13 want to proceed against Larkin, although you could if you
14 wanted to and if I allowed you to, you could notwithstanding
15 the bankruptcy. That is my only point.
16         MR. FEDERMAN: Okay.
17         THE COURT: That is my only point.
18         Again, it's a matter of convenience. Why go forward
19 with discovery against Larkin when you really don't know what
20 the outcome of the bankruptcy is going to be?
21         Again, as I say, this is usually what counsel prefer.
22 When a significant defendant in a piece of litigation goes into
23 bankruptcy court, most lawyers say, okay, let's stop everything
24 for ninety days or six months and see what shakes out, because
25 it is just a waste to go forward with the case. It just seems

1 to me to be the sensible thing to do. I don't even think there
2 was a request here, was there, for a stay?
3          MR. FEDERMAN: No. You did it automatically, Your
4 Honor. And very promptly, I might add.
5          THE COURT: That's my point. Wherever I see a
6 bankruptcy stay, I assess the case, and I say to myself, they
7 are not going to want to do anything with this with the
8 corporate defendant in bankruptcy, so I just went ahead and
9 issued the stay. I didn't mean for it to be a --
10         MR. FEDERMAN: We have an almost identical situation
11 in the Ameresco case in the Northern District of Texas. In
12 that case, the federal judge only reached out to the corporate
13 defendant and did not stay as to all defendants.
14         THE COURT: Right. As I say, I have done that
15 sometimes even against the wishes of counsel. So, it's a
16 case-by-case decision.
17         MR. FEDERMAN: Well, I am where I am, Your Honor.
18         THE COURT: So, in effect, what you are arguing -- we
19 are going to move on to your important point, but you are
20 arguing some sort of equitable tolling.
21         MR. FEDERMAN: Yes, Your Honor. As far as we are
22 concerned, you stayed the case as to all defendants. I could
23 not pursue it. Had I filed a second action, just naming
24 Azarela, I would be then brought up for perhaps violating the
25 intent of the court order. The bottom line for our arguments

today, Your Honor, is we did not name Azarela then, and we are now trying to bring him in.

To perhaps help simplify your job and your clerks' jobs, we think the most relevant case for this Court is the case of Arlund v. Smith, Judge Spencer's decision. To a great extent, the fortunes of the investors in RailWorks and in this case will rise and fall on Judge Spencer's decision there.

What we have here, Your Honor, is -- I know we disagree on this whole integration issue, and it is not -- maybe lengthwise it's what we will discuss a lot, but it is not the only cause of action here. On the integration issue, if I could hit it very briefly, Mr. Larkin, to use the language of Judge Spencer, gave --

THE COURT: By the way, the table is available if you are more comfortable with a table. And we also have lectern, although it seems not to be in the courtroom.

MR. FEDERMAN: This is fine, but I may have to use my glasses to see a few of these things.

THE COURT: Okay.

MR. FEDERMAN: Judge Spencer really spends a good amount of time discussing the so-called puffery, and he draws a distinction, citing to MicroStrategy, on the subsequent condition verus the present condition. Unquestionably, we believe Mr. Larkin stated that integration had been affected. It was a present condition, that they had integrated the

companies acquired to date.

Why that is important is -- we have broken the numbers down, Your Honor, and it is contained in our surreply brief.

In 1998, two companies were acquired with revenues of $5.2 million.

In 1999, there are 14 companies with $325.5 million in revenues.

In 2000, only five companies were acquired, Your Honor, at $52 million.

Unquestionably, by the end of 1999, integration or the extent of integration for RailWorks had taken place.

By the end of 1999, Your Honor, 85 percent of the revenues for the company, if you go to 2001, were from corporations already integrated.

The statements Larkin gave repeatedly was that they were experiencing the benefits from integration, the synergies, the cost savings, and the cross-marketing. None of that was true, Your Honor. We are dealing here with active misrepresentation, not omissions. That is a very important fact.

If you look at the two highlighted cases by the defendants, the Raab case and the Graff case, those cases dealt with omissions, not active misrepresentations. Mr. Larkin made present statements that they had integrated and that they were experiencing the financial benefits of that integration. It

simply was not true.

THE COURT: Well, it is not true unless integration is a process.

MR. FEDERMAN: Well, every company acquires and divests corporations. It is a process. It is a continuing process. But this company in particular was based -- its business model was based on the integration and the synergies. They acquired all of these completely unrelated companies that happened to be providing services to the rail industry. They went as far afield as the engineering company to Dura-Wood. I am talking specifically about HSQ because we highlight it extensively in our complaint, as you noticed. Dura-Wood. One company is in Oakland, California, the other company is in Louisiana. One company provided engineering technology-type services, the other one literally treated timber to build rail cars -- not the cars, but the actual rails.

Why it is important for us on this integration is that was the basis of the business plan. That is what investors were told. At the end of the day, under MicroStrategy and the Arlund decision, what this Court is going to have to decide is, is the mix of information altered by defendants' statements, or would a reasonable investor have changed his investment decision or have changed his mind had those statements not been accurate?

In other words, would a reasonable investor think it

mattered that, in fact, these synergies had not taken place? In fact, they were not experiencing cost savings. In fact, they were not able to cross-market within the subsidiary companies, as Mr. Larkin said they had already in their back pocket, that they were doing that. In fact, they were not. We have specific statements in the amended complaint to that effect, Your Honor.

As a matter of fact, the current CEO, and we quoted this in our brief, extensively said the problem with RailWorks was they never integrated. This company was not integrated. It was operating as separate subsidiaries on an entrepreneurial basis. We quote extensively that information, and it can be included in a second amended complaint if we need to.

Getting back to the HSQ and the Dura-Wood situation, we bring in those paragraphs. I think it starts in about paragraph 60. I know I have it written down here in my notes, Your Honor.

(Pause in the proceeding.)

MR. FEDERMAN: Paragraphs 59 through 62 is HSQ, and paragraphs 63 to 66 is Dura-Wood.

THE COURT: Right.

MR. FEDERMAN: This brings us to our second point. We have discussed the integration and savings, which simply was not true. It did not happen, and we allege it. On this motion, our allegations are taken as true. This is a motion to

*Page 25*

1  dismiss, not summary judgment, Your Honor, as most defense
2  counsel think it is under the PSLRA. The subsidiaries were not
3  integrated. The bankruptcy CEO noted integration had never
4  taken place. That is unquestionably the facts as we allege.
5      Now, HSQ and Dura-Wood. This is very important to our
6  allegations because this is financial mismanagement and fraud.
7  Active fraud. They like to say mismanagement. Well, Enron was
8  mismanaged, and all of these other companies. Tyco was
9  mismanaged. The list is so long we don't have to get into it.
10 They stated specifically that they had a specific dollar amount
11 of backlogs in orders. We allege that that is not true. It
12 was not true. We give the time when they allege they have this
13 back-order of $800-plus million. We allege it was not true,
14 and we tell them what the source of that is, who the person was
15 that is providing that to us in HSQ. Those are false financial
16 reports.
17     They come in and -- and when I say "they", I am
18 talking about Larkin and Azarela. We are talking about the
19 President, the CFO, the CEO, and board members. They come in
20 and change the means of accounting at HSQ.
21     THE COURT: Are we no longer talking about
22 integration?
23     MR. FEDERMAN: Yes. I am now on to the financial
24 fraud.
25     THE COURT: Okay. I thought so.

Sharon Cook, Official Court Reporter, U.S. District Court

*Page 26*

1      MR. FEDERMAN: I am finished with the integration, and
2  I am on financial fraud.
3      THE COURT: You did that so seamlessly, I just wanted
4  to make sure I was still with you.
5      MR. FEDERMAN: Thank you. I hope you are still with
6  me.
7      Our action is not just integration. We are now on to
8  the financial fraud, and that is where Azarela and Larkin are
9  again in the middle of it. We give dates and times and places.
10     They acquire HSQ, a long-standing construction
11 business. They change the historical means of accounting for
12 HSQ. Magically, HSQ now has greater revenues than it did
13 previously. And, magically, HSQ has more of a backlog than it
14 previously had on an historical and any other basis.
15     We allege that, and we tell them what the basis is,
16 and they know who the basis is. It is the former officers of
17 HSQ. We know this for a fact, and we have these documents, and
18 it is specific in our pleadings. Again, that is paragraphs 59
19 through 62.
20     They have changed the financials. Why they change it
21 is to puff up their revenue numbers. Why? Because they have
22 bonds due, they have debentures due that they need to ensure
23 the marketplace they can pay. Without that backlog, they
24 cannot demonstrate to these creditors the ability going forward
25 to make payments. They make the first payment on the

Sharon Cook, Official Court Reporter, U.S. District Court

*Page 27*

1  debentures, and then they subsequently default on the second
2  one.
3      To do all of this and give assurances to the market,
4  they have "cooked the books", for lack of a better term. We
5  give specifics on that, Your Honor, in these pleadings.
6      Now, Dura-Wood is the second situation. I am moving
7  on to Dura-Wood now and off of HSQ.
8      THE COURT: All right. That is --
9      MR. FEDERMAN: That is paragraphs 63 to 66.
10     THE COURT: Okay.
11     MR. FEDERMAN: And keep in mind, Your Honor, we have
12 developed this information with absolutely no discovery in the
13 case. This is just kind of a preview of what can be developed
14 with discovery. Okay? Under the Dura-Wood allegations, we
15 give times, places, and circumstances. And we name names. We
16 name names.
17     Again, at Dura-Wood, they have problems with their
18 financials, and they again "cook the books" and change the
19 historical means on which Dura-Wood reported its financials.
20 They do this in order to generate a backlog that previously had
21 never existed for the company, and to increase the revenues.
22 We tell what people were known to have this information. There
23 is a vice president of RailWorks who reported directly to
24 Azarela, who was the CFO and then the president of the company.
25     THE COURT: That's Dunley?

Sharon Cook, Official Court Reporter, U.S. District Court

*Page 28*

1      MR. FEDERMAN: Yes. And we give the time and the
2  place and the circumstances of this.
3      We cannot be more specific absent discovery in this
4  case, Your Honor. What we have demonstrated simply in
5  paragraphs 59 through 66 is there is a basis for this cause of
6  action.
7      Now, I have done the integration, and, in the middle,
8  I have now talked about the financial chicanery in the
9  situation where they "cooked the books". I give facts, I give
10 times, and I give circumstances. Whether I can survive a
11 motion for summary judgment at this point or not is not the
12 standard. I understand the PSLRA raised the bar. However, it
13 did not construct a roof over my head. I give the specifics of
14 the fraud, and particularly I think I have satisfied Judge
15 Spencer on this.
16     Now, my third area goes to the so-called restructuring
17 officer. Okay? This company was in trouble. This company,
18 and we cited to one case directly on point, knew they were
19 heading to a bankruptcy. Those are our allegations, and they
20 must be taken as true. They hired someone who they publicly
21 disclosed --
22     THE COURT: I'm sorry.
23     They must be taken as true as factual allegations.
24     MR. FEDERMAN: That is correct.
25     THE COURT: But to the extent you rely on the fact of

Sharon Cook, Official Court Reporter, U.S. District Court

1 the bankruptcy, --
2           MR. FEDERMAN: No, no. I am not.
3           THE COURT: Okay.
4           MR. FEDERMAN: I am not relying on the fact of the
5  bankruptcy. What I am relying on is the fact that they
6  retained a person who -- and, again, this is discussed further
7  in our surreply brief.
8           I cannot apologize enough. I wanted to have it to you
9  earlier, but apparently we have had a problem on both sides
10 receiving things electronically.
11          They hire someone who they publicly announce is coming
12 in as a consultant to help restructure the company. Now, to
13 cynical attorneys, such as plaintiff's counsel, that is a
14 euphemism, that they are restructuring the company. Okay? But
15 we are talking about, under the standards in MicroStrategy,
16 what a reasonable investor knows. We are not talking about an
17 MBA or cynical attorneys.
18          They bring in a restructuring expert. He's charged
19 specifically with being a liaison with the bankruptcy attorneys
20 and the creditors' committee and to make decisions relative to
21 bankruptcy. That is what we now know.
22          Now, if that was put in the public statement, it would
23 have a completely different representation, and I think a
24 fuller and more complete representation, to the reasonable,
25 average investor than simply, we have had a series of

        Sharon Cook, Official Court Reporter, U.S. District Court

1  restructurings, we need to continue these restructurings, and
2  we hope in the future that these will be successful, as opposed
3  to over here, Your Honor, with, we have hired this person who
4  specializes in prepackaged bankruptcies, and this person is
5  going to be charged with being --
6           THE COURT: See, I just have the strong sense that you
7  are looking through your rear-view mirror in making this
8  argument.
9           MR. FEDERMAN: No, because this person was hired, Your
10 Honor, in June of 2001. They don't announce that a
11 restructuring expert is hired until August. He is hired in
12 June to work with bankruptcy counsel and the creditors'
13 committee and to examine the bankruptcy potential. We have
14 cited to you one case on point that the failure to advise of
15 the impending bankruptcy is in and of itself an omission of a
16 material fact.
17          He is hired in June. They disclosed the fact of his
18 hiring in August. The bankruptcy doesn't come until I believe
19 October. This is a series of events, and I understand that. I
20 understand you may be cynical a little bit about, now, wait a
21 minute, Mr. Federman, we know the company failed and went into
22 bankruptcy. That is very astute, even for someone who
23 practices in Texas. But what we don't know, and what I have
24 not been able to fully develop at this point, is that the
25 severity of the problem must have been known in June when they

        Sharon Cook, Official Court Reporter, U.S. District Court

1  hired someone who is specifically charged with dealing with
2  bankruptcy counsel, creditors' committee, and decisions
3  relative to bankruptcy.
4           THE COURT: And my problem is, frankly, before 1995,
5  you would have had a fairly easy way to get at that. But
6  Congress has made a judgment that it was too easy. Too easy.
7           MR. FEDERMAN: Exactly.
8           THE COURT: If we were here ten years ago, you are not
9  here arguing a motion. You are out conducting discovery.
10          MR. FEDERMAN: Right. I understand that. And
11 instead, you know, we have the Enrons of the world and the
12 Amerescos of the world and everything else that has now fallen
13 on the investors' shoulders.
14          What I have done in my pleading, though, is I have
15 shown you, frankly, what I believe is an incredible amount of
16 information. It is not enough to -- I'll admit right now, Your
17 Honor, it is not enough to get by a motion for summary
18 judgment, but that is not what I am facing.
19          THE COURT: You are absolutely right about that.
20          MR. FEDERMAN: His talk about the different Class
21 Periods is really Class Period talk. He is saying, well, you
22 have these different events, and one is a disclosure, but it's
23 not a full disclosure. We will handle that, Your Honor, on the
24 motion for class certification, or, frankly, in developing
25 subclasses for damages.

        Sharon Cook, Official Court Reporter, U.S. District Court

1           That is not appropriate, and whether or not these
2  investors, who invested based upon a predicate of a company
3  that had already integrated, that was having cost savings, and
4  investors who believed that they could rely on the integrity of
5  the books, -- and, by the way, yes, Your Honor, Arthur Andersen
6  was the auditor for this company -- that they could rely on the
7  integrity of the financial statements and the integrity of the
8  CFO and the president of this company that they did not "cook
9  the books" and that they did not change historical reporting
10 for subsidiaries for no reason other than to falsely report a
11 backlog of orders, generates, frankly, trust that they are
12 going to have revenues.
13          If you are saying you have contracts with certain X
14 dollars, you think it is going to convert into revenues. They
15 didn't have the backlogs, it didn't convert into revenues, and,
16 yes, Your Honor, through my spyglass, I could say, aha, you ran
17 out of money and you filed bankruptcy because you never had the
18 orders to begin with. They shouldn't have reported them.
19          They changed the financial statements of at least two
20 subsidiaries. That is what I have found already, Your Honor,
21 with absolutely no discovery. And that is because, quite
22 honestly, there are some shareholders and there are some
23 employees who are willing to take the risk of their jobs to
24 step forward and honestly say what they have reported and who
25 they reported it to. And that's what I have pled for Your

        Sharon Cook, Official Court Reporter, U.S. District Court

1 Honor. Who knew what, and when, and why it was false is all
2 stated in that amended complaint.
3     If you look at our surreply brief, you can see that we
4 have done even additional work, again all third-party
5 discovery. I know people say, boy, you guys developed a lot of
6 information without formal discovery. Well, it is an enormous
7 expense and burden to do it this way, I can assure you. It
8 takes a lot of face-to-face time traveling around the country.
9 But what we have demonstrated to this Court is there is factual
10 underpinnings to the main crust of our case, and that is they
11 falsified financial reports. The affirmative statement of the
12 present condition that they had successfully integrated was
13 false, and they knew it to be false.
14     The last part, at the very end of the Class Period, is
15 going to be, they knew they were going down the tube, they
16 hired a bankruptcy workout specialist in June, they don't
17 release that information until August, and they don't give the
18 public a fair understanding of what that person's charge was
19 when he was hired.
20     THE COURT: What is the effect on your theory of the
21 case if I disagree with you with respect to the import of the
22 integration issues? As I hear you, you seem to be resting your
23 financial mismanagement fraud theory very heavily on acceptance
24 of your integration theory.
25     MR. FEDERMAN: It does not destroy my case, if that's

1 what you are saying, because then my case gets into the actual
2 financial. It will make my case when -- defense counsel will
3 love that I'm throwing this out, but I am being honest and
4 upfront with them, as I will be throughout the case and before
5 the Court, I have an audit firm that is Arthur Andersen.
6     THE COURT: That's only the second time you have
7 mentioned that.
8     MR. FEDERMAN: Well, let me tell you. Every time I
9 think about how I am going to try to get discovery from Arthur
10 Andersen, it gives me a knot in my stomach. I have a company
11 that is in bankruptcy. The officers essentially resigned to
12 pursue other interests, one of which would be getting out of
13 town as fast as they can once the facts become known. It is
14 going to be difficult, Your Honor. What the integration theory
15 does for me is that it at least allows me to conduct discovery
16 and see what was known by whom.
17     If I only go after the false statements of the
18 financials, I don't think it is going to impact my Class
19 Periods, but it may not give me the easier avenue of discovery,
20 because the integration discovery I think avoids Arthur
21 Andersen. The financial statements will not.
22     We are going to be here, and I know these are very
23 fine lawyers here, but this courtroom will be filled with
24 Arthur Andersen defense counsel. That is what I am trying to
25 avoid. So, Your Honor, that is the reason.

1     THE COURT: Well, thankfully, we have a bigger
2 courtroom on the first floor.
3     MR. FEDERMAN: And the hotel association will
4 appreciate it.
5     THE COURT: What do you say about scienter?
6     MR. FEDERMAN: Well, obviously, I disagree with them
7 on scienter. There is no standard that the insider must be a
8 selling shareholder to allege scienter. That has never been a
9 standard. Never, ever.
10     THE COURT: I don't think that is quite what they are
11 saying, but I take your point.
12     MR. FEDERMAN: Okay. But on scienter, unquestionably
13 Larkin is the person who made all the statements. I know I am
14 going back to integration, and you're tired of hearing about it
15 because it sounds like I may be barking up a tree on that one.
16 It is what it is. Larkin made these statements. He was a
17 hands-on executive officer. Azarela was not only the CFO, but
18 he was a board member and then the president of the company.
19     In our complaint, we give dates, times, places, and
20 reports they received of the financial statements that were
21 falsified. They knew it. If that is not reckless behavior by
22 these people, reckless indifference, I don't know what is.
23 They knew it. They were the chief executive officers, the
24 largest individual shareholders in this company. They had the
25 most to gain in this company. Did they cash out timely?

1 Apparently not.
2     THE COURT: Well, you say apparently.
3     MR. FEDERMAN: I don't have discovery yet. I don't
4 know what else they received.
5     THE COURT: You know what is in the bankruptcy.
6     MR. FEDERMAN: Yes, I do know that. But they did not
7 sell stock. They did, however, receive the financial reports
8 that were false. They knew at the time they were receiving
9 this information that it was false. We give the information in
10 Dura-Wood, you know, the chain of command of how it was working
11 up the chain.
12     I think Larkin -- I will be able, I hope, to still
13 discover e-mails that Larkin and Azarela received from
14 employees. We have the e-mail addresses that I need to search.
15 I believe Azarela in particular was in the mix of this. He
16 reported to Larkin for awhile, but subsequently he was the
17 president of the company. Larkin was the president. He was in
18 meetings with HSQ managers. He knew they were changing the
19 historical financial reports of these subsidiaries. The effect
20 of the change did nothing other than to falsify the backlog and
21 to increase projected revenues, none of which was reported
22 historically. That has to be, Your Honor, reckless
23 indifference. I give the time, the place, and the
24 circumstances. I even named the name of the report they
25 received.

1      THE COURT: And you don't think that is just generally
2 accepted accounting principles, so to speak?
3      MR. FEDERMAN: No, I don't think that that is, Your
4 Honor. I don't think they are going to be able to fly in that
5 one. I could say what I would or wouldn't have done had I been
6 given Ernst and Whinney rather than Arthur Andersen. But, you
7 know, this case crumbled. They knew they had problems. They
8 did the financials redo on the statements. It is not going to
9 fly. If they want to present that through expert testimony, we
10 are going to rise to that challenge and unquestionably get over
11 that hurdle, and that will be the summary judgment issue. That
12 is not going to my motion to dismiss issue.
13      What I was required to do and what I think I did very
14 successfully, at least I hope my mom would think so, is that I
15 provided the financial statements that were falsified,
16 specifically stating the dates of the false statements and who
17 knew about it. I gave the name of the reports that were
18 falsified. They cannot tell me they don't know what reports to
19 look at to get to the bottom of it.
20      These New York counsel are very experienced in this
21 line of business. They know exactly what they need to do to
22 start punching holes in my case. I want to give them the
23 opportunity to do that, Your Honor. I think these investors
24 deserve your allowing us to have the opportunity to take the
25 discovery. If they can defeat me with their expert reports,

1 let's have another hearing on that a couple of months from now.
2      THE COURT: Mr. Federman, thank you very much. You
3 have been very forthright, and I really appreciate the
4 forthrightful way you have addressed the issues.
5      MR. FEDERMAN: Thank you.
6      THE COURT: Mr. Aaron, briefly?
7      MR. AARON: Yes. Thank you, Your Honor.
8      To begin with, I would like to put an objection on the
9 record to the surreply papers because I have not seen them.
10      THE COURT: I am going to give you a chance to file a
11 sur-surreply.
12      MR. AARON: Thank you.
13      THE COURT: So, rather than file an objection, why
14 don't you just file a supplemental memorandum.
15      MR. AARON: Thank you, Your Honor.
16      THE COURT: And you can do that in fifteen days.
17      MR. AARON: Thank you, Your Honor. I appreciate that.
18      THE COURT: I'm sorry. I don't know if it was a
19 problem here or what, but it seems like it was a problem here
20 somehow.
21      MR. AARON: Well, I won't belabor the point, but it
22 seems to me that they have the first amended complaint that's
23 before the Court, and in their opposition papers, they have
24 additional stuff they want to add, so this would be in the
25 nature of a fourth amended complaint, but we will address that

1 in due course.
2      THE COURT: Understood.
3      MR. AARON: With respect to the integration issue,
4 Your Honor, I agree that it is a process, and counsel appears
5 to be kind of moving away from that. Like a good lawyer, as I
6 would expect my very capable adversary to do, he has now
7 morphed and said, financial statement fraud. Well, come on.
8      I encourage Your Honor to read the allegations in the
9 amended complaint with respect to HSQ and Dura-Wood. HSQ and
10 Dura-Wood are two of thirty-five companies.
11      There is nothing alleged in -- you know, I take
12 counsel's point that under 12(b)(6), we assume the allegations
13 of the complaint are true, but it is interesting, because we
14 then have to overlay 9(b), because this is a fraud case,
15 particularity, and then you have to overlay the PSLRA. And the
16 PSLRA says that he has to specify the statements and provide
17 the reason or reasons why the statement is misleading.
18      Just bare bones allegations. I allege it, Your Honor
19 must adopt it. Respectfully, not if it's contradicted by the
20 documents that are directly in the case. And I am going to
21 bring one of those examples to Your Honor's attention, as we
22 did in the papers earlier.
23      But the point is, with respect to the two of the
24 thirty-five subsidiaries, yes, they are arguing accounting
25 issues. One, quite frankly, is the Louisiana sales tax issue.

1 I don't see what is material about it. I don't think he has
2 alleged materiality, as I believe he is required to do. Why
3 would the accounting for a particular item with two, even
4 assuming it is two, although I think it is only one because one
5 is the Louisiana sales tax, why would one of thirty-five
6 companies be material in the mind of a reasonable investor? As
7 a matter of law, I say it is not.
8      The restructuring officer. Again, good lawyers change
9 their theories. In the opposition memorandum, it talks
10 about --
11      THE COURT: What page are you on?
12      MR. AARON: Page 32 of the memorandum in support of
13 plaintiff's opposition of the motion to dismiss, at the very
14 top, Your Honor.
15           In addition, Mr. Moore testified that in the
16           spring of 2001, RailWorks had appointed a Chief
17           Restructuring Officer, whose duties, among other
18           things, were to advise RailWorks as to the --
19      THE COURT REPORTER: Mr. Aaron, could you --
20      MR. AARON: Do you think I could read that a little
21 faster?
22      (Laughter.)
23      MR. AARON: I will read it again, and this time I will
24 read it slowly.
25      THE COURT: Whenever Ms. Cook crosses me, which never

## Page 41

1 happens, I threaten to make her work in the Southern District.
2          (Laughter.)
3          THE COURT: And she always, always, always says,
4 whatever you need, Judge.
5          I'm kidding. Sharon is as fast as any, but she can't
6 keep up with the New York court reporters.
7          MR. AARON: I apologize.
8          At page 32, at the top, there are two sentences I
9 would like to read into the record.
10         THE COURT: Okay.
11         MR. AARON:
12              In addition, Mr. Moore testified that in the
13              spring of 2001, RailWorks had appointed a Chief
14              Restructuring Officer, whose duties, among other
15              things, were to advise RailWorks as to the
16              potential of RailWorks filing bankruptcy. This
17              was never disclosed to the investing public.
18         In the reply papers, we pointed to Exhibit jj.
19         THE COURT: Yes. I remember that now.
20         MR. AARON: The third page.
21         THE COURT: So, the issue now really becomes a timing
22 issue?
23         MR. AARON: Well, now counsel has changed it into a
24 timing issue. And, quite frankly, we are not under summary
25 judgment, so we can't put in affidavits and all of that, but

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 42

1 the fellow was not hired until the press release came out.
2 Those are the facts. But I don't want to get into, you know,
3 whether we assume what he says to be true. The only point I am
4 making, Your Honor, is now plaintiff's counsel has cleverly
5 kind of shifted from what he was saying before. In fact, it
6 was disclosed.
7          With respect to scienter, Your Honor, again, I just go
8 back to the PSLRA. I could not agree more with Your Honor's
9 comment that prior to 1995, in all likelihood, this gentleman
10 is taking discovery and bringing all the people from Arthur
11 Andersen in and all stuff like that. But what the PSLRA says
12 in 1578U4B2 is:
13              In any private action, ... the plaintiff must
14              state with particularity facts giving rise to a
15              strong inference that the defendant acted with a
16              required state of mind.
17         So, it isn't enough just to plead conclusory
18 allegations, saying the Court must accept them as true, and,
19 therefore, they must have been conscious and reckless.
20         What it really does come down to is the motive and
21 opportunity test. Under the motive and opportunity test, where
22 all that is being alleged is that these gentlemen, Azarela and
23 Larkin, benefited from this alleged fraud, that is where you
24 need to show insider trading or stock sales. That's why I
25 believe, while it is a true statement in the abstract, that it

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 43

1 is never the test that you look at what they sell. In these
2 circumstances, in the case presented before this Court, that is
3 the test, and we submit it has not been met.
4          THE COURT: Thank you very much, counsel. This has
5 really been very helpful to the Court.
6          Obviously, I am going to consider whether a third
7 amended complaint, or I guess a second amended complaint, is
8 something that is a possibility if I adhere to my preliminary
9 view, which is that the plaintiff has not satisfied its
10 pleading burden.
11         But I am going to look at the record again in light of
12 your arguments, I am going to give the defendants an
13 opportunity to file a supplemental memorandum, and the matter
14 is submitted.
15         Thank you very much.
16         COUNSEL: Thank you, Your Honor.
17         THE COURT: We are in recess.
18         (The proceeding was then concluded.)

Sharon Cook, Official Court Reporter, U.S. District Court

## Page 44

INDEX
Hearing
June 18, 2003

|  | Page Numbers |
|---|---|
| Commencement of Hearing | 2 |
| Colloquy | 2 -- 3 |
| Mr. Aaron | 3 -- 13 |
| Mr. Federman | 14 -- 38 |
| Mr. Aaron | 38 -- 43 |
| Conclusion of Hearing | 43 |

Sharon Cook, Official Court Reporter, U.S. District Court

CERTIFICATION

I, Sharon Cook, hereby certify that I was the Official Court Reporter present during the foregoing proceeding and that this verbatim transcript is true and accurate. The proceeding was taken by me in machine shorthand, and this verbatim transcript was subsequently prepared by me utilizing the XSCRIBE Computer-Aided Transcription system.

Sharon Cook
Official Court Reporter
7522 United States Courthouse
101 West Lombard Street
Baltimore, Maryland     21201

Telephone No.:  (410) 837-2343

Sharon Cook, Official Court Reporter, U.S. District Court