IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JON KEENEY, On behalf of himself   :
and all others similarly situated,   :
      Plaintiff   :
  :
      v.   :     Civil No. AMD 01-2670
  :
JOHN G. LARKIN and MICHAEL Z.   :
AZARELA,   :
      Defendants   :

...o0o...

MEMORANDUM OPINION

Alleging a veritable smorgasbord of affirmative misrepresentations of, and failures

to disclose, material facts, plaintiff, Jon Keeney ("Keeney"), instituted this securities fraud

class action pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §

78j(b) (and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5), and a derivative

claim under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t (a). Now

pending is defendants' motion to dismiss. The issues have been fully briefed and a hearing

has been held. For the reasons set forth herein, the motion to dismiss shall be granted without

leave further to amend the complaint.

BACKGROUND

Keeney was a shareholder of RailWorks Corporation ("Railworks"). He seeks to

represent a class of all persons who purchased or otherwise acquired shares in Railworks

between February 10, 1999, the date on which RailWorks issued a press release reporting

its financial results for fourth quarter 1998, and August 20, 2001,the date on which

RailWorks announced that its second-quarter net loss in 2001 did not satisfy requirements under a debt agreement and that it was likely to default. Keeney has joined as defendants John G. Larkin ("Larkin"), the former Chairman and Chief Executive Officer of RailWorks, and Michael R. Azarela ("Azarela"), the company's former Executive Vice President and Chief Financial Officer (collectively, "Defendants").

RailWorks' initial public offering occurred in August 1998. Its business plan consisted of acquiring more than 35 disparate railway companies (as a so-called "roll-up" concern) in order to become a nationwide provider of integrated rail system services and products. The company's services and products included the following: new construction, rehabilitation, repair and maintenance of track, signaling, communications, electrical and other track-related systems, and rails products manufacturing and supply.

Keeney proceeds on a "fraud on the market" theory. His allegations generally comprise two clusters of issues. First, he contends that Defendants violated § 10(b) by issuing and causing to be issued numerous press releases and other public statements which falsely represented that RailWorks had successfully integrated the operations of its many acquired companies, with resultant positive financial outcomes, the effect of which was to prop up the price of RailWorks securities. Second, Keeney alleges that Defendants purposefully misrepresented material facts in respect to, and failed to make full and timely disclosures of, discrete aspects of RailWorks' financial condition and financial management, including but not limited to its access to credit, the value of certain assets, its potential for

bankruptcy, and the maintenance of irregular accounting practices by, and the financial condition of, certain acquired companies.

On September 6, 2001, Keeney filed this action against RailWorks and Larkin. On September 20, 2001, RailWorks filed its petition in bankruptcy. On October 29, 2001, upon my receipt of the notice of the bankruptcy stay as to RailWorks, I *sua sponte* issued an Order staying and administratively closing this action as to both RailWorks and Larkin. At counsel's request, I lifted the stay on November 22, 2002, permitting the case to proceed against Larkin; RailWorks had by then obtained a discharge and had emerged from bankruptcy as a privately-held enterprise. Thereafter, on January 6, 2003, with leave of court, Keeney filed his Amended Complaint, in which he has asserted claims against Azarela for the first time.

ANALYSIS

*Limitations*

Defendant Azarela contends that all claims asserted against him are barred by the applicable statute of limitations and, specifically in support of that contention, he argues that the Amended Complaint does not relate back to the date of the original complaint. Indeed, Keeney conceded at the hearing that, unless the period of limitations was tolled as to Azarela during the period that my stay order was in effect, the claims against Azarela must be dismissed. For the reasons stated in detail on the record at the hearing, my entry of the stay as to both of the original defendants (RailWorks and Larkin) upon the bankruptcy filing by

RailWorks did not affect, and did not intend to affect, the period of limitations as to any other potential defendant, including Azarela. Of course, the Bankruptcy Code effected an automatic stay as to RailWorks. The stay (and administrative closure) of this case as to Larkin was no more than a convenience to the court and to counsel, who certainly would not have wanted to proceed under the circumstances then extant. Nothing in the order staying the case or in the circumstances surrounding the entry of the stay could have reasonably suggested otherwise. Accordingly, no theory of equitable tolling is applicable here and the claims asserted against Azarela shall be dismissed as time-barred.

*Merits*

To allege a cognizable claim under § 10(b) and Rule 10b-5, a plaintiff must allege facts showing that: (1) defendant made a false statement or omission of material fact, (2) with scienter, (3) upon which plaintiff justifiably relied (4) that proximately caused damage. *Phillips v. LCI Int., Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994)). In this case, Defendants contend that, with regard to the integration-related claims, Keeney has failed to plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b) and the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4(b). Defendants also contend that Keeney has failed to allege sufficient facts to show that, as to his integration-related claims, Defendants made false statements or omissions of material fact. Finally, as to the second cluster of claims, unrelated to

-4-

RailWorks' integration process, Defendants allege that Keeney has failed to plead facts supporting the elements of scienter or causation. I shall address these myriad issues in order.

## I.

With respect to Keeney's first set of claims, that Defendants, in several instances, falsely represented that RailWorks had successfully integrated its acquired companies, Defendants argue that Keeney fails to meet the heightened pleading requirements of § 10(b) and Rule 10b-5 and that, even if these allegations are legally sufficient, they do not constitute false statements or omissions of material fact.

Defendants first argue that Keeney fails to comply with the heightened pleading standards required of § 10(b) and Rule 10b-5 plaintiffs. A complaint stating causes of action pursuant to § 10(b) and Rule 10b-5 must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, as well as the pleading requirements of the PSLRA. *In re Humphrey Hospitality Trust, Inc., Secs. Litig.*, 219 F. Supp. 2d 675, 682 (D. Md. 2002); *Aig Global Secs. Lending Corp. v. Banc of Am. Secs. LLC*, 254 F. Supp. 2d 373, 381-82 (S.D. N.Y. 2003).

Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Under Rule 9(b), the "circumstances" required to be pled with particularity are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999); *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D.

Md. 2000); *First Guar. Mortg. Corp. v. Procopio*, 217 F. Supp. 2d 633, 637 (D. Md. 2002).

The Fourth Circuit has defined the purposes of Rule 9(b) as follows:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Id*. at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)). Failure to comply with the pleading requirements of Rule 9(b) is treated as a failure to state a claim under Rule 12(b)(6). *See Harrison*, 176 F.3d at 783 n. 5.

In enacting the PSLRA, Congress substantially strengthened the liability protections and heightened the pleading requirements in private securities fraud lawsuits. *See In re Manugistics Group, Inc., Securities Litigation*, No. CIV. S 98-1881, 1999 WL 1209509, at *1 (D. Md. August 6, 1999) ("Congress clearly intended to cut back the ease with which shareholders, through federal class action law suits, could hold corporations and their officers at legal swordpoint . . . ."). Under the PSLRA, a complaint must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required

-6-

state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint that does not meet these heightened

pleading requirements shall be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

Despite the heightened pleading standards of Rule 9(b) and the PSLRA, Keeney

correctly avers that no rule requires him to plead "detailed evidentiary matter" in order to

survive a motion to dismiss. *In re Health Management Inc. Sec. Litig.*, 970 F. Supp. 192, 208

(E.D. N.Y. 1997); *see also In re Cephalon Sec. Litig.*, 1997 WL 570918, at *2 (E.D. Pa.

Aug. 29, 1997) (The PSLRA "does not require pleading all of the evidence and proof

thereunder supporting a plaintiff's claim."). Moreover, neither Rule 9(b) nor the PSLRA

requires plaintiff to set forth facts which, because of the lack of discovery, are in the

exclusive possession of the Defendants. *See Sweeney Co. of Md. v. Engineers-Constructors,

Inc.*, 109 F.R.D. 358, 360 (E.D.Va. 1986).

Defendants argue that although Keeney asserts that RailWorks issued "materially

false and misleading" press releases, Amended Complaint ¶¶ 38, 49, he does not specifically

mention which press releases contain misstatements and, instead, alleges in a conclusory

fashion that all 18 cited press releases are "materially false and misleading." In the Amended

Complaint, Keeney quotes from a series of press releases (*see infra*) to demonstrate an

alleged pattern of falsity regarding the status of Railworks' on-going efforts to integrate the

operations of its disparate acquisitions and thereby achieve the economies of scale that were

the *sine qua non* of Railworks' very existence as a full service rail transportation enterprise.

According to Keeney's parsing of the press releases, Defendants misled shareholders into

believing that the integration process was complete when, in fact, it was not. *E.g.*, Amended Complaint, at ¶¶ 38, 49. Although Keeney does not separately accompany each press release with a statement of reasons why those particular statements are false, Keeney specifically highlights the segments of the press releases that are, allegedly, false and misleading, and he follows the collective set of press releases with a list of reasons why the comments in the press releases falsely create a perception of a successful integration. *Id.* Accordingly, the Amended Complaint makes sufficiently clear which statements are alleged to have been misleading and the reason or reasons why Keeney contends those statements were misleading. Moreover, the Amended Complaint provides the time, place, and contents of the false representations, as well as the identity of Larkin and RailWorks as the parties making the misrepresentations, and that Defendants thereby, among other things, inflated stock values. Finally, the allegations are not frivolous, and they provide Defendants with fair notice of the claims filed against them. *See Harrison*, 176 F.3d at 784. Thus, as allegations of "fraud," the averments in the Amendment Complaint pass muster under Rule 9(b) and the PSLRA.

## II.

Defendants contend that, even assuming Keeney's allegations regarding the integration issue are legally sufficient as allegations of fraudulent misrepresentations to satisfy the requirements of Rule 9(b) and the PSLRA, substantively, they nonetheless do not rise to the level of false statements or omissions of material fact sufficient to state a claim.

I agree.

The materiality standard for an alleged misrepresentation under § 10(b) "is an objective one," and the issue generally presents a question of fact involving "the significance of an omitted or misrepresented fact to a reasonable investor." *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996). The Fourth Circuit has stated that:

> [m]isstatements or omissions regarding actual past or present facts are far more likely to be actionable than statements regarding projections of future performance. Generally, the latter will be deemed actionable under § 10(b) and Rule 10b-5 only if they are supported by specific statements of fact or are worded as guarantees.

*Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (chairman's statement expressing his "comfort" with an analyst's prediction of future earnings for two fiscal years was purely a projection of future performance rather than a report of its past or present results, did not constitute a guarantee, and was not specific enough to perpetrate a fraud on the market); *Raab v. General Physics Corp.*, 4 F.3d 286, 289-90 (4th Cir. 1993) (statements in Annual Reports regarding future growth, such as "regulatory changes . . . have created a marketplace for the DOE Services Group with an expected annual growth rate of 10% to 30% over the next several years" and "the DOE Services Group is poised to carry the growth and success of 1991 well into the future," immaterial); *see also Hillson Partners*, 42 F.3d at 212 (president's statements that he "was comfortable with" an analyst's earnings estimate that the company would earn 80 cents per share in the 1992 fiscal year and $ 1.05 per share in the 1993 fiscal year, did not constitute comments as to past or present sales, and was

neither a guarantee nor specific enough to perpetuate a fraud on the market").

Keeney asserts that the following statements, issued in RailWorks' press releases and either attributed to Larkin or known by him to be false, falsely indicate that RailWorks' *then-existing* acquisitions had been successfully integrated and that RailWorks was reaping operational and financial benefits from such integration:

- "[A]ctual earnings for the first quarter of 1999 demonstrate the continued success of our aggressive acquisition program" (issued April 27, 1999), Amended Complaint, ¶ 26;

- "Our dramatic year over year revenue growth is being driven by the successful integration of our founding and acquired companies . . . ." (issued October 19, 1999), Amended Complaint ¶ 28;

- The increase in backlog "reflects the strength of our bonding program and the marketing synergies we are realizing as we continue to successfully integrate the operations of the 27 companies we have acquired to date" (issued November 30, 1999), Amended Complaint ¶ 29;

- "Our plan is to continue the development of additional niche services within the framework of our existing integrated organization and via our strategic acquisition program" (issued December 8, 1999), Amended Complaint ¶ 30;

- "Now that we have a full year of integrated operations under our belt, we look forward to continuing to build our management team, our service and product offerings and our reputation . . . " (issued February 10, 2000), Amended Complaint ¶ 31; and

- "This integration effort has enabled us to execute against our high quality backlog and realize integration savings" (issued July 19, 2000), Amended Complaint ¶ 36.

Defendants assert that these statements, all addressing or alluding to RailWorks'

-10-

integration efforts, are immaterial as a matter of law because they are "soft," constitute

"puffing," and are non-actionable "forward-looking" statements within the meaning of

settled securities fraud jurisprudence. Defendants also assert that these statements do not

constitute false or misleading statements of material fact because, considered singly or in the

aggregate, they are immaterial in light of the "total mix" of information available to the

market regarding RailWorks' ongoing integration efforts and its evolving financial

condition.

### A.

In *Humphrey Hospitality*, Judge Nickerson observed that:

> The Fourth Circuit, both before and after the enactment of the
> PSLRA, has made clear that "'soft,' 'puffing' statements . . .
> generally lack materiality because the market price of a share is
> not inflated by vague statements predicting growth." *Raab v.
> Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (citing
> *Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992)). *See also,
> Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999),
> *cert. denied*, 529 U.S. 1067, 146 L. Ed. 2d 482, 120 S. Ct. 1672
> (2000). . . . In addition, "projections of future performance not
> worded as guarantees are generally not actionable under the
> federal securities laws." *Raab*, 4 F.3d at 290 (citing *Krim v.
> Banctexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

219 F. Supp. 2d at 682. Furthermore, optimistic statements, such as predictions of future

revenue or earnings, are "forward-looking statements" within the meaning of the PSLRA,

15 U.S.C. § 78u-5(I)(1), and are protected by the PSLRA's safe harbor provisions. *In re

CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 661 (D. Md. 2000); *see* 15 U.S.C. § 78u-5(c).

Defendants maintain that the above statements in the press releases relating to the

success of RailWorks' integration merely express optimism and satisfaction with the "successful" integration of acquired companies. Keeney responds that the statements noted above are false statements of existing fact that the acquired companies had been successfully integrated into the company. In my view, both are correct, in part.

It is clear that statements such as "our dramatic year over year revenue growth is being driven by the successful integration of our founding and acquired companies" and "we have a full year of integrated operations under our belt" are not *forward-looking* statements predicting the future success of RailWorks' integration process. Nevertheless, it is also clear beyond reasonable argument that there are *forward-looking portions* of the press releases being relied on by Keeney, e.g., "[o]ur plan is to continue the development of additional niche services" and "we look forward to continuing to build our management team, our service and product offerings and our reputation . . . ." Arguably, however, the admittedly forward-looking segments are rooted in the fact that RailWorks has experienced a successful integration. At bottom, in my view, the sections of the press releases which feature the ostensible success of RailWorks' ongoing integration efforts are not "forward-looking," and therefore they are not, categorically, beyond the scope of cognizable misrepresentations, as Defendants suggest.

B.

Although at least some of the statements in the press releases are not "forward-looking," the question remains as to whether the statements are "material" in respect to

-12-

RailWorks' integration efforts and therefore the proper subject of a fraud claim. *See Hillson Partners*, 42 F.3d at 211. Keeney relies heavily upon *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999), in support of his contention that false statements as to the status of RailWorks' integration efforts were material.

The plaintiffs in *Aetna* argued that the defendants made false and misleading statements concerning the successful integration of two companies following their merger. One statement which the plaintiffs in *Aetna* alleged was false or misleading is as follows:

> Joe [the Company's new president] has done a great job leading the rapid and successful integration of the health business in creating a winning strategy for the health business going forward. Decisions have been made and implemented quickly, and the business is on track to meet all the objectives that were set at the time of the merger.

*Id.* at 944. The court rejected the defendants' argument that this representation was "mere puffery." The court found that, because the comments were tied to the integration issue about which the plaintiffs complained, and described these efforts as "successful" and that Aetna was "on track to meet all objectives that were set at the time of the merger," a statement concerning the current status of the integration efforts could not be characterized as one that would be so obviously unimportant to an investor that reasonable minds could not differ on the question of materiality. *Id.* at 945.

As Defendants contend, however, the facts of *Aetna* clearly distinguish that case from the present case. The *Aetna* defendants allegedly misrepresented the successful integration of *two merged companies*. In sharp contrast, RailWorks' press releases, issued over the

-13-

period of more than two years, reported on a company that eventually acquired over 35 disparate companies. Thus, given that the very business plan of RailWorks, as every investor knew or is charged with knowledge of, contemplated an ongoing series of acquisitions of disparate companies, the market surely would not reasonably believe that, during the class period, there was some finite point in time at which RailWorks could have completed all integration efforts, or even most efforts at integration of even *already-acquired* companies. Keeney's contrary contention relies on cases, such as *Aetna*, which involve statements to media that are significantly unlike the unique blend of "present fact/assumptions on which present facts are based/forward-looking expressions of optimism" that are at issue in this case. *E.g., In re Musicmaker.com Sec. Litig.,* 2001 WL 34062431, *19 (C.D. Cal. June 4, 2001) (statement during television broadcast that "we signed a big . . . deal," which "directly contradicted" statement in SEC filing, signed by declarant and filed a week earlier, sufficient to plead claim under § 10(b)).

Any doubt about the correctness of this conclusion evaporates in light of the "total mix" of information that was available to the market in respect to RailWorks' evolution into a fully integrated whole. In *Basic v. Levinson*, 485 U.S. 224 (1988), the Supreme Court stated that in the § 10(b) context, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see*

-14-

*Humphrey Hospitality*, 219 F. Supp. 2d at 684 n.6. Although Keeney insists (in attempting to distinguish *Levinson*) that as to the integration issue, he relies on *affirmative misrepresentations* rather than on alleged *omissions*, I am not persuaded that this facile distinction makes a difference under the circumstances of this case. In any event, when a plaintiff pleads fraud-on-the-market, as in this case (Amended Complaint, at ¶¶ 75-76), the relevant "reasonable investor" is the market rather than an individual investor. A statement is material if and only if the market would regard the statement as significant, and the market is more "jaundiced" in its view of rosy corporate statements than are individuals. *Phillips*, 190 F.3d at 617.

The Fourth Circuit has stated that "even lies are not actionable" when an investor "possesses information sufficient to call the [mis]representation into question." *Phillips*, 190 F.3d at 617 (quoting *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522 (7th Cir. 1985)). Thus, liability attaches under the federal securities laws "only when there is a 'substantial likelihood' that an alleged misrepresentation 'significantly altered the total mix of information' a reasonable investor (the market) possesses." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000).

In adjudicating a motion to dismiss in a securities fraud case, a court may rely on public documents which a plaintiff fails to attach to his complaint if it finds the information contained in those documents explicitly relied on, quoted by, incorporated by reference in,

or otherwise integral to the complaint, and if the plaintiff does not challenge their authenticity. *Phillips*, 190 F.3d at 618; *see Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991); *In re Trex Co., Ins. Sec. Litig.*, 212 F. Supp. 2d 596, 599 n. 1 (W.D. Va. 2002); *In re Microstrategy, Inc. Securities Litig.*, 115 F. Supp. 2d 620, 623 n. 4 (E.D. Va. 2000). This case shows the wisdom of this rule.

It is clear here that RailWorks made many public disclosures showing that its integration efforts were *ongoing* and that there were risks associated with *future* integration efforts. RailWorks acquired 14 companies between April 1999 and June 2000; it regularly disclosed the business risks created by the acquisition of, and the continuing need to integrate, these companies. Specifically, both the press releases that Keeney describes as misleading, as well as public filings during the class period, inform the market of the difficulties RailWorks would likely encounter and that would impede RailWorks' actual performance from reaching its projected performance, including the "[c]ompany's ability to complete pending acquisitions in a timely manner and arrange for future acquisitions," the "timing and integration of future acquisitions," and "general economic conditions." For example, a quarterly report filed on March 29, 1999, just after the beginning of the putative class period states:

> The Operating Companies Do Not Have a Combined Operating History; The Company May be Unsuccessful Integrating Their Decentralized Operations . . . . The Company . . . has acquired six additional operating companies, since [August 1998] . . . The operating companies were separate independent

> entities before RailWorks acquired them and to a certain extent they continue
> to operate as independent entities . . . . The integration of the operating
> companies . . . is important to the Company's operating and growth strategies
> . . . . Management may not be able to integrate the operations or the necessary
> systems and procedures . . . to manage effectively the combined enterprise .
> . . [T]here can be no assurance that the management group will be able to
> implement the Company's acquisition and operating strategies . . . Any failure
> by management to . . . integrate the operating companies . . . could have a
> material adverse effect on the Company's business, financial condition and
> results of operations.

Graham Aff., Ex. B at 24. Morever, throughout the class period, RailWorks issued other

similar, warnings with respect to integrating companies that had already been acquired. For

example, RailWorks filed a Form 10-Q quarterly report in November 1999 that stated, "[o]ur

operating companies do not have a combined operating history and we may be unsuccessful

integrating their decentralized operations . . . . We may be unable to successfully integrate

. . . acquisitions." Graham Aff., Ex. R, at 20. In February 2000, RailWorks issued its 1999

Annual Report that enumerated risk factors, including "the absence of a combined operating

history of our operating companies and difficulties in integrating their operations . . . ."

Graham Aff., Ex. S. Identical warnings also appeared in quarterly reports filed by RailWorks

in May and August 2000. Graham Aff., Ex. T at 17; Ex. U, at 29. In addition, securities

analysts' reports made reference to the risks associated with acquisitions, and such reports

are part of the "total mix" of information available to the market. *See, e.g.*, Graham Aff., Ex.

V, at 2 ("differences in timing to complete acquisitions . . . can have material impact on our

earnings estimates").

　　　　This series of statements, a mass of material indeed, sufficiently alerted the market

that RailWorks might not be able to integrate the entities that it had already acquired, and that future efforts at integration would pose challenges. Nothing in any of the press releases cited by Keeney counters this reality. Keeney argues that Defendants never issued a statement which told investors that the previously acquired companies had *not* been integrated and that investors were shocked and stunned upon issuance of the September 28, 2000, and August 20, 2001, press releases disclosing that integration had not achieved success. As reflected above, and to the contrary, however, RailWorks did notify investors that it may be unsuccessful in integrating its decentralized operations, that the operating companies were separate independent entities before RailWorks acquired them and to a certain extent they continued to operate as independent entities, that management may not be able to integrate the operations or the necessary systems and procedures to manage the combined enterprise effectively, and that failure by management to integrate the operating companies could have a material adverse effect on RailWorks' business, financial condition and results. In short, RailWorks repeatedly placed warnings in several of its press releases and public statements, and the market was aware that RailWorks may not be integrated.

Accordingly, as a matter of law, Defendants' use in press releases of terms such as "successful integration," the "framework of [an] existing integrated organization," or even a "full year of integrated operations under our belt" did not significantly alter a reasonable investor's view that RailWorks was never truly fully integrated in light of the total mix of information available. Consequently, the Defendants' motion to dismiss shall be granted as

-18-

to any claim based on RailWorks' statements relating to the integration of acquired companies.

## III.

### A.

Keeney's second cluster of claims allege misrepresentations and omissions based on a miscellany of facts. Within this second cluster, Keeney's allegation that RailWorks falsely represented that it could meet an October 2001 bond interest payment deadline fails to meet the requirements of the Rule 9(b). Keeney asserts that in May 2001 RailWorks falsely represented that it would be able to fulfill a bond interest payment that was due on October 15, 2001. Amended Complaint, at ¶56. Keeney alleges that the May disclosure was false because, on August 20, 2001, three months after the May disclosure, RailWorks announced that it would not be able to make the October bond interest payment. Keeney further alleges that to show bondholders that RailWorks would be able to pay interest when the payments were due, in December 2000 RailWorks projected $800 million in revenue for 2001. *Id.* at ¶57. Keeney alleges, however, that RailWorks did not have a backlog in orders of $800 million and did not have a reasonable basis to project contracts for $800 million in revenue for 2001. *Id.*

Although Keeney implies that the August 2001 announcement, which disclosed that RailWorks was unable to fulfill the bond interest payment due in October, was purposely delayed to maintain RailWorks' stock value, he does not allege any facts to support the

implication that these announcements were dilatory, or that Defendants knew in May 2001 that they would not be able to make the bond interest payment. Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b). *Harrison*, 176 F.3d at 784; *In re E.spire Communs., Inc., Sec. Litig.*, 127 F. Supp. 2d 734, 748 (D. Md. 2001). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). "Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* Here, Keeney does not allege any facts to demonstrate that Defendants knew they would not be able to make the October bond interest payment at the time of the May disclosure. Accordingly, these allegations are examples of "fraud by hindsight," and do not meet the pleading requirements of the Rule 9(b).

## B.

Keeney alleges that Defendants made several other false and misleading material statements and omissions unrelated to the issue of the status of RailWorks' integration efforts. Defendants counter that Keeney does not specify which statements or omissions were materially misleading or the manner in which such statements or omissions were misleading. Assuming, arguendo, that these statements or omissions constitute material misrepresentations, for the reasons stated below, I am persuaded that Keeney has not properly pled scienter as to these claims.

As defined by the Supreme Court, "scienter refers to a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12 (1976). As mentioned above, the PSLRA requires that as to any federal securities fraud action requiring proof of state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not meet these pleading requirements, the district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). Thus, Keeney must shoulder the burden in this case of alleging particularized facts "giving rise to a strong inference" of scienter.

The Fourth Circuit has "not yet determined which pleading standard best effectuates Congress's intent," as its courts have generally held that the cases before them do not meet the most lenient standard, the two-pronged Second Circuit test. *Phillips*, 190 F.3d at 621; *Humphrey Hospitality*, 219 F. Supp. at 685; *In re Visual Networks, Inc., Sec. Litig.*, 217 F. Supp. 2d 662, 666 (D. Md. 2002). *Compare Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (plaintiff may plead scienter by alleging specific facts that either (1) establish "both motive and opportunity to commit fraud" or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness") *with In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (holding "that particular facts giving rise to a strong inference of deliberate recklessness, at a minimum, is required to satisfy the heightened pleading

standard under the PSLRA"). *And see In re Comshare, Inc., Sec. Litig.*, 183 F.3d 542, 550-51 (6th Cir. 1999) (plaintiff may survive a motion to dismiss under the PSLRA by pleading facts that give rise to a strong inference of "simple" recklessness, but evidence of a motive and opportunity to commit securities fraud does not constitute scienter for purposes of § 10(b) or Rule 10b-5 liability).

As mentioned, scienter under the Second Circuit standard may be established by alleging specific facts that either (1) establish a motive to commit fraud and an opportunity to do so or (2) constitute circumstantial evidence of conscious or reckless behavior. *Phillips*, 190 F.3d at 620-21. Keeney succeeds here on neither theory.

1.

In the Fourth Circuit, "motive to commit fraud would entail 'concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged.'" *In re Visual Networks, Inc.*, 217 F. Supp. 2d at 668 (citing *In re Criimi Mae*, 94 F. Supp. 2d 652, 660 (D. Md. 2000) (quoting *Phillips*, 190 F.3d at 621)). Opportunity may be established by showing that Defendants had "the means and likely prospect of achieving [the] concrete benefits [desired] by the means alleged." *In re Criimi Mae*, 94 F. Supp. at 660 (quoting *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Indisputably, Defendants, holding positions of authority with RailWorks, had the opportunity to commit fraudulent acts. *See Phillips*, 190 F.3d at 621 (holding that defendant, as Chairman and CEO of company had opportunity to cause artificial depression in price of stock); *In re Criimi*

-22-

*Mae*, 94 F. Supp. 2d at 660 (holding that officers of company had opportunity to commit fraud given their positions of power and authority in company). Thus, at issue here is whether Keeney has pled facts sufficient to show that Defendants had a *motive* to commit fraud.

To demonstrate motive, Keeney must allege facts showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields*, 25 F.3d at 1130. Often, plaintiffs demonstrate motive by showing that defendants sold their stock in the company at suspicious times. *See In re CIENA*, 99 F. Supp. 2d at 663; *In Re E.spire*, 127 F. Supp. 2d at 742; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (complaint did not plead strong inference of scienter where some defendants did not sell stock). There is no dispute in this case that Defendants did not make any sales during the class period. Nevertheless, Keeney asserts that Defendants' false and misleading statements artificially inflated RailWorks' stock value, and thereby allowed RailWorks to acquire target companies, and that those acquisitions constituted concrete personal benefits to the Defendants.

In support of this rather strained contention, Keeney relies on the reasoning in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), to assert that a defendant's desire to consummate corporate transactions may be a sufficient motive for securities fraud. *See id*. at 93-94. In *Rothman*, the Second Circuit explained that "in some circumstances, the

artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Id*. at 93; *see In re Time Warner Inc. Sec. Litig*., 9 F.3d 259, 270 (2d Cir.1993) (sufficient allegations of motive that defendants issued misstatements in order to maintain high stock price to lessen dilutive effects of a new rights offering announcement). The appellant-plaintiffs in *Rothman* alleged that GT Interactive Software Corporation ("GT") and its officers had failed to expense royalty advances in order to artificially inflate stock price to facilitate the acquisition of four companies. *Rothman*, 220 F.3d at 94. The complaint alleged that GT made an acquisition for $ 5.4 million in cash and 700,000 shares of stock valued at $ 7.2 million. *Id*. The court reasoned that this allegation created a strong inference that GT and its officers improperly refused to expense royalty advances to artificially inflate its *stock price*, *which it used to make the purchase*. *Id*. The court stated that "[t]his conduct, in combination with the other allegations of the Complaint, reinforces the adequacy of the Complaint's [sic] allegation of scienter." *Id.*

Keeney's reliance on *Rothman* is misplaced. First, unlike the deal alleged in *Rothman*, Keeney does not allege *that RailWorks acquired any specific company in a majority-stock deal where the stock value had been inflated artificially*. Although the acquisition of W. T. Byler, Inc. (evidence of which is properly part of the record on the pending motion) did have a stock component, it is clear that, as RailWorks reported on November 5, 1999, the purchase price in that transaction consisted of over $23 million *in cash* and only (approximately) $3 million in RailWorks stock. Graham Aff., Ex. Y at 2. In *Rothman*, the

single subject acquisition was made in circumstances where the stock component of the acquisition exceeded the cash component (*i.e.,* the stock was valued at $7 million and the cash portion equaled $5.4 million). *Rothman*, 220 F.3d at 94; *cf. In re Visual Networks, Inc.*, 217 F. Supp. 2d at 669 (allegation that profits from the sale of the stock evidenced defendants' motive insufficient where stock sale was a small percentage of the total stock owned). Manifestly, Keeney fails to allege any facts demonstrating that Defendants benefitted from any majority-stock deal, sold company stock at suspicious times, made a stock-heavy acquisition creating a strong inference of motive, or took steps to secure any other substantial personal financial gain.

It is also worth noting that the *Rothman* court explicitly stated that its opinion did not stand for the proposition that simple allegations concerning an acquisition would suffice to plead scienter. Specifically, the Second Circuit reasoned as follows:

> Whether sufficient motive could be shown solely by an allegation of high stock price artificially maintained in the context one [sic] impending acquisition might well depend on the particular circumstances of the case, and, in any event, is not the issue before us.

*Id.* at 94. For these reasons, Keeney has not adequately alleged facts reflecting any concrete benefits that could be realized by the allegedly false statements and wrongful nondisclosures so as to demonstrate motive on the part of Defendants.

### 2.

Circumstantial evidence of conscious or reckless behavior is an alternative manner of pleading scienter under the Second Circuit test widely applied by courts in the Fourth

Circuit. *Phillips*, 190 F.3d at 620-21. To establish recklessness, Keeney would be required to

> prove that the defendant acted with a conscious or reckless effort to defraud.
> Recklessness requires an act "so highly unreasonable and such an extreme
> departure from the standards of ordinary care as to present a danger of
> misleading the plaintiff to the extent that the danger was either known to the
> defendant or so obvious that the defendant must have been aware of it."

*In re CIENA*, 99 F. Supp. 2d at 658 (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509,

517 (1st Cir. 1978)); *In re Visual Networks, Inc.*, 217 F. Supp. 2d at 669; *Phillips*, 190 F.3d

at 621. In *In re Criimi Mae*, Judge Chasanow stated:

> [t]here is a "significant burden on the plaintiff in stating a fraud claim based
> on recklessness," *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996),
> and a plaintiff's allegations "must be based on a substantial factual basis in
> order to create a 'strong inference' that the defendant acted with the required
> state of mind," *Phillips*, 190 F.3d at 621.

94 F. Supp. 2d at 661. Furthermore, because Keeney has failed to demonstrate that

defendants had a motive to defraud the shareholders, *supra*, he must produce an even

stronger inference of recklessness. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46,

50 (2d Cir. 1987).

Because the standard for recklessness gives little insight into precisely what actions

and behaviors constitute recklessness sufficient for § 10(b) liability, the Second Circuit

scrutinized the facts of several securities fraud cases which provided the most concrete

guidance as to the types of allegations required to meet the pre-PSLRA pleading standard.

*Novak*, 216 F.3d at 308. According to these cases, the court stated, a plaintiff's claims

typically suffice to state a claim based on recklessness when plaintiff specifically alleges (1) that defendants either knew or should have known material facts related to the corporation that were contradictory to their public statements, or (2) facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. *Id.* at 308-09. *See Rolf*, 570 F.2d at 47-48 (standard met where the plaintiff alleged that the defendant, his broker, consistently reassured the plaintiff that the investment advisor responsible for the plaintiff's portfolio "knew what he was doing" but never actually investigated the advisor's decisions to determine "whether there was a basis for the [defendant's] assertions"); *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (standard met where defendant allegedly included false statements in SEC filings despite "the obviously evasive and suspicious statements made to him" by the corporate officials upon whom he was relying for the information and despite outside counsel's recommendation that statements not be included).

As discussed below, notwithstanding allegations that Defendants (i) knowingly failed to disclose RailWorks' financial losses arising from the disposition of the assets of one of its acquired subsidiaries, W. T. Byler, Inc., (ii) knowingly failed to disclose (or culpably delayed the disclosure) that RailWorks hired a Chief Restructuring Officer to address its potential to file bankruptcy, and (iii) knowingly overstated approximately $23 million in assets of its Comstock subsidiary, Keeney either fails to allege scienter through recklessness, or, even assuming, as to the Comstock issue, that scienter is alleged, that any act supporting

-27-

a finding of scienter was a proximate cause of damage to himself or to any member of the proposed plaintiff class.

i.

Keeney first alleges that Defendants knew, but failed to disclose, RailWorks' financial losses arising from the disposition of the assets of one of its subsidiaries W. T. Byler, Inc. *See* Amended Complaint, at ¶¶ 49, 55. Keeney cites a June 26, 2001, press release which announced that RailWorks' expected financial results for the second quarter of 2001 to fall below the projected estimates. Amended Complaint, at ¶ 48. The press release noted that the sale of assets related to RailWorks' W. T. Byler subsidiary, effective June 1, 2001, would adversely affect RailWorks' earnings before interest, taxes, depreciation and amortization by approximately *$1 million* for the quarter. *Id.* The Amended Complaint further alleges that in an August 2001 press release, however, RailWorks disclosed *$14 million* in losses associated with discarding assets related to the W. T. Byler subsidiary. *Id.* at ¶ 55. Keeney, therefore, alleges that the statements made in the June 2001 press release were materially false and misleading and that RailWorks failed to accurately inform investors that it would suffer $14 million in losses associated with the W. T. Byler subsidiary.

To plead scienter sufficiently, however, Keeney must allege facts that show Defendants acted with a conscious or reckless effort to defraud shareholders, not merely that estimates of losses increased over time. For example, in *Novak*, shareholders claimed that

defendants had "knowingly and intentionally . . . overstated [AnnTaylor, Inc.'s] financial condition by accounting for inventory that they knew to be obsolete and nearly worthless at inflated values and by deliberately failing to adhere to the Company's publicly stated markdown policy." 216 F.3d at 304. The Second Circuit concluded that plaintiffs' scienter allegation was adequate, emphasizing that plaintiffs alleged also that the defendants had, after discussion, made a conscious decision not to mark down inventory specifically because of the likely effect on AnnTaylor Stores Corporation. *Id.* at 311-12. In making this decision, defendants "knowingly sanctioned procedures that violated the Company's own markdown policy, as stated in the Company's public filings . . . [and] caused those filings to be materially misleading in that the disclosed policy no longer reflected actual practice." *Id.* at 311. In contrast, the nondisclosure allegations in the instant case fail to demonstrate that Defendants took part in any such conscious decision to defraud shareholders and the allegations, accordingly, do not allege the level of recklessness as did those in *Novak*.

In addition, Keeney does not plead particularized facts showing that when the June 26, 2001, statements were made, Defendants knew or should have known that the losses would instead rise to $14 million. *Novak*, 216 F.3d at 308; *see Cosmass v. Hassett*, 886 F.2d 8, 12 (2d Cir. 1989) (pleading standard was met when the plaintiffs alleged defendants made or authorized statements that sales to China would be "an important new source of revenue" when they knew or should have known the Chinese import restriction in place at the time would severely limit such sales); *Goldman v. Belden*, 754 F.2d 1059, 1063, 1070 (2d Cir.

1985) (pleading standard was met where plaintiffs alleged defendants publicized several highly positive predictions about the marketing prospects of a computer system when they knew or should have known facts about the system and its consumers that revealed "rave uncertainties and problems concerning future sales of" the system). Accordingly, the facts pleaded in the Amended Complaint do not support a "strong inference" that Defendants acted with fraudulent intent or that their actions evince an "extreme departure" from ordinary care, in an effort to inflate RailWorks' stock value. Accordingly, scienter has not been sufficiently alleged for this claim.

ii.

Keeney also alleges that in early January 2001, RailWorks was aware that HSQ, one of its subsidiaries, was in danger of defaulting on a major contract and that such default could have an adverse impact on HSQ as well as RailWorks and its other subsidiaries. Keeney further alleges that in May or June of 2001, RailWorks appointed a Chief Restructuring Officer whose duties, among other things, were to advise RailWorks as to the potential of RailWorks filing bankruptcy. Keeney further asserts that RailWorks never disclosed this fact to the public. *Id.*

Keeney argues that Defendants' knowledge of the danger of a contract default combined with the hiring of a Chief Restructuring Officer was clearly material, and caused RailWorks' statements concerning the condition of the company to be false and misleading. Keeney cites to *Arnlund v. Smith*, 210 F. Supp. 2d 755 (E.D. Va. 2002), as instructive in this

regard. In *Arnlund*, the plaintiff brought suit against individual officers and directors of Heilig-Meyers Company pursuant to Rule 10b-5, in part, for a failure to disclose that the Board of Directors had received bankruptcy consultation, that the company needed special counsel and debt restructuring advisors, and that the company had liquidity problems. *Id.* at 762. In denying defendants' motion to dismiss on this issue, the court concluded that it "[could] not find that the possibility of bankruptcy and a liquidity crisis would be of no import to a reasonable investor." *Id.* at 765.

In *Arnlund*, management had concluded that should amendments to the company's credit facility not be made by May 25, 2000, the company would be in default and should be "positioned to file for bankruptcy." *Id.* at 758. By May 25, no agreement to amend the credit facility had been reached. Nonetheless, on May 30 the company issued an annual report, unanimously approved by defendants, representing that it was solvent and growing, and that "there were no significant factors affecting the business of the Company." *Id.* Almost three months later the company filed for bankruptcy. *Id.* at 759. In this context, the court held that information relating to the company's liquidity crisis and the possibility of bankruptcy was material and should have been disclosed. *Id.* at 765. Furthermore, the court in *Arnlund* stated that the plaintiffs did

> more than rely on a change in the Company's position to infer
> fraud; they set out in painstaking detail when Defendants were
> made aware of material information, based on the Company's
> own meeting minutes. This detail, coupled with the length of
> time that elapsed between the dissemination of the Annual
> Report and public disclosure of the Company's financial

condition, may give rise to an inference of fraud. *Compare In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000)("Mere proximity in time between optimistic or reassuring statements about a company's prospects and filing for bankruptcy protection does not give rise to a strong inference of scienter when, as here, the event that forced the company to seek bankruptcy protection did not occur until after the statements were made.")(emphasis added). Precisely what sent the Company into bankruptcy is a question of fact that is unknown to the Court at this time. Plaintiffs have adequately pled that Defendants knew the Company was headed in that direction before May 30, 2000.

*Arnlund*, 210 F. Supp. 2d at 765.

*Arnlund* might be apposite and persuasive here if RailWorks had failed to disclose its difficulties in respect to its credit lines. However, it is clear that RailWorks regularly issued warnings on its shrinking access to credit. In a quarterly report issued in November 2000, RailWorks noted that it would have violated the terms of its credit agreement in September 2000 had it not obtained two waivers from its creditors, effective through December 15, 2000. This document also stated that the company was negotiating an amendment to the credit agreement, but that there was no assurance that an agreement could be reached. *See* Graham Aff., Ex. ff, at 30. Similarly, a March 2001 public filing stated that RailWorks had successfully negotiated amendments to its credit agreement in December 2000 and February 2001 for a $15 million increase in funding. This document also revealed that RailWorks might have a limited ability to obtain additional financing that it could use as working capital. *Id.*, Ex. gg, at 21-22. In May 2001, in its quarterly report, RailWorks stated that "[d]ue to the limited remaining availability under the line of credit, the Company is

considering requesting an increase to that maximum availability under the line [of credit] in order to fund working capital and contingent purchase price requirements," and that "an increase to the revolving credit facility may need to be provided to finance the Company's working capital needs and other requirements." *Id*., Ex. hh.

Furthermore, unlike the facts of *Arnlund*, where the Board of Directors approved an annual report failing to disclose credit problems and a potential for bankruptcy, RailWorks' press release issued in August 2001 disclosed that RailWorks appointed Shaun K. Donnellan as Chief Restructuring Officer "to assist in the development of the Company's recovery plan." In addition, the press release reported that Donnellan's duties would include "improving cash management procedures, renegotiating credit facilities," and assisting the Chief Executive Officer. *Id*. In the face of these facts, Keeney's introduction of the issue of access to credit does not give rise to a strong inference that Defendants intentionally withheld information from RailWorks investors regarding RailWorks' credit difficulties and potential for bankruptcy. Accordingly, Keeney fails to allege scienter for this claim.

iii.

Next, Keeney seeks to rely on alleged material misstatements and failures to disclose related to a report analyzing RailWorks' contract claims. Amended Complaint, at ¶ 52. This so-called Claims Review Report, prepared in May 2001 and ultimately presented on July 30, 2001 to RailWorks Directors and Managers, contained an analysis related to a RailWorks subsidiary, Comstock. The report allegedly stated that, in public disclosures and statements

since 1999, RailWorks had overstated the value of Comstock assets by approximately $23 million. Moreover, Keeney alleges that Defendants were principals of Comstock and that Defendants leveraged their positions at Comstock to gain their management positions and stock ownership with RailWorks. Keeney asserts that, by overvaluing the assets of Comstock, Defendants received RailWorks stock which they would not have otherwise been entitled to had they disclosed the true value of Comstock's assets. Keeney argues that this overstatement caused RailWorks' financial statements to be materially misleading to the benefit of Defendants.

Again, however, Keeney fails to present a substantial factual basis upon which a "strong inference" might be drawn that Defendants acted with the required state of mind. *Phillips*, 190 F.3d at 621. The Claims Review Report showing an overstatement of $23 million in financial statements and public disclosures does suggest that Defendants, as principals of Comstock, knew of the overstatement at an earlier time. *But see In re Read-Rite Corp. Sec. Litig.*, No. 00-17098., --- F.3d ---, 2003 WL 21523667, at *3 (9th Cir. July 3, 2003) ("The existence of a 'reasonable inference,' however, does not satisfy the PSLRA's requirement that Plaintiffs allege particular facts that give rise to a "strong inference" of scienter on the part of Defendants.").

Even more fundamentally, however, as to the Comstock issue, Keeney fails to satisfy the element of proximate cause in respect to the *delayed disclosure of the* Claims Review Report. To prevail on a § 10(b) and a Rule 10b-5 claim, Keeney must allege and prove that

-34-

defendants made a false statement or omission of material fact that proximately caused his

damages. *Phillips*, 190 F.3d at 613. "In a suit brought pursuant to Rule 10b-5, a plaintiff

must show loss causation: that the misrepresentations and omissions caused economic

harm." *Arnlund*, 210 F. Supp. 2d at 768 (quoting *Gasner v. Board of Supervisors*, 103 F.3d

351, 360 (4th Cir. 1996)); *see also Spencer Trask Software and Info. Servs. LLC v. Rpost*

*Int'l Ltd.*, No. 02 Civ. 1276, 2003 WL 169801, at *20 (S.D. N.Y. Jan. 24, 2003) (dismissing

Rule 10b-5 claim for lack of loss causation where plaintiffs failed to link defendants' alleged

misrepresentations to the alleged decline in the value of the investment); *Banca Cremi, S.A.*

*v. Alex Brown & Sons*, 132 F.3d 1017, 1027 n. 12 (4th Cir. 1997) ("Because [defendants]

cannot show justifiable reliance, its § 10(b) action fails as a matter of law and we need not

address the district court's other grounds for granting summary judgment against the plaintiff

on this claim."). The Amended Complaint pleads no damages suffered by plaintiffs that

resulted from the delayed disclosure of the Contract Review Report on July 30, 2001.

Accordingly, even assuming that Defendants acted recklessly in respect to the Comstock

valuation issue, Keeney nevertheless fails to plead facts supporting an essential element of

such a claim because he does not plead facts suggesting that the delayed disclosure of the

allegedly false and misleading omission was a proximate cause of the drop in RailWorks'

stock price.

3.

Finally, Keeney alleges that Defendants engaged in, or had knowledge of, several

-35-

violations of Generally Accepted Accounting Principles ("GAAP") and related misconduct that may have improperly inflated the value of RailWorks' stock during the class period. Standing alone, allegations of violations of GAAP are not sufficient to satisfy the pleading requirements of the PSLRA. *Svezzese v. Duratek, Inc.*, 2002 WL 1012967, at *4 (D. Md. April 30, 2002), *aff'd*, 67 Fed.Appx. 169, 2003 WL 21357313 (4th Cir. June 12, 2003). Pleading scienter sufficiently under the PSLRA "requires more than a misapplication of accounting principles," and "allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2nd Cir. 1996). Thus, the alleged GAAP violations can only raise a strong inference of scienter if Keeney's other allegations evince circumstances suggestive of fraudulent intent.

Keeney alleges that subsequent to RailWorks' acquisition of its HSQ subsidiary, the Defendants manipulated the accounting procedures of HSQ causing the artificial inflation of HSQ's revenues and profit margin. Amended Complaint, at ¶¶ 59-61. Keeney also alleges that "RailWorks indicated that HSQ was experiencing a sales backlog when, in fact, there was no sales backlog" and that "RailWorks made unsupported adjustments to HSQ's . . . income statements thereby making the Company appear more profitable." Amended Complaint, at ¶60, 61. The PSLRA requires that to allege scienter, "the complaint, shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

mind." 15 U.S.C. § 78u-4(b)(2). Keeney does not plead any facts regarding the actual revenue and profit that RailWorks allegedly inflated. Furthermore, with regard to the sales backlog, Keeney fails to plead this allegation adequately because he does not plead who made this representation, in what manner the representation was made or when the representation was made. Simply asserting accounting manipulations, without pleading facts specifically suggesting that such manipulations where undertaken or authorized them with fraudulent intent, is insufficient to establish a finding of scienter.

In this same vein, Keeney alleges that former employees of DuraWood, another acquisition by RailWorks, "have stated" that after RailWorks' acquisition of Dura-Wood, RailWorks installed an accounting program which was incapable of calculating state sales tax and that, although Larkin was informed of same, Keeney alleges, he did nothing to correct the situation. Amended Complaint, at ¶63. Keeney makes no allegation regarding the amount of sales tax at issue. Nor does Keeney allege that Defendants *intended* to do anything improper through the installation of this accounting program. Keeney quotes a "DuraWood front office worker" to allege that Bill Dunley, a RailWorks Vice President required "[the office worker's] boss make some changes dealing with income (income not yet earned)." Amended Complaint, at ¶64. Keeney also alleges that RailWorks caused DuraWood "to purchase receivables from another company for a percentage of the actual value" and record improperly the difference in value. Amended Complaint, at ¶65. Keeney contends this violated standard accounting procedures and had the effect of falsely making DuraWood

appear more profitable than it was. *Id*. These vague allegations do not constitute facts specifying any actual values that created or resulted from such accounting violations or intent to defraud investors. When pleading scienter sufficiently under the PSLRA, "allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill*, 101 F.3d at 270. For these reasons, the Dura-Wood related allegations fail to meet the heightened pleading requirements for scienter under the PSLRA and are insufficient as a matter of law. Thus, scienter has not been alleged for these claims, assuming that this cobbling together of facts is properly viewed as a "claim."

VI.

For the reasons set forth herein, the motion to dismiss shall be granted. An order follows.

Filed: August 6, 2003                                   _____/s/_____

                                                       Andre M. Davis
                                                       United States District Judge